UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOCELYN ESTRELLA on behalf of the infant
D.R.,

                          Plaintiff,

          -against-                                          **REPORT AND
                                                             RECOMMENDATION**

COMMISSIONER OF SOCIAL                                       12 Civ. 6134 (NSR)(JCM)
SECURITY,

                          Defendant.
------------------------------------------------------------x

To the Honorable Nelson S. Román, United States District Judge:

          Plaintiff Jocelyn Estrella ("Plaintiff"), appearing *pro se*, commenced this action on behalf

of her daughter ("D.R.") pursuant to 42 U.S.C. § 405(g), challenging the decision of the

Commissioner of Social Security ("the Commissioner"), which denied D.R.'s application for

disability benefits, finding her not disabled.  Presently before this Court is the Commissioner's

motion for judgment on the pleadings to affirm the Commissioner's decision pursuant to Rule

12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)"). (Docket No. 20).  Plaintiff has not

filed a cross-motion.  For the reasons below, I respectfully recommend that the Commissioner's

motion should be denied and the case should be remanded[1] for further administrative

proceedings.

## I.  BACKGROUND

          D.R. was born on February 5, 1999. (R.[2] 42).  On November 7, 2008, Plaintiff filed a

supplemental security income ("SSI") application on D.R.'s behalf, alleging that D.R. became

---

[1] The Court recommends that the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g).

[2] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social
security benefits on D.R.'s behalf, filed in this action on January 25, 2013. (Docket No. 12).

disabled as of October 1, 2008 due to a learning disability. (R. 84, 88). The Social Security Administration ("SSA") denied the application on January 13, 2009. (R. 42). Plaintiff appealed the denial, and on July 27, 2010 Plaintiff testified before Administrative Law Judge ("ALJ") Curtis Axelson. (R. 31-41). D.R. appeared at the hearing as well, although ALJ instructed her to wait outside during the majority of the hearing because of the sensitive nature of some of D.R.'s alleged psychological conditions. (R. 33). On January 3, 2011, ALJ Axelson affirmed the denial of benefits, concluding that D.R. was not disabled. (R. 12-28). The Appeals Council denied Plaintiff's request for review on July 9, 2012. (R. 1-3).

Thereafter, Plaintiff appealed the SSA's decision by submitting her complaint in the present action to the *Pro Se* Office of this Court on August 7, 2012. (Docket No. 2). The Commissioner filed a motion for judgment on the pleadings under Rule 12(c) on February 14, 2014. (Docket No. 20). Plaintiff did not oppose the motion or cross move. The Court held a status conference on November 19, 2015, at which both Plaintiff and counsel for the Commissioner appeared.[3] At this conference, Plaintiff represented to the Court that she had not received a copy of the Commissioner's motion. The Court ordered the Commissioner to serve Plaintiff with another copy of the motion and set a briefing schedule for Plaintiff's opposition to the Commissioner's motion. On November 30, 2015, Plaintiff submitted medical and educational records for D.R. from 2011 to 2015. (Docket No. 27). To date, Plaintiff has not filed a cross motion for judgment on the pleadings or any opposition briefing to the Commissioner's motion. The Commissioner filed her reply on January 12, 2016, addressing the new evidence submitted. (Docket No. 26).

---

[3] Counsel for the Commissioner appeared by telephone with permission from the Court. (Docket No. 25).

## A. D.R.'s Educational Records and Evaluations

D.R.'s Individualized Education Program ("IEP") for 2008-2009 recommended Collaborative Team Teaching[4] with a 12:1 ratio. (R. 145, 146). The report, dated October 29, 2008, noted D.R.'s "limited cognitive linguistic ability" and "language related deficits[.]" (R. 147). Her intellectual functioning was estimated within the borderline range and she demonstrated challenges in reasoning, vocabulary, storage of information, visual perceptual organization, immediate memory, and working memory when holding and in the manipulation of large amounts of information. (R. 147). Regarding her social/emotional performance, D.R. was noted to be a behaved student who harbored feelings of insecurity and inadequacy but was able to engage in effective interactions with her peers and adults. (R. 150). She was concerned about others' perceptions of her and she felt unappreciated and unsupported. (R. 150). No medications were listed. (R. 151).

D.R.'s guidance counselor at P.S. 1, Estefania Hernandez, completed a teacher questionnaire on December 1, 2008. (R. 108-115). She reported that she had known D.R. for a year and two months, including the 2007 school year and from October to November of 2008. (R. 108). She noted that D.R. was in a 17:1 ratio classroom. (R. 108).

Regarding D.R.'s impairments in the domain of acquiring and using information, Ms. Hernandez reported serious problems in providing organized oral explanations, adequate descriptions and expressing ideas in written form. (R. 109). She also found obvious problems in comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, understanding and participating in class discussions, learning new material, recalling and applying previously

---

[4] A classroom with one special education teacher and one general education teacher.

learned material, and applying problem-solving skills in class discussions. (R. 109).  She wrote that D.R. worked independently and tried to complete tasks, but rarely participated in class discussions and requested help with math problems. (R. 109).  She also noted that D.R. wrote a lot during writing time, but that her writing was disorganized and she had difficulty retelling stories. (R. 109).

In the attending and completing tasks section of the teacher questionnaire, Ms. Hernandez stated that D.R. had obvious problems carrying out multi-step instructions and completing work accurately without careless mistakes, and only slight problems in completing class/homework assignments and working at a reasonable pace/finishing on time. (R. 110).  There was no indication of problems in any of the other categories. (R. 110).  In the narrative section of the report, Ms. Hernandez wrote that D.R. sometimes had trouble following multi-step instructions, made careless mistakes, and sometimes had trouble finishing her work on time. (R. 110).  Ms. Hernandez indicated that D.R. had no problems in interacting and relating with others, moving about and manipulating objects, or caring for herself. (R. 112-113).  In the additional comments section, Ms. Hernandez noted that D.R. was evaluated on October 2008 and her full IQ was found to be 72, after which she was recommended for a Collaborative Team Teaching classroom with a 24:2 ratio because of her learning disability classification. (R. 115).  She also stated that D.R. was now attending P.S. 39. (R. 115).

D.R.'s IEP for 2010-2011 recommended that D.R. be placed in an integrated co-teaching classroom with a 12:1 ratio. (R. 171).  Additionally, the IEP, dated March 26, 2010, documented the initiation of counseling services for D.R., including one thirty-minute individual counseling session and one thirty-minute group counseling session per week. (R. 172, 183).  Regarding her social/emotional performance, the IEP noted that D.R. was well-behaved, but lacked confidence

and harbored feelings of insecurity. (R. 176).  It had been reported that D.R. displayed

withdrawn behavior in and out of the school environment and was sometimes hesitant to make

new friends. (R. 176).  Self-doubting statements were also observed. (R. 176).  Regarding her

learning disability, D.R. continued to demonstrate delays in her receptive and expressive

language skills and demonstrated an inability to comprehend, process and execute simple and

multi-step directives that were aurally presented to her. (R. 174).  The IEP initiated regular

speech services as well. (R. 172, 183).

## B.  The Function Report

Prior to the hearing before ALJ Axelson, Plaintiff completed an SSA form indicating that

D.R. was prescribed Abilify on September 12, 2009 by Dr. Yelena Makarov, M.D. (R. 119).  She

wrote that the problem arose when D.R. began putting her toys in the refrigerator, and

subsequently Plaintiff found a knife under D.R.'s pillow, which she reported to the school

counselor. (R. 119).  Plaintiff reported that following an evaluation by the school, D.R. began

talking about wanting to kill herself. (R. 119).

Following the ALJ's decision, Plaintiff supplemented the record to include a function

report dated January 14, 2011. (R. 124-141).  In that report, Plaintiff checked a number of

functions that her daughter was not able to do. (R. 127-132).  In the narrative section of the

report, Plaintiff wrote that in a moment D.R. could be happy and when Plaintiff turned around

D.R. would be mad. (R. 132).  She also noted that D.R. hit her little sister. (R. 132).  In addition,

she indicated that D.R. took medication "to calm her" on an ongoing basis, and stated that it was

prescribed by Yelena Makarov. (R. 139).  The Appeals Council considered this evidence in

deciding to deny Plaintiff's request for review. (R. 1).

## C.  The Childhood Disability Evaluation

Dr. M. Apacible, Psychiatry, completed a Childhood Disability Evaluation in January 2009. (R. 164-69).  On the form, he indicated that D.R. had a learning disability, but that this impairment did not meet or medically equal an impairment in the Listing of Impairments ("Listed Impairment"). (R. 164).  He found that D.R. had less than marked limitations in acquiring and using information and in attending and completing tasks. (R. 166).  He noted that D.R.'s teacher questionnaire from P.S. 1 indicated obvious problems in the area of acquiring and using information, but that attempts to obtain a teacher questionnaire from D.R.'s current school were unsuccessful. (R. 166).  In attending and completing tasks, Dr. Apacible stated that Plaintiff's record showed trouble at times following multi-step instructions, careless mistakes, and trouble finishing on time. (R. 166).  Dr. Apacible concluded that Plaintiff had no limitation in interacting and relating with others, moving about and manipulating objects, caring for herself, or health and physical well-being. (R. 166-67).  Dr. Apacible made no mention of any mental health symptoms or treatment.

## D.  July 27, 2010 Hearing before ALJ Axelson

Plaintiff and D.R. both testified at the July 27, 2010 hearing before ALJ Axelson. (R. 31-41).  Plaintiff testified first, using a Spanish translator. (R. 33).  ALJ Axelson noted that he had asked Plaintiff to appear at the hearing without her daughter because one of the documents presented indicated that D.R. had thoughts of suicide, and the ALJ did not feel that D.R. should hear the discussions about that allegation. (R. 33).  Plaintiff agreed, and confirmed that D.R. was in the waiting room with her uncle. (R. 33).  Plaintiff then testified about D.R.'s learning disability, stating that she had difficulty understanding things and retaining information. (R. 35-36).  The ALJ inquired as to whether D.R. was receiving treatment for her "emotional

problems," and Plaintiff testified that D.R. was seeing Yelena Makarov.[5] (R. 36).  She said that

the emotional impairments first began the year prior, when D.R. started putting things into the

refrigerator, and that she had told someone at her school that she wanted to kill herself. (R. 36).

When asked why she did not have evidence of counseling services received at the school,

Plaintiff testified that the school was almost out for summer break when D.R. was scheduled to

begin counseling, and as a result, she received no documentation. (R. 37).  The ALJ said that he

would seek records from D.R.'s psychiatrist, and asked when she was scheduled to see Dr.

Makarov again. (R. 37).  Plaintiff testified that D.R. was scheduled to see Dr. Makarov the

previous Saturday, but that Plaintiff was unable to go, so they needed to make a new

appointment. (R. 37).

Regarding D.R.'s relationships with others, Plaintiff testified that D.R. had friends, but

that she often provoked her younger sibling. (R. 38).  She said that she ate a lot and watched

television during the day, but that she did not help with chores because she was always too tired.

(R. 39).  Following this testimony, D.R. joined Plaintiff in the hearing and told the ALJ that

school was "good" and that she would be entering fifth grade. (R. 39-40).

## II.  THE ALJ'S DECISION

The ALJ applied the three-step evaluation process for determining disability in a child in

his January 3, 2011 decision. (R. 18-28).  At the first step, the ALJ found that D.R. had not

engaged in "substantial gainful activity since November 7, 2008, the application date." (R. 21).

At the second step, the ALJ determined that D.R.'s sole severe impairment was a learning

disorder. (R. 21).  He noted that Plaintiff claimed other psychiatric conditions, but that the record

presented no medical evidence at all to substantiate those claims. (R. 21).  He recounted

---

[5] In the transcript from the hearing before ALJ Axelson, Dr. Makarov's name is spelled phonetically as Helena
Mercaudo. (R. 36).

Plaintiff's testimony that D.R. went for psychiatric treatment on an unspecified irregular basis since September 12, 2009, and that she had been evaluated by her school counselor. (R. 21). He concluded based on Plaintiff's testimony that D.R. had missed her last appointment and had not yet scheduled another, that the severity of D.R.'s psychiatric conditions was "not enough to merit consistent treatment." (R. 21). He also noted that no evidence of a medical evaluation was present in the record, and that no psychiatric records were found, even "after attempts to obtain additional records[.]" (R. 21).

Regarding Plaintiff's alleged learning disability, the ALJ noted that D.R. received special education services and her school psychoeducational evaluation showed a full IQ of at least 72, but that her mother reported problems in information retention. (R. 21). At the third step, the ALJ held that D.R. did not have an impairment that met, medically equaled, or functionally equaled the Listed Impairments found at "20 C.F.R. Part 404, Subpart P, Appendix 1." (R. 22). The ALJ considered the Listed Impairment for cognitive delays (112.05), but found that D.R.'s impairment did not meet or medically equal this Listed Impairment, which required the presence of mental retardation characterized by subaverage intellectual functioning with adaptive deficits. (R. 22). He noted that Plaintiff's intellectual functioning was estimated within the borderline range and she did not present adaptive deficits. (R. 22). Regarding whether D.R.'s impairment functionally equaled the severity of the Listed Impairment, the ALJ considered "all of the relevant evidence in the case record" and determined that D.R. had a less than marked limitation in acquiring and using information, attending and completing tasks, and no limitation in interacting and relating with others, moving about and manipulating objects, caring for herself, or in health and physical well-being. (R. 22, 24-28).

In coming to these conclusions, the ALJ held that Plaintiff's allegations regarding D.R.'s emotional impairments were not supported by the record, which contained no evidence of an affective disorder or any evidence of the allegations of self-harm ideation. (R. 23). The ALJ discussed the report of Ms. Hernandez, D.R.'s school guidance counsel, who said that D.R. had a learning disability, and recommended Collaborative Team Teaching with two teachers for every 24 students. (R. 23). Ms. Hernandez had followed D.R. for the 2007 to 2008 school year and had opined that D.R. had obvious problems acquiring and using information and some problems attending and completing tasks. (R. 23). He noted that Ms. Hernandez found that D.R. had serious problems expressing ideas in a written form and providing organized explanations, obvious problems in working carefully and carrying out multistep instructions, slight problems working at a reasonable pace and competing assignments, but generally did not have any problems paying attention. (R. 23). He pointed out that Ms. Hernandez also stated that D.R. had no problems with single-step instructions, interacting and relating with others, moving about and manipulating objects, caring for herself, medical conditions or well being. (R. 23). The ALJ gave Ms. Hernandez's opinion the greatest weight, as she was a professional counselor who observed D.R.'s progress for more than a year. (R. 23). The ALJ also adopted the opinions of Dr. M. Apacible, the state agency consulting psychiatrist who evaluated D.R.'s record and opined that D.R. had less than marked limitations in acquiring and using information and attending and completing tasks, and found no other functional limitations. (R. 23).

## III. DISCUSSION

The Commissioner argues that the ALJ's decision was legally correct and supported by substantial evidence. (Docket No. 21). More specifically, the Commissioner asserts that there is substantial evidence in the record that supports the ALJ's conclusions that D.R. did not have a

severe emotional impairment and that D.R.'s impairment or combination of impairments did not meet, medically equal or functionally equal a listing. (Docket No. 21).

Plaintiff's complaint summarily argues that ALJ Axelson's decision "was erroneous, not supported by substantial evidence in the record, and/or contrary to law." (Docket No. 2 at ¶ 9). As noted above, Plaintiff did not file a motion for judgment on the pleadings, or an opposition to the Commissioner's motion. On November 19, 2015, the Court held an in-person status conference, at which Plaintiff asserted that she had not received a copy of the Commissioner's motion. The Court ordered the Commissioner to serve another copy of her motion on Plaintiff and directed Plaintiff to respond by December 30, 2015. On November 30, 2015, in place of a motion or opposition to the Commissioner's motion, Plaintiff mailed the Court and the Commissioner copies of medical and educational records from 2011 to 2015. (Docket No. 27). The Commissioner filed a reply on January 15, 2016 in which she contends that the Court may not consider the new evidence submitted in its review of the ALJ's decision, and that the new evidence does not provide a basis for a remand. (Docket No. 26).

## A.  Legal Standards

A claimant under the age of 18 is disabled if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). "[T]he SSA has enacted a three-step sequential analysis to determine whether a child [is] eligible for SSI benefits on the basis of a disability." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (citing 20 C.F.R. § 416.924(a)). At step one, "the ALJ considers whether the child is engaged in 'substantial gainful activity.'" *Id.* (quoting 20 C.F.R. § 416.924(b)). At step two, "the ALJ

considers whether the child has a 'medically determinable impairment that is severe,' which is defined as an impairment that causes 'more than minimal functional limitations.'" *Id.* (quoting 20 C.F.R. § 416.924(c)).  At the third, and last, step, "if the ALJ finds a severe impairment, he or she must then consider whether the impairment 'medically equals' or . . . 'functionally equals' a disability listed in the regulatory 'Listing of Impairments.'" *Id.* (quoting 20 C.F.R. § 416.924(c)-(d); *id.* pt. 404, subpt. P., app. 1).

Whether a child's impairment is a functional equivalent of a Listed Impairment requires an assessment of six domains, the child's: (1) ability to acquire and use information; (2) ability to attend and complete tasks; (3) ability to interact and relate with others; (4) ability to move about and manipulate objects; (5) ability to care for oneself; and (5) health and physical well-being. *Pollard*, 377 F.3d at 190 (quoting 20 C.F.R. § 416.926a(a)-(b)).  If the child exhibits a "marked" limitation in two of these domains, or an "extreme" limitation in one of these domains, the child's disability is functionally equivalent to a Listed Impairment. 20 C.F.R. § 416.926a(a); *Pollard*, 377 F.3d at 190 (citation omitted).  A "marked" limitation in a domain means when the child's "impairment(s) interferes seriously with [his or her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  "It is the equivalent of the functioning [the SSA] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*  An "extreme" limitation in a domain means when the child's "impairment(s) interferes very seriously with [his or her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation "does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning [the SSA] would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*  In evaluating the child's

domains, the SSA "will assess the interactive and cumulative effects of all of the impairments for

which [it has] evidence, including any impairments [the child has] that are not 'severe.'" 20

C.F.R. § 416.926a(a).

## B.  Standard of Review

When reviewing an appeal from a denial of Social Security benefits, the Court's review is

"limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g).  The Court does

not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is

disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original)

(quotation marks and citations omitted).  However, where the proper legal standards have not

been applied and "might have affected the disposition of the case, [the] court cannot fulfill its

statutory and constitutional duty to review the decision of the administrative agency by simply

deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is

grounds for reversal." *Pollard*, 377 F.3d at 189 (quotation marks and citation omitted).  "Where

there are gaps in the administrative record or the ALJ has applied an improper legal standard"

remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v.

Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (internal quotation marks and citations omitted).

## C.  ALJ's Duty to Develop the Record

The ALJ has an affirmative obligation to develop the record due to the nonadversarial

nature of the administrative proceeding. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)

(citations omitted).  This duty to develop the record remains where the claimant is represented by

counsel, *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000), and is heightened where, as here, the

claimant is unrepresented at the administrative hearing, *see Rivera v. Barnhart*, 423 F. Supp. 2d 271, 277 (S.D.N.Y. 2006). As part of this obligation, the ALJ is required to make "every reasonable effort" to obtain a claimant's treating physician's medical reports. 20 C.F.R. § 416.912(d). In order to do so, the ALJ should make an initial request from the claimant's treating physician for records, plus one follow up request. 20 C.F.R. § 416.912(d)(1). "If the documents received lack any necessary information, the ALJ should recontact the treating physician." *Oliveras ex rel. Gonzalez v. Astrue*, No. 07 Civ. 2841(RMB)(JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008)[6] (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)). "The ALJ also has authority to subpoena medical evidence on behalf of the claimant." *Id.* (citing 42 U.S.C. § 405(d)). Moreover, when the disability at issue is a psychiatric impairment, the ALJ's duty to develop the record is further enhanced. *Santiago v. Comm'r of Soc. Sec.*, No. 13CV3951-LTS-SN, 2014 WL 3819304, at *15 (S.D.N.Y. July 14, 2014).

In reviewing the administrative record, there are gaps regarding D.R.'s mental health treatment, which the ALJ had a duty to develop further. Plaintiff submitted an SSA form indicating that Dr. Yelena Makarov had prescribed Abilify to D.R. on September 12, 2009. (R. 119). She explained that D.R. first displayed symptoms when she started putting her toys in the refrigerator, and then she found a knife under D.R.'s pillow, and D.R. spoke about wanting to kill herself. (R. 119). At the hearing before ALJ Axelson on July 27, 2010, Plaintiff testified that D.R. had been seeing her psychiatrist, Dr. Makarov, for treatment for her "emotional problems," which had begun the year before. (R. 26). The ALJ asked Plaintiff when D.R. was scheduled to see Dr. Makarov next, and Plaintiff testified that D.R. had missed the last appointment because

---

[6] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to *pro se* Plaintiff.

Plaintiff was unable to go, and needed to schedule her next appointment. (R. 37).  When asked why she had no documentation of counseling services that D.R. had received at school, Plaintiff explained that when D.R. was scheduled to begin counseling at the school, school was almost out for summer break, and as a result, the school didn't give her any documentation. (R. 37).  This timeline is supported by the 2010 IEP, which initiated counseling services twice a week for D.R. beginning in April 2010. (R. 172, 183).

ALJ Axelson did not consider any medical treatment records or a medical source statement from Dr. Makarov in deciding that D.R. was not disabled.  Instead, he concluded based on Plaintiff's testimony that the severity of D.R.'s psychiatric conditions was "not enough to merit consistent treatment," and that there was no medical evidence of an affective disorder or of D.R.'s alleged self-harm ideation. (R. 23).  The Commissioner alleges that the record reveals that the Commissioner and the ALJ attempted to obtain records from Montefiore Medical Group, but that such attempts were unsuccessful.  (Docket No. 21 at 6 n.5).  However, the ALJ's mere assertion that no psychiatric records were found "after attempts to obtain additional records" does not satisfy his obligation to make "every reasonable effort" to obtain a claimant's treating physician's medical reports. 20 C.F.R. § 416.912(d).  The only indication in the record of an attempt to obtain medical records from Montefiore Medical Group was in December 2008, when the facility indicated that there were no records on file for D.R. (R. 159, 163).  This was nearly two years prior to the hearing, and nearly a year prior to when Dr. Makarov first prescribed Abilify, according to Plaintiff.

The ALJ made his determinations regarding D.R.'s functional limitations based solely on the IEPs, teacher questionnaire and the report of a consulting psychiatrist who never examined D.R. in person. "The opinion of a consulting doctor who simply reviewed the medical data is not

an adequate substitute for the opinion of a physician who has been able to observe the claimant over a period of time." *Oliveras ex rel. Gonzalez*, 2008 WL 2262618, at *7.  This is even more so where, as here, the consulting doctor has no medical data to review and has only considered educational records.  The record has no documentation of any attempt to obtain records from Dr. Makarov after December 2008.  If Dr. Makarov was unresponsive to the ALJ's requests for records, which the ALJ implies in his decision but which is not documented in the record, the ALJ should have issued a subpoena seeking the medical records. *See Oliveras ex rel. Gonzalez*, 2008 WL 2262618, at *6.  The ALJ's failure to further develop the record regarding D.R.'s mental health treatment with Dr. Makarov warrants a remand.[7]

**D.  New Evidence**

In support of her appeal, Plaintiff mailed copies of treatment and educational records from 2011 to 2015 to the Court. (Docket No. 27).  The Commissioner argues that the Court may not consider this evidence, which is not a part of the administrative record, in determining whether the ALJ's decision should be affirmed, modified or reversed. (Docket No. 26). Additionally, the Commissioner contends that this additional evidence is not a valid basis for a remand of the ALJ's decision. (*Id.*).

The Court "may order the Secretary to consider additional evidence, 'but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988) (citing 42 U.S.C. § 405(g)).  This is known as a sentence six remand,

---

[7] "Although a remand request is normally made by a party, there is no reason why a court may not order the remand *sua sponte*." *Legall v. Colvin*, No. 13 CV 1426(VB), 2014 WL 4494753, at *3 n.3 (S.D.N.Y. Sept. 10, 2014) (internal quotation marks and citation omitted). Additionally, when "there is legal error requiring remand, it is unnecessary to determine whether the ALJ's decision was supported by substantial evidence" as "the ALJ's failure to develop the administrative record would frustrate such an exercise." *Armstrong v. Colvin*, No. 12 CV 8126(VB), 2013 WL 6246491, at *19 (S.D.N.Y. Dec. 3, 2013) (citation omitted).

which does not require the Court to affirm, modify, or reverse the Commissioner's decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

The Second Circuit has indicated that Plaintiff bears the burden of establishing that "the proffered evidence is (1) new and not merely cumulative of what is already in the record . . . , and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative . . . . Finally, [Plaintiff] must show (3) good cause for her failure to present the evidence earlier." *Tirado*, 842 F.2d at 597. Notably, the evidence need not be generated during the relevant time period to be relevant. *Pollard v. Halter*, 377 F.3d 183, 193-94 (2d Cir. 2004) ("Indeed, '[w]e have observed, repeatedly, that evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement [i.e., insured status] was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present . . . ."). Finally, the prong of materiality requires "a reasonable possibility that the new evidence would have influenced the Secretary to decide [Plaintiff's] application differently." *Id.*

Here, there is no question that Plaintiff had good cause for her failure to present this evidence as all of the submitted records post-date the ALJ's decision. *See Lisa v. Sec'y of Dep't of Health & Human Servs. of U.S.*, 940 F.2d 40, 44 (2d Cir. 1991) ("'Good cause' for failing to present evidence in a prior proceeding exists where, as here, the evidence surfaces after the Secretary's final decision and the claimant could not have obtained the evidence during the pendency of that proceeding."). Additionally, these records, which consist of letters from treating sources dated in 2014 and 2015, treatment records from 2011, 2014 and 2015, and D.R.'s IEPs from 2014 and 2015 are not cumulative of what the ALJ had before him, as ALJ

Axelrod considered no treatment records and could not have considered the IEPs from these later years.

The sole remaining question is whether these records are material.  There is no question that some of these records are relevant to the time period for which D.R.'s benefits were denied: Plaintiff's application date of November 7, 2008 to the date of the ALJ's decision, January 3, 2011.  The submitted treatment records and letters from Marta Wells, Mental Health Clinician, and Dr. Sarah F. Nayeem, MD, Child and Adolescent Psychiatrist, indicated that D.R. suffered from recurrent episodes of severe major depressive disorder with psychotic symptoms and generalized anxiety disorder. (Docket No. 27-1 at 1-6).  In November 2014, D.R. was taking Sertraline HCI, an antidepressant, and in August 2015, she was prescribed Escitalopram, another antidepressant. (Docket No. 27-1 at 1-5).  This lends credence to Plaintiff's allegation that D.R. was prescribed Abilify, another antidepressant, in 2009. (R. 119).  Newly submitted treatment records indicated that Plaintiff reported to Ms. Wells that D.R. had exhibited symptoms since the third grade, when she put a knife under her pillow, (Docket No. 27-1 at 12, 32), which is consistent with Plaintiff's testimony before ALJ Axelson and her assertions in the materials that she provided to the SSA. (R. 36, 119).  Additionally, Plaintiff submitted a Patient Discharge Report dated May 31, 2011 from Lincoln Medical and Mental Health Center's Emergency Department, which lists a diagnosis of oppositional defiant disorder. (Docket No. 27-2 at 11).  Although this treatment record was made four months after the ALJ's decision, it nonetheless suggests that D.R. may have suffered from similar mental health conditions during the relevant period as well.  See Santiago, 2014 WL 3819304, at *21 ("These new records disclose a continuity of impairments and may shed light on the severity of the impairments prior to the ALJ's determination.").

However, despite the relevancy of these records, the Court cannot conclude that there is a reasonable possibility that these records, on their own, would have influenced the Secretary to decide Plaintiff's application differently. These limited records do not provide substantial evidence of D.R.'s disability during the relevant period, and there is no other medical evidence in the record of D.R.'s mental health limitations, which, in the aggregate with this new evidence, could cause the ALJ to conclude that D.R. was disabled. At the most, these new records would likely cause the ALJ to assess Plaintiff's credibility differently, to more thoroughly consider whether her alleged psychological impairments were severe, and to seek medical evidence in this regard. As there is no reasonable possibility that these records, on their own, would have influenced the ALJ to decide Plaintiff's application differently, a sentence six remand is not appropriate. *See Hutchinson v. Colvin*, No. 6:14-CV-787, 2016 WL 843376, at *5 (N.D.N.Y. Mar. 1, 2016) (holding that although the new evidence would cause the ALJ to revise the RFC determination, but the ultimate disability determination would remain unchanged, and therefore remand was not appropriate).

## E.  Remand

Having determined that a sentence six remand is not appropriate in this case, but that the ALJ's failure to develop the record regarding D.R.'s mental health treatment was a legal error, the Court next considers what relief is appropriate. Sentence four of 42 U.S.C. § 405(g) states, "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Courts "have opted simply to remand for a calculation of benefits" where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision[.]" *Rosa*, 168

F.3d at 83; *see also Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980) (reversing and ordering

that benefits be paid where "the record provides persuasive proof of disability and a remand for

further evidentiary proceedings would serve no purpose.").  On the other hand, "remand for

further development of the evidence" may be appropriate "where there are gaps in the

administrative record or the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82-

83 (citations omitted).

Here, ALJ Axelson erred in failing to develop the record fully regarding D.R.'s mental

health.  Where "further findings will plainly help to assure the proper disposition of the claim"

and "it is entirely possible that a complete record would justify the SSA's current conclusion that

plaintiff was not disabled at the relevant time, remand for calculation of benefits is not

appropriate[.]" *Lugo v. Barnhart*, No. 04 Civ. 1064(JSR)(MHD), 2008 WL 515927, at *25

(S.D.N.Y. Feb. 8, 2008), *report and recommendation adopted*, No. 04 Civ. 1064 (JSR), 2008

WL 516796 (S.D.N.Y. Feb. 27, 2008).  Consequently, I recommend that the case be remanded

under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

## IV.  CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the

Commissioner's motion should be denied and the case should be remanded for further

administrative proceedings.

## V.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from receipt of this Report and

Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for

computing time).  If copies of this Report and Recommendation are served upon the parties by

mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Nelson S. Román at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Nelson S. Román and not to the undersigned. Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   August 2, 2016
         White Plains, New York

**RESPECTFULLY SUBMITTED,**

JUDITH C. McCARTHY
United States Magistrate Judge

2016 WL 843376
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jody Hutchinson, Plaintiff,

v.

Carolyn W. Colvin, Commissioner
of Social Security, Defendant.

6:14-CV-787
|
Signed 03/01/2016

**Attorneys and Law Firms**

Peter W. Antonowicz, Office of Peter W. Antonowicz,
Rome, NY, for Plaintiff.

Sixtina Fernandez, Social Security Administration, New
York, NY, for Defendant.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District
Judge

**\*1** Plaintiff Jody Hutchinson brought this suit under §
205(g) of the Social Security Act ("Act"), as amended,
42 U.S.C. § 405(g), to review a final decision
of the Commissioner of Social Security ("Commissioner")
denying his application for supplemental security income
("SSI") benefits. Plaintiff alleges that the decision of
the Administrative Law Judge ("ALJ") denying his
application for benefits is not supported by substantial
evidence and is contrary to the applicable legal standards.
Pursuant to Northern District of New York General
Order No. 8, the Court proceeds as if both parties had
accompanied their briefs with a motion for judgment on
the pleadings.

**I. PROCEDURAL HISTORY**
On November 21, 2011, Plaintiff filed an application
for SSI benefits. The claim were denied by initial
determination on May 11, 2012. Plaintiff filed a timely
request for a hearing on June 8, 2012. Administrative Law
Judge ("ALJ") James G. Myles presided over a hearing
by teleconference on April 10, 2013. The ALJ issued an

unfavorable decision on May 1, 2013, which Plaintiff
appealed. The Social Security Appeals Council denied his
appeal on June 10, 2014. This action followed.

As indicated above, Plaintiff brings this action under §
205(g) of the Social Security Act ("Act"), as amended,
42 U.S.C. § 405(g), to review the Commissioner's final
decision.

**II. FACTS**
The parties do not dispute the underlying facts of this
case as set forth by Plaintiff in his memorandum of law.
Accordingly, the Court assumes familiarity with these
facts and will set forth only those facts material to the
parties' arguments.

**III. THE COMMISSIONER'S DECISION**
The ALJ engaged in the required five-step analysis to
determine whether a claimant qualifies for disability
benefits. (See Social Security Administrative Record
("R."), dkt. # 10, at 11-25). The ALJ first determined
that Plaintiff had not engaged in substantial gainful
activity since November 21, 2011, the alleged onset
date of his application. (Id. at 13). Second, the
ALJ concluded that Plaintiff suffered from a set of
severe impairments that included: non-insulin dependent
diabetes mellitus, hypertension, oseteoarthritis of the
shoulders, diabetic neuropathy, diabetic retinopathy,
gout, Raynaud's disease, left knee pain of unclear etiology,
and depression. (Id.). These impairments, the ALJ found,
represented more than minimal limitation in Plaintiff's
ability to perform work-related activity. (Id.). The ALJ
considered Plaintiff's claim that he suffered from a
learning disability. (Id.). While the record contained no
evidence to support this claim and Plaintiff's hearing
testimony "was not suggestive of significant mental
limitations," the ALJ's assessment of Plaintiff's Residual
Functional Capacity ("RFC") accommodated this alleged
disability. (Id.).

Turning to the next step in the evaluation process, the
ALJ concluded that Plaintiff did not have an impairment
or combination of impairments that met or medically
exceeded the severity of one of the impairments listed in
the Social Security regulations. (Id. at 14). The ALJ found
that the record of Plaintiff's musculoskeletal impairments,
including major dysfunction of a joint and disorders of
the spine, did not establish an impairment "accompanied

by signs that are reflective of listing-level severity." (Id.). The record did not contain any "clinical, laboratory, or radiograph findings" to demonstrate disability under the listings. (Id.). The Plaintiff's vision problems likewise failed to reach a level of severity that met a listing. (Id.). Plaintiff's problems with hypertension and his cardiovascular system also failed to meet a listing, as did his Raynaud's disease. (Id.). Plaintiff's type-2 diabetes milletus was non-insulin dependent and did not meet the severity criteria for any listing. (Id.). The medical evidence also failed to support a finding that either Plaintiff's diabetic neuropathy or gout met a listing. (Id.). Plaintiff's mental impairments failed to meet or medically equal a listing. (Id.). He had no restriction on activities of daily living as result of his mental impairments, mild difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and had no demonstrated periods of decompensation of extended duration. (Id.). Plaintiff therefore could not meet a listing for his mental-health issues, since he did not have at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration. (Id.).

**\*2** Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in the Social Security regulations, except that he was limited to standing and walking for a total of two hours cumulatively during an eight-hour workday. (Id. at 16). He could occasionally perform overhead reaching with the dominant right upper extremity, but could not perform any overhead reaching with the non-dominant left upper extremity. (Id.). The ALJ found that Plaintiff should avoid ladders, ropes and scaffolds, as well as concentrated exposure to work hazards. (Id.). In additional, the Plaintiff should not have a job where "[e]xtensive contact with the public" was "a critical function" of his "job responsibilities." (Id.). He was "limited to routine, unskilled work." (Id.).

The ALJ summarized the medical evidence and Plaintiff's hearing testimony. (Id. at 16-19). Plaintiff's medical record demonstrated a history of treatment for shoulder pain. (Id. at 16-17). The record indicated as well that Plaintiff experienced left shoulder pain when raising his arms. (Id. at 17). At the hearing, the ALJ noted that Plaintiff had difficulty lifting his arms over his head, with more difficulty on the left side. (Id.). Because of these problems, the ALJ's RFC assessment limited the amount

of overhead reaching Plaintiff could do. (Id.). The ALJ also determined that the record established limitations due to Plaintiff's type-2 diabetes, as well as other conditions, such as peripheral neuropathy, retinopathy, gout and Raynaud's disease at least partly related to that condition. (Id.). The ALJ also found that the medical record demonstrated "a history of mental impairments and a diagnosis of depression." (Id. at 18). Plaintiff had not received any treatment for mental illness, however, since 1986. (Id.). In 2012, a consulting psychologist concluded that Plaintiff suffered from depression and recommended treatment. (Id.). She also concluded that he might struggle with "performing complex tasks independently, relating adequately to others and appropriately dealing with stress." (Id.). She found, however, that Plaintiff was capable of performing simple tasks without supervision, could "maintain attention and concentration, cognitively learn new tasks, and make appropriate decisions." (Id.).

While the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms, Plaintiff's claims about the intensity, persistence, and limiting affects of those impairments were not entirely credible. (Id.). At the hearing, the Plaintiff did not appear to be in any distress, and he was "responsive and articulate" in answering questions. (Id.). His description of his symptoms and limitations, however, was "vague." (Id.). Activities in which Plaintiff admitted he had engaged undermined his claims about his limitations. (Id.). Plaintiff testified, for instance, that he suffered from foot problems and took a variety of medication, yet was able to leave the home, ride in a car, prepare simple meals, and do light chores. (Id.). Despite his history of depression, Plaintiff's testimony "was not suggestive of significant limitations." (Id.).

Next, the ALJ found that Plaintiff had no past relevant work. (Id. at 20). The ALJ then found that, considering the Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy which he could perform. (Id.). The vocational expert had testified that Plaintiff could perform the requirements of a number of representative occupations, such as document preparer, addressor, and surveillance monitor. (Id. at 20-21). Because such jobs were available to a person with Plaintiff's RFC, the ALJ concluded that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national

economy" and that a finding of "not disabled" was required. (Id.).

**\*3** Plaintiff challenges these findings in various respects.

## IV. STANDARD OF REVIEW
The Court's review of the Commissioner's determination is limited to two inquiries. See 42 U.S.C. § 405(g). First, the Court determines whether the Commissioner applied the correct legal standard. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990); Shane v. Chater, No. 96-CV-66, 1997 W L 426203, at \*4 (N.D.N.Y July 16, 1997)(Pooler, J.) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. See Tejada, 167 F.3d at 773; Balsam o, 142 F.3d at 79; Cruz, 912 F.2d at 11; Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982). A Commissioner's finding will be deemed conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g); see also Perez, 77 F.3d at 46; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine de novo whether a Plaintiff is disabled. The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.") (citations omitted). In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). W here the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. See Quinones v. Chater, 117 F.3d 29, 36 (2d Cir. 1997)(citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately " +'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.' +" Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir. 1990)(quoting Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983)).

## V. DISCUSSION
Plaintiff offers two grounds for challenging the opinion of the ALJ. The Court will address each in turn.

### A. Use of Opinion Evidence
Plaintiff first argues that the ALJ erred by failing to state what weight he had applied to the opinion of the examining psychologist, Rachelle Hansen. In any case, the ALJ's conclusions with regard to Plaintiff's mental limitations are inconsistent with Hansen's findings. Defendant contends that the ALJ did ex plain the weight assigned Hansen's opinion. The ALJ, Defendant insists, also properly assessed the limitations assigned by Hansen.

Plaintiff is incorrect that the ALJ failed to explain the weight that he assigned to Dr. Hansen's opinion. The ALJ's decision finds that Hansen concluded that Plaintif f "could follow and understand simple directions and instructions; perform simple tasks independently; maintain attention and concentration; cog nitively learn new tasks; [and] make appropriate decisions." (R. at 19). At the same time, the ALJ found that Hansen's opinion was that Plaintiff "might have difficulties performing complex tasks independently, relating adequately to others and appropriately dealing with stress." (Id.). The ALJ assigned "some weight to this opinion and note[d] that the assessed residual functional capacity accounts for the claimant's mental impairments." (Id.). In assigning Plaintiff's RFC, the ALJ concluded that "[e]xtensive contact with the public should not be a critical function of the [plaintiff's] job responsibilities." (Id. at 16). The ALJ noted "a history of mental impairments and a diagnosis of depression," but that Plaintiff "report[ed] that he last received mental health treatment in 1985-1986." (Id. at 19).

**\*4** The record is clear that the ALJ did state the w eight accorded to Dr. Hansen's opinion. Remand on that basis is not appropriate. Similarly, Plaintiff's claim that the ALJ failed to offer an explanation for ignoring or discrediting Dr. Hansen's position is not supported by the record. Plaintiff claims the ALJ ignored two of Dr. Hansen's findings: that Plaintiff's "difficulties appear to be caused by his pain and physical difficulties"; and that "the results of" her examination "appear to be consistent with stress related problems, and this may significantly interfere with plaintiff's ability to function on a daily basis." As to the first of these claims, the ALJ acknowledged

that Hansen "stated that the aforementioned limitations appear to be caused by the [plaintiff's] pain and physical difficulties." (R. at 18). The ALJ did not reject that finding. As to the second finding, the Court first notes that Hansen's finding is not definite, stating only that Plaintiff's limitations "may" cause problems with daily functioning. Such a finding required the ALJ to interpret other data to reach a conclusion. The ALJ thus pointed to evidence in the record that supported his assessment of Plaintiff's mental functioning, noting that "[d]uring a psychiatric consultative examination, the [p]laintiff's attention and concentration were intact; he was able to perform simple mathematical equations; and his recent remote memory skills were intact." (Id.). The ALJ also pointed to various activities of daily living that Plaintiff could perform despite his other limitations, and noted that Plaintif f was not taking any medication for depression or receiving any treatment on the issue. (Id.).

The ALJ therefore had substantial evidence to support his findings on Plaintiff's mental limitations. He did not ignore Hansen's findings, but instead pointed to how the record supported the limitations he established. Though the ALJ did address Hansen's findings, he was not required to provide a point-by-point explanation of how that opinion fit his findings. Indeed, "[w]hen ... the evidence of record permits [the court] to glean the rationale for an ALJ's decision, the ALJ need not "have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Mongeur v. Heckler, 722 F.3d 1033, 1040 (2d Cir. 1983). Plaintiff's motion will be denied in this respect.

**B. Evidence Not Evaluated by the ALJ**

Plaintiff next contends that the ALJ's opinion ignored the Diabetes Functional Capacity Questionnaire provided by Marie Heylen, FNP-C. Dated April 22, 2013, the questionnaire had been provided to the ALJ a week before he issued his decision, though the ALJ did not mention the evidence in his decision. The questionnaire addresses the limitations caused by Plaintiff's type-2 diabetes. The Appeals Council also failed to address this evidence. The Commissioner responds that the evidence was never before the ALJ. Moreover, the Appeals Council considered the new evidence and did not remand the case to the ALJ for reconsideration. In the end, the Commissioner argues, the ALJ's decision acknowledged

limitations caused by the Plaintiff's diabetes which would not have been altered by this evidence.

Federal law permits a court to order that the Commissioner consider new evidence " +'upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record at a prior proceeding.' +" Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004) (quoting 42 U.S.C. § 405(g)). "New evidence is 'material' if it is both (1) 'relevant to the claimant's condition during the time period for which benefits were denied' and (2) 'probative.' +" Id. (quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)). Materiality also demands " +'a reasonable probability that the new evidence would have influenced the [Commissioner] to decide claimant's application differently.' +" Id. (quoting Tirado, 842 F.2d at 597).

The record in question, a "Diabetes Mellitus Residual Functional Capacity Questionnaire," was completed by Marie Hayden, a Nurse Practitioner, on April 22, 2013. (R. at 371-76). The report lists Plaintiff's diagnoses as "gout, Raynaud's, diabetic retinopathy, diabetic polyneuropathy, hypertension, diabetic macular edema, and d[iabetes] m[ellitus]." (Id. at 371). The report listed Plaintiff's symptoms as including extremity pain and numbness, difficulty walking, muscle weakness, retinopathy, sweating, and vascular disease/leg cramping. Id. Hayden denied that Plaintiff was a "malingerer," and certified that emotional factors "contribute[d] to the severity of [Plaintiff's] condition." (Id. at 372). Still, Plaintiff's diabetes "seldom" interfered with his "attention and concentration." (Id.). He was capable of "low stress" jobs. (Id.). Plaintiff suffered form drowsiness as a side effect of his medication. (Id.). Hayden concluded that Plaintiff could walk only 1/4 of a block without rest or severe pain, could sit or stand for only 20 minutes at a time and could stand or walk for less than two hours in an eight-hour day. (Id. at 373). He needed a job that allowed him to shift positions at will from sitting, standing or walking, and required periods of walking around during an 8-hour day. (Id.). He needed five-minute walks every 20 minutes. (Id.). He also needed unscheduled breaks to relieve his neuropathy. (Id. at 373-74). Plaintiff could rarely lift 20 pounds, occasionally lift 10 pounds, and frequently lift less than 10 pounds. (Id. at 374). He could never climb ladders or stairs, and only occasionally twist, stoop or crouch. (Id.). Plaintiff had no

significant limitations in reaching, handling or fingering. (Id.). Plaintiff was to avoid even moderate exposure to extreme heat or cold, high humidity, perfumes, cigarette smoke, soldering fluxes, solvents/cleaners, chemicals, and some other unspecified irritants or allergens. Id. at 375. He was to avoid all exposure to fumes, odors, dusts and gasses. (Id.). Though unclear how often, Hayden also found that Plaintiff's condition would cause him to suffer good and bad days.

 **\*5** Hayden's April 22, 2013 evaluation is a more detailed version of a February 2, 2013 medical source statement she also completed. (Id. at 341). There, Hayden listed Plaintiff's diagnoses as "diabetes, neuropathy, retinopathy, chronic back pain, mild, chronic." (Id.). Hayden certified that "pain, fatigue and concentration is present to such an extent as to be distracting to adequate performance of daily activities of work causing the patient to be off-task for at least 25% of the time in an 8-hour block of time." (Id.). He would also likely have good and bad days, but not in a predictable way. (Id.). "He suffered from neuropathic leg pain making it hard to stand for extended periods." (Id.). The ALJ's opinion examined Heylan's findings and concluded that they were entitled to "some weight." (R. at 19). He rejected her finding that Plaintiff would be off-task for 25% of the day due to pain, fatigue and concentration issues, but accommodated Hayden's finding that Plaintiff faced "difficulty standing for extended periods" in his RFC assessment.

The ALJ rendered his decision in this case on May 1, 2013. The parties disagree about whether Hayden's April 22, 2013 opinion was before the ALJ at the time he rendered his decision. Whatever the case, the ALJ failed to address this evidence, which was submitted after the hearing. The Appeals Council also failed to directly address the evidence in upholding the ALJ's decision. The Court will treat the evidence as if were new evidence. The question before this Court is thus whether the additional assessment is material.

As stated previously, "[n]ew evidence is 'material' if it is both (1) 'relevant to the claimant's condition during the time period for which benefits were denied' and (2) 'probative.' " Pollard, 377 F.3d at 193. (quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)). The question here is one of materiality, which demands " +'a reasonable probability that the new evidence would have influenced the [Commissioner] to decide claimant's application differently.' " Id. (quoting Tirado, 842 F.2d at 597). The evidence supplied by Hayden does not add anything material to the ALJ's assessment of the health issues faced by the Plaintiff–the ALJ found that the Plaintiff suffered from diabetes mellitus and various conditions related to that disease. T he detailed questionnaire supplied by Hayden, however, addresses the limitations resulting from that condition, and thus could be considered by the ALJ in determining Plaintiff's RFC. Hayden's opinion appears to place a slight additional restriction on Plaintiff's functioning: her opinion states that Plaintiff is unable to use ladders, ropes and scaffolds, while the ALJ's RFC finding states only that Plaintiff must "avoid" such work. She also notes that he should avoid exposure to certain extreme conditions and chemicals. Remand to consider that additional limitation would not be material however, since the jobs listed found by the vocational expert did not require such extreme exposure. Plaintiff could perform those jobs even with an additional limitations as described by Hayden. The Court will therefore deny the motion on those grounds as well.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is **DENIED.** The Commissioner's motion for judgment on the pleadings is **GRANTED**. The decision of the Commissioner is affirmed.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2016 WL 843376

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 515927
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jose LUGO, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 04 Civ. 1064(JSR)(MHD).
|
Feb. 8, 2008.

REPORT & RECOMMENDATION

MICHAEL H. DOLINGER, United States Magistrate
Judge.

**\*1 TO THE HONORABLE JED S. RAKOFF,
U.S.D.J.:**
Plaintiff Jose Lugo filed this action pursuant to the Social
Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3). He
seeks review of the December 6, 2003 determination by
the Commissioner of the Social Security Administration
("Commissioner") denying his three merged applications
for Supplemental Security Income ("SSI") benefits-dated
December 22, 1993, November 12, 1997, and August 31,
1999, respectively-based on a finding that he was not
disabled.

The Commissioner has moved to remand this action
for further administrative proceedings. He seeks this
remand to reopen the evidentiary record and to permit
the Administrative Law Judge ("ALJ") to explain how
he weighed the medical evidence and medical opinions to
arrive at his conclusion that plaintiff was able to perform
light work. Plaintiff has cross-moved for remand solely for
calculation of SSI benefits.

For the reasons that follow, we recommend that the
Commissioner's determination be reversed, that his
motion for a remand be granted, that the plaintiff's cross-
motion be denied and that the case be remanded for
further administrative proceedings.

I. Procedural History

1. *The December 28, 1993 Application and the First
Federal Court Action*
On December 28, 1993, plaintiff filed his first
application for SSI benefits. (Administrative Record
Transcript ("Tr.") 39-41.) A Disability Determination
and Transmittal form, dated March 30, 1994, indicated
Lugo's primary diagnosis as alcoholism and his
secondary diagnosis as arthralgia. [1] (Tr. 42.) The
Social Security Administration ("SSA") initially denied
plaintiff's application on April 5, 1994. (Tr. 64.) According
to the SSA, the medical evidence showed that Lugo had
"pain and stiffness with some restriction of [his] activities
and the ability to function normally in every day life," but
that he was capable of performing "medium work." (Tr.
66.) The plaintiff filed for reconsideration (Tr. 67), and on
January 19, 1995, the Commissioner denied the request.
(Tr. 90.) In March 1995, plaintiff requested a hearing
before an ALJ. (Tr. 94.) On December 8, 1995, ALJ Mary
Cerbone presided over a hearing (Tr. 24-38), at which
Lugo was represented by Vivian De La Cruz of Harlem
Legal Services. (Tr. 26.) [2]

On January 5, 1996, ALJ Cerbone issued her decision.
(Tr. 10-18.) She found the plaintiff not disabled and not
eligible for SSI payments despite his alleged drug, alcohol,
kidney and low-back problems. (Tr. 13.) Specifically, she
found that while Lugo could not perform his past relevant
work, he could perform a "wide range of light work,"
that there were no "significant" non-exertional limitations
that would compromise his capacity to perform light
work, and that his testimony regarding constant and
totally disabling pain was "not ... credible to the extent
alleged." (Tr. 17-18.)

Plaintiff subsequently filed a request for review with the
SSA Appeals Council. On April 10, 1997, the Appeals
Council denied plaintiff's request. (Tr. 5-6.)

**\*2** On May 30, 1997, Lugo filed a complaint in this
court seeking review of the ALJ's January 5, 1996
decision. The Commissioner moved, in March 1998, for
judgment on the pleadings. In June 1998, Magistrate
Judge Katz issued a Report and Recommendation ("R
& R"), recommending affirmance of the SSA's denial
of benefits. In doing so, he reviewed the treating and
consultative physicians' reports and the ALJ's decision
and found that the Commissioner's determination that
plaintiff was not disabled and was capable of light work

was supported by substantial evidence, that the ALJ had not erred in declining to accord controlling weight to the opinion of Lugo's treating physician and that the ALJ had fulfilled her duty to develop the record. (Tr. 191-211.) In short, Judge Katz recommended that the defendant's motion for judgment on the pleadings be granted and the Commissioner's decision affirmed. (Tr. 191.)

On September 28, 1998, the District Court declined to adopt Judge Katz's R & R and instead remanded the case "to further consider any relevant evidence bearing on plaintiff's claims of severe pain and, if she adheres to her original determination, to set forth the reasons these claims are found incredible." (Tr. 217.) The SSA remanded the case to ALJ Newton Greenberg, who conducted a hearing on August 28, 2000. (Tr. 218-25.) For purposes of that hearing, the ALJ merged Lugo's 1993 application with two subsequent applications-one filed in November 1997, while his lawsuit was pending here, and the other filed in August 1999, after the remand order from this court. The decision by ALJ Greenberg at the 2000 hearing, later affirmed by the Appeals Council, is the subject of this Report and Recommendation.

### 2. The November 12, 1997 Application

While Lugo's lawsuit was pending in federal court, he filed a second application for SSI benefits, on November 12, 1997, alleging disability based on diabetes, arthritis and mental problems. (Tr. 243-45, 260-65.) On February 2, 1998, the SSA denied his application, finding that his condition was not severe enough to keep him from working. (Tr. 228-31.) Lugo filed for reconsideration (Tr. 232-33), and on May 12, 1998, the SSA denied the request. (Tr. 234-37.) In June 1998, plaintiff requested a hearing before an ALJ. (Tr. 238-39.)

On January 13, 1999, ALJ Greenberg presided over a hearing on the 1997 application, at which Lugo was represented by Christopher Bowes, Esq., of the Center for Disability Advocacy Rights. (Tr. 538-50.) In a decision rendered March 17, 1999, ALJ Greenberg denied Lugo's application (Tr. 169-77), finding that while he could not return to his past relevant work (Tr. 175), he retained the ability to perform the full range of light work and that his capacity for light work was not significantly compromised by any non-exertional limitations. (Tr. 177.) In asserting that plaintiff was capable of performing light work, ALJ Greenberg found that while plaintiff's arthritis could cause back pain, "these symptoms are not of such intensity or

frequency to preclude work activity," particularly given that his condition did not require physical therapy or orthopedic surgery, and that Lugo had testified that he could read, watch TV and perform light household chores. (Tr. 175.) In the "Findings" section, ALJ Greenberg opined that Lugo's allegations as to the level of pain he was experiencing were "not consistent with the objective medical evidence and [we]re not credible to the extent alleged." (Tr. 176.) In April 1999, Lugo requested Appeals Council review of the decision. (Tr. 168.)

### 3. The September 20, 1999 Application and the August 28, 2000 Hearing

**\*3** Lugo filed a third application for SSI benefits in September 1999 (Tr. 422-26), alleging that he was disabled as a result of kidney, spinal and psychiatric conditions. (Tr. 432.) The SSA denied his claim on December 6, 1999 (Tr. 409-13), finding that his condition was not severe enough to keep him from working and that based on his age, education and experience, he could perform a job requiring medium work. (Tr. 413.) Lugo filed for reconsideration (Tr. 414-15), and on April 11, 2000, the SSA denied the request. (Tr. 416-19.) In May 2000, plaintiff requested a hearing before an ALJ. (Tr. 420-21.)

On August 28, 2000, ALJ Greenberg presided over the hearing, in which he "merged" Lugo's December 1993, November 1997 and August 1999 SSI applications. (Tr. 551-59.) Lugo was again represented by Mr. Bowes. (Tr. 553.) In a decision dated November 17, 2000 (Tr. 157-65), ALJ Greenberg reviewed the hearing testimony and the entire body of evidence accompanying plaintiff's three SSI applications and found Lugo's "allegations about his limitations due to pain and psychiatric problems not credible, based on the medical evidence." (Tr. 163.) While acknowledging that Lugo experienced pain, ALJ Greenberg found that the record indicated that it was "manageable with medications, and is not of such severity that it prevents the claimant from working. The claimant is employable, but is not motivated: he is a malingerer." (Tr. 163.) ALJ Greenberg also found that Lugo retained "a residual functional capacity for the full range of light work.... [with] no limita[ti]ons on mental functioning." (*Id.*)

In December 2000, plaintiff's counsel requested an Appeals Council review of the ALJ's decision (Tr. 153) and submitted a letter-brief, dated June 28, 2002, outlining specific objections to that decision. (Tr. 149-51.)

The Appeals Council denied review in a notice dated December 6, 2003. (Tr. 147-48.)

### 4. The Second Federal Court Action

On February 9, 2004, Lugo filed the instant action in federal court, seeking review and reversal of the Commissioner's determination denying all three of his applications for SSI benefits. On July 27, 2004, the Commissioner responded with a motion for remand, seeking reversal of the November 2000 decision and a remand of the case for further administrative proceedings. (Mem. of Law in Supp. of Def.'s Mot. for Remand 1.) Plaintiff has in turn sought an order finding him disabled and remanding solely for calculation of benefits. (Mem. of Law in Supp. of Pl.'s Cross-Mot. for J. on the Pleadings 1.)

### II. Factual Background

#### A. Testimonial Evidence

Lugo was born on April 28, 1953 in the Dominican Republic. (Tr. 26-27.) He testified at his first hearing that he had completed one year of high school in the Dominican Republic (Tr. 28), but testified at his second hearing that he had completed only the sixth grade. (Tr. 541.) He can read and write Spanish, but speaks no English. (Tr. 28.) He arrived in the United States in 1982 and has permanent residency status. (Tr. 27, 246-246a, 541.)

 *4 Lugo lives with his wife. (Tr. 27, 542.) He testified that he is able to take care of his basic personal needs, including dressing and washing himself, but is unable to perform household chores. (Tr. 33-34.) In the past, Lugo worked in a fish market, as a street painter and as a security officer at a supermarket, a job that required him to lift up to eighty pounds. (Tr. 28, 35.) Lugo reported last looking for work sometime between 1989 and 1991 and stated that he was receiving public assistance. (Tr. 541-42.)

Lugo has a history of drug and alcohol abuse. At his first hearing in 1995, he stated that he had last used cocaine three years previously (*i.e.,* in 1992) and had then enrolled in a three-year treatment program, which he had completed. (Tr. 28-29.) At his second hearing, in January 1999, he stated that he had stopped using cocaine "[o]ver five or seven years ago" (Tr. 542) and that he had been a heavy drinker for many years. (Tr. 543.) Lugo's drug and alcohol use were not discussed at his third hearing.

With regard to his physical ailments, Lugo testified that he suffered from pain related to kidney stones and had undergone a lithotripsy[3] in 1994, a procedure that destroys kidney stones with a laser. (Tr. 29, 131.) He asserted that his kidney stone attacks were accompanied by diarrhea, vomiting and pain that lasted, in slightly varying accounts, either two to three hours (Tr. 36) or five to six hours. (Tr. 555.) He stated that painkillers relieved the pain after one to two hours. (Tr. 555-56.) According to Lugo, he passed a kidney stone two weeks prior to the first hearing (Tr. 29) and a month or two before the third hearing, although at the third hearing he reported that he had had pain the week before (though he did not specifically say whether he had passed a stone). (Tr. 556.) He estimated at the third hearing that he felt the pain and vomiting symptoms associated with the stones on a more-or-less monthly basis. (Tr. 556.) As to symptoms, he described "very strong pain" in his back when he passed stones (Tr. 37), accompanied by blood in his urine. (Tr. 29, 37.) He explained that if the stone did not pass on its own, he would see a doctor. (Tr. 556.)

Lugo complained of lower back pain-separate from the pain he experienced from kidney stones-due to arthritis. (Tr. 30-31, 548-49, 557.) He testified that he also had arthritis in his legs, arms and neck, and that these areas would become numb and he would lose strength in his arms approximately two to three times a week. (Tr. 30.) At the third hearing, he stated that he could not move his neck, back and sometimes his hands. (Tr. 557.) At the time of the first hearing, he had been walking with a cane for ten months due to the arthritis (Tr. 30-31) and reported that, although he had taken a subway to the hearing, he experienced difficulty in traveling by public transportation, because the standing and motion caused him pain. (Tr. 27.) Also at the first hearing, he claimed that he could walk only two blocks, could stand for an hour or two, could not bend, could kneel only with difficulty, could sit for up to an hour and could carry five pounds only with difficulty. (Tr. 31-32.) At the second hearing, he asserted that he felt back pain every day and that he took medication daily to relieve the pain, but that the medication was only forty to fifty percent effective. (Tr. 548-49.)

 *5 At the first hearing, in 1995, Lugo did not testify that he suffered from any mental or emotional problems, though his disability examiner did list his alcoholism as

his primary diagnosis on his Disability Determination and Transmittal. (Tr. 42.) At the second hearing, in 1999, he asserted that he had been treated at a psychiatric hospital in the Dominican Republic after having been shot and mugged when was in his twenties. (Tr. 543.) He also claimed at the same hearing that he was seeing a psychiatrist and was taking three medications daily; however, he could remember the name of only one, Ambien, a sleep aid. (Tr. 542, 550.) He also reported that he was afraid to go out because he heard voices calling him at various times during the day (Tr. 543-45), and he alluded to experiencing problems with his memory. (Tr. 549-50.) At his third hearing, in 2000, plaintiff's counsel asserted that Lugo had "significant mental limitations due to major depression." (Tr. 557.)

B. *The Medical Record Before the ALJ*

Plaintiff was regularly treated by Dr. Clayton Natta, an internist and hematologist, since August 14, 1992. (Tr. 128-33.) Dr. Natta provided four reports or summaries between 1993 and 1998. (Tr. 115, 128-31, 133-39, 500.)

According to Dr. Natta, plaintiff suffered from lower back pain after falling twice in the snow in 1992. The pain persisted and required analgesics. Lugo also suffered from periodic kidney stones, which were treated by a lithotripsy at Brooklyn Hospital in 1994. (Tr. 128.) Dr. Natta diagnosed nephrolithiasis (*i.e.,* kidney stones) in the left kidney, Type II diabetes, atopic dermatitis, osteoarthritis of the lumbar spine and respiratory allergies. (Tr. 131, 133.) To treat these conditions, Lugo underwent the 1994 lithotripsy, adopted a 1500-calorie diabetic diet, and received medication for periodic urinary tract infections and analgesics for his lower back pain. (Tr. 131.) According to Dr. Natta, Lugo's back pain persisted despite the use of increasingly powerful analgesics. (Tr. 131, 134.) [4]

Dr. Natta opined on two occasions-September 14, 1995 (Tr. 137) and October 9, 1998 (Tr. 500)-that plaintiff was unable to work, apparently because of his low-back pain. In support of that conclusion, he provided findings of lumbar spine tenderness, 2

☞ muscle spasm, twenty to twenty-five percent loss of motion in the lumbar spine, loss of lumbar curvature and a recurring macular rash. (Tr. 129.) He also mentioned blood in the urine, nocturia [5] and a burning sensation on urination. (Tr. 133.) As for plaintiff's physical limitations,

the doctor opined that Lugo could regularly sit for only one-half hour to one hour daily, that he could stand or walk for only one hour, and that he could not lift or carry, push, pull, bend, squat, climb or reach on a sustained basis, although he could perform grasping and fine manipulation with his hands. (Tr. 135-36.) He further stated that plaintiff could not regularly travel by bus or subway. (Tr. 137.)

**\*6** Dr. Natta's last written statement was dated October 9, 1998. (Tr. 500.) He reported that plaintiff was being treated for degenerative joint disease (specifically sclerosis of the sacroiliac joints) [6] and latent luetic infection, [7] that he was status post-left hydrocelectomy [8] and that he suffered from kidney stones (nephrolithiasis) and Type II diabetes. He also reported that plaintiff continued to take Motrin 600 mg, Tylenol # 3 and Flexeril. He reiterated, however, that plaintiff was "unable to work in any capacity." (Tr. 500.)

Plaintiff was also treated in 1997 by Dr. Joerg Bose for a case of major depression with dysthymic disorder, [9] which Dr. Bose characterized as moderate to severe. (Tr. 325-30.) According to the psychiatrist, Lugo presented as unmotivated and tearful. His mood was sad and his affect restless. (Tr. 327.) Dr. Bose found plaintiff limited in his capacity for understanding and memory but not limited in the areas of sustained concentration and adaptation. (Tr. 329.)

The record also includes documents from Columbia Presbyterian Hospital for the period from March 1994 to September 1997. In March 1994, Lugo was diagnosed with a kidney stone, which caused pain, fever, some bleeding (hematuria) and fever. (Tr. 310.) He passed the stone and was discharged. In June 1994, he had a similar episode and was scheduled for a lithotripsy. (Tr. 303.) Periodic reports of a similar nature are scattered throughout plaintiff's medical records from 1994 to 1996, with reference to a lithotripsy actually having been performed in 1995 at Brooklyn Hospital. (Tr. 298, 300, 393-95.) In 1997, a radiological examination yielded a finding of "sclerosis of the sacroiliac joints bilaterally," probably indicating degenerative joint disease. (Tr. 292, 398, 465.)

The record also contains a host of reports by consulting doctors. We summarize their results in chronological order.

In March 1994, Dr. Alain DelaChapelle, a psychiatrist, conducted a mental-status examination of Lugo. He reported that plaintiff was participating in an alcohol rehabilitation program and did not show any depression or psychotic symptoms. (Tr. 118.) He stated that plaintiff was hoping to "get back on his feet and return to work." The psychiatrist diagnosed alcohol dependence and suggested continuing alcohol counseling. He characterized Lugo's prognosis as "fair." (Tr. 119.)

In March 1994, Dr. A. DeLeon, an internist, examined plaintiff for the SSA. He summarized plaintiff's reported history of kidney stones ("nephrolithiasis"), arthralgia of the neck and back, alcoholism and histories of drug abuse and depression. (Tr. 120.) He then summarized his findings from the physical examination, stating that plaintiff could bend forward to 60 degrees and that no tenderness or muscle spasm was observed at L3-L4 in the lumbar spine. (Tr. 121.) A follow-up x-ray of the cervical spine was found to be normal. (Tr. 123.) Dr. DeLeon found that plaintiff could sit without limitation and was only "slightly limited" in other exertional activities. (Tr. 122.) He offered a prognosis of "fair ." (Tr. 122.)

 *7  On January 5, 1995 plaintiff underwent a consultative physical examination by Dr. Howard Finger, an internist (Tr. 124-26), and another psychiatric examination by Dr. DelaChappelle. (Tr. 116-17.) Dr. Finger mentioned depression and reported that plaintiff had said that he had difficulty sleeping. He stated that plaintiff had reported that he had stopped drinking and using cocaine in the last one to two years. He also noted plaintiff's complaint of kidney stones and back and neck pain. (Tr. 124.)

Based on his physical examination of Lugo, Dr. Finger stated that Lugo's straight leg raising was negative to sixty degrees. Plaintiff reported diffuse low-back pain on flexion of the lumbar spine past seventy to eighty degrees, but the range of motion in his cervical spine was normal. The doctor noted no muscle spasm, although he observed that plaintiff's gait was slow. He determined that Lugo's lower extremity strength and grip strength were reduced to 4👈/5 bilaterally. (Tr. 125.) Finally, he noted that Lugo's blood tests were normal. The doctor offered a "fair" prognosis. He diagnosed a history of alcohol and cocaine abuse, a history of kidney stones, chronic low-back disorder, arthralgia of the cervical spine and a history of

depression and insomnia. He noted no gross difficulties in sitting and opined that plaintiff "may be mildly limited" in other exertional activities. (Tr. 126.)

During Dr. DelaChappelle's second psychiatric evaluation, he reported Lugo's assertion that he had suffered from depression for about one year, which Lugo attributed to his medical problems. Dr. DelaChapelle observed that Lugo appeared "mildly depressed" on a mental-status exam and was unable to do "serial sevens" accurately. (Tr. 116.) Lugo reportedly told the doctor that he stayed at home, reading or watching television, that he rarely socialized and that he relied on his wife to do most household chores. The doctor diagnosed Lugo with both cocaine abuse in remission and a depressive disorder, for which he recommended psychiatric treatment. He listed Lugo's prognosis as "fair." (Tr. 117.)

On January 7, 1998, Lugo underwent another physical examination by Dr. Finger. (Tr. 319-21.) After summarizing plaintiff's history-including kidney stones, arthritis and low-back pain, diabetes, high blood pressure and a nervous condition, as well as drinking and drug use-the doctor reported his physical findings. Lugo's straight leg raising was negative to sixty degrees bilaterally. He was able to flex the spine to forty fifty degrees before encountering "moderate diffuse low back pain," with no observed muscle spasm. Dr. Finger observed that plaintiff's gait was slow and mildly to moderately stiff. (Tr. 320.) Plaintiff exhibited mild crepitus [10] in the knees. The doctor estimated the strength in his lower extremities at 4👈/5. (Tr. 321.)

Dr. Finger also ordered radiological studies. These revealed mild scoliosis and minimal osteoarthritis of the lumbosacral spine. (Tr. 323.) The radiological report noted "eburnative changes with both sacroiliac joints, more pronounced on the inferior aspect." (*Id.*) [11] Dr. Finger diagnosed chronic low-back disorder, non-insulin-dependent diabetes, arthralgias of the hands, knees and shoulders and a history of kidney stones, depression and alcohol abuse. (Tr. 321.) He further concluded that plaintiff was "mildly to moderately limited" in his ability to stand, walk, lift and carry and "mildly limited" in sitting. He opined that plaintiff's prognosis was "guarded." (Tr. 321.)

 *8  Two weeks later, plaintiff underwent another psychiatric exam by Dr. DelaChappelle. (Tr. 334-35.)

Lugo reported experiencing depression, sadness, nervousness, insomnia and suicidal ideation. He also mentioned that he had been in psychiatric treatment for the prior six months with Dr. Chattah, a psychiatrist, and that he was taking Prozac and Ambien, which somewhat improved his condition. [12] (Tr. 334.)

In his mental-status examination, Dr. DelaChappelle found that plaintiff was alert and cooperative and showed good eye contact. Lugo's speech was coherent and relevant, and he was neither anxious nor depressed and was not hallucinating. The doctor judged his intellectual functioning to be average and his insight and judgment to be fair. Plaintiff could also recall three of three objects in three minutes. (Tr. 334.)

Dr. DelaChappelle diagnosed Lugo with dysthymic disorder. He further found that Lugo had a satisfactory ability to understand, remember and carry out instructions, to respond appropriately to supervision and to co-workers and to deal with pressures in a work setting. He characterized Lugo's prognosis as "fair." (Tr. 335.)

Three months later, in April 1998, plaintiff underwent still another psychiatric evaluation, this time by Dr. Richard King, a psychiatrist. (Tr. 344-45.) Lugo described a history of substance abuse, although he stated that he had stopped this habit several years before. He claimed to occasionally hear voices calling his name, and he reported that he was taking Prozac and Ambien. (Tr. 344.)

Dr. King reported that, on examination, Lugo established fair rapport and exhibited no acute distress. His speech was coherent and relevant. He was euthymic [13] and not significantly anxious or depressed. (Tr. 344.) He exhibited no hallucinations, his intellectual functioning was average and he was able to reproduce geometric shapes adequately. (Tr. 344-45.) He exhibited fair judgment and insight and adequate concentration and attention. (Tr. 345.)

Dr. King concluded that plaintiff suffered from a mild dysthymic disorder and suggested ruling out a substance-induced mood disorder. He diagnosed alcohol, cocaine and marijuana dependence, although he noted that Lugo had reported that he no longer used these substances. The doctor concluded that plaintiff had a satisfactory ability to understand, remember and carry out instructions and

to respond to supervision, co-workers and workplace pressures. (Tr. 345.)

In May 1998, plaintiff underwent another physical examination by Dr. Finger. (Tr. 346-48.) The doctor reported that plaintiff's straight leg raising was negative to sixty degrees. His forward flexion of the spine reached fifty degrees with moderate diffuse mid- and low-back pain. His muscle strength in the low extremities, as well as his grip strength, was again measured at 4/5, and his gait was slow and stiff. He was able to get on and off the examination table without assistance, however, although he did it slowly. (Tr. 347.)

**\*9** Dr. Finger ordered X-rays of plaintiff's knees, which were normal. An x-ray of his lumbosacral spine showed mild L5-S1 osteoarthritis and marked sclerosis of the sacroiliac joints bilaterally. (Tr. 349 .)

Dr. Finger diagnosed plaintiff as suffering from non-insulin-dependent diabetes mellitus, arthralgias in the knees, hands and shoulders, chronic low-back disorder, a history of kidney stones, a history of drug and alcohol abuse and a history of depression. He evaluated plaintiff as mildly limited in the length of time he could sit, mildly to moderately limited in the length of time he could stand and the distance he could walk, and moderately limited in his ability to lift and carry. He evaluated Lugo's overall prognosis as "guarded." (Tr. 348.)

The record contains another residual functional capacity analysis, dated May 11, 1998, by a Dr. B. Reynolds, who apparently reviewed plaintiff's file but did not examine him. Dr. Reynolds concluded that Lugo could lift up to 20 pounds occasionally and up to 10 pounds frequently. He further found that Lugo could stand and walk for as many as six hours in an eight-hour workday, or, alternatively, could sit for as many as six hours in an eight-hour day and do pushing and pulling while seated, including the use of hand or foot controls. He further opined that plaintiff could occasionally climb, balance, stoop, kneel or crawl. (Tr. 382-83.)

Plaintiff underwent another psychiatric evaluation in November 1998, this time by Dr. Luigi Marcuzzo, a psychiatrist. (Tr. 480-81.) Plaintiff reported long-term depression resulting from physical problems and physical abuse by his stepmother. He also reported a history of five suicide attempts, the most recent only three weeks before.

He claimed to hear voices calling his name and reported low energy, poor motivation, insomnia, paranoid ideation and poor concentration. He also mentioned a history of substance abuse and said that he had entered a treatment program the prior year, that is, in 1997. He did believe that the medications he was taking were helping his depression "somewhat." (Tr. 480.)

Based on his examination, Dr. Marcuzzo described Lugo as "rather guarded and suspicious, withdrawn[ ] [and] tearful." Lugo's speech was limited in scope and concrete. The doctor noted no delusions, but observed some instances of paranoid ideation. Plaintiff's mood was depressed and his affect constricted. His short-term memory was intact, but his remote memory was impaired. His attention and concentration were impaired, and he was easily distractible. His insight and judgment were fair, although he could not perform serial sevens. (Tr. 481.)

Dr. Marcuzzo offered a diagnostic impression of major depression. He also viewed Lugo's memory, understanding, sustained concentration, persistence, social interaction and adaptation as impaired. He concluded that his prognosis was "fair." (Tr. 481.)

Two days later, a consulting physician, Dr. E. Cadet, offered a medical assessment of plaintiff. He noted his impressions of plaintiff's ailments, namely depression, diffuse arthralgia and histories of kidney stones and hydrocele repair. On this basis, he opined that plaintiff met the SSI criteria for disability. (Tr. 479 .) [14]

*10 One year later, Lugo underwent a psychiatric examination by Dr. Geraldo Tapia. (Tr. 502-03.) On this occasion, plaintiff recounted that he had been mugged and shot in the shoulder eighteen years before and had suffered from nervousness ever since. He said that he was sad, sensitive to noises, feared being on the street alone, stayed isolated, had difficulty sleeping and hears voices calling him. He also reported a prior history of marijuana and cocaine use. (Tr. 502.)

Dr. Tapia described plaintiff's speech as relevant and coherent. He found no thought disorder or delusions. He rated Lugo's insight and judgment as fair. (Tr. 502.)

The doctor diagnosed a dysthymic disorder and suggested the need to rule out a post-traumatic stress disorder. He evaluated Lugo as having a good ability to understand,

carry out and remember instructions, and a fair ability to respond appropriately to supervision and co-workers in a work setting. (Tr. 502.)

At about the same time, plaintiff underwent a physical examination by Dr. Babu Joseph. (Tr. 507-08.) He noted that the cervical spine had a full range of motion, and that scoliosis, paraspinal muscle spasm and tenderness were not indicated. He reported that plaintiff had a lumbar ventral flexion of forty degrees and a dorsal flexion of five degrees. (Tr. 507.) An x-ray taken of Lugo's lower back in connection with the examination was normal. (Tr. 505.) Dr. Joseph diagnosed joint and low-back pain, a history of kidney stones, depression and a skin disorder. He concluded also that plaintiff was mildly limited in standing, walking, lifting and carrying. (Tr. 508.)

The remaining two examinations in the record were both conducted on March 2, 2000. Dr. A. Cacciarelli (Tr. 533-35) reported that plaintiff complained of low-back pain, kidney problems, a skin disease and a nervous disorder. Lugo had stated to Dr. Cacciarelli that it was difficult for him to stand for more than fifteen to twenty minutes at a time, and that he could not lift or carry more than five to ten pounds. He reported also that he was taking Celebrex, Flexeril, Risperdal, Prozac and Ambien. (Tr. 533.)

Dr. Cacciarelli found that plaintiff complained of pain at 40 degrees on forward flexion. The doctor also observed eczema on plaintiff's lower extremities. He diagnosed a history of psychiatric disorder, chronic skin disease, a history of kidney stones and joint and back pain. He concluded, based on these findings, that plaintiff had "a limited ability to push, pull or carry heavy objects or stand around for long periods of time." (Tr. 535.)

Plaintiff's final psychiatric evaluation was conducted by Dr. King. (Tr. 531-32.) This time, plaintiff reiterated the incident that he had reported to Dr. Tapia, in which he had been shot eighteen years before, and mentioned that he had been psychiatrically hospitalized at some point in the Dominican Republic. He reported having been depressed since he was shot and said that he had used cocaine and heroin in the past but had stopped around 1993. (Tr. 531.)

*11 Dr. King indicated that during the exam, plaintiff had a fair rapport and exhibited no acute distress. His speech was relevant and coherent. According to Dr. King,

he was euthymic and not notably depressed or anxious, and he exhibited no hallucinations, delusions or suicidal ideation, among other things. His intellectual functioning was average. His insight and judgment were fair, and his attention and concentration were adequate. (Tr. 531.)

Dr. King diagnosed plaintiff with mild to moderate dysthymic disorder and a history of a major depressive episode (apparently a reference to Lugo's condition when examined by Dr. Marcuzzo). He diagnosed alcohol, cocaine and marijuana dependence, although he noted plaintiff's statement that he had ended his abuse of those substances. He also found that Lugo had a satisfactory ability to understand, remember, carry out instructions, respond to supervision and co-workers and deal with pressures in a work setting. (Tr. 532.)

Dr. Anthony Danza provided the final assessment of plaintiff's exertional capacities found in the record, apparently without examining the plaintiff, on April 4, 2000. [15] Dr. Danza opined that Lugo could lift or carry as much as 50 pounds occasionally and 25 pounds frequently. He also reported that plaintiff could stand and walk for up to six hours in an eight-hour workday, and that he could, alternatively, sit for as many as six hours in a day while performing pushing and pulling, including the operation of hand or foot controls. (Tr. 523.) He further stated that Lugo could frequently climb, balance, stoop, kneel, crouch and crawl. (Tr. 524 .)

C. *ALJ Greenberg's November 17, 2000 Decision*
As noted, ALJ Greenberg "merged" all three of Lugo's applications and considered the entire record when he issued his November 17, 2000 decision finding Lugo ineligible for SSI benefits. (Tr. 157-65.) In his decision, the ALJ applied the five-step evaluation process required by 20 C.F.R. § 416.920 (2005) to determine whether a claimant is disabled. (Tr. 158.) He first found that Lugo had not engaged in substantial gainful activity since 1991. (Tr. 158.) With regard to the severity of his impairments, ALJ Greenberg began by reviewing the May 17, 1999 decision he had authored concerning Lugo's second (November 1997) application.

As summarized by the ALJ, in his 1999 decision he had found: (1) that Lugo could perform light work, lifting and carrying up to twenty pounds and standing and walking for six hours; (2) that while he had a history

of kidney stones, he had tested free of kidney stones in 1997 and 1998; (3) that Lugo had non-insulin-dependent diabetes mellitus that was diet-controlled and had no systemic complications; (4) that he had "very minimal osteoarthritis in the lumbosacral spine, could flex his spine to 50 degrees with no paravertebral muscle spasm, could perform normal side bending and extension in the lumbosacral spine, and had a normal range of motion in the cervical spine," (5) that Lugo had mild crepitus in his knees with no gross swelling; (6) that he was taking Prozac and Ambien for a dysthymic disorder but had no work-related mental limitations; and (7) that Lugo had "clear" attention and concentration, could calculate and do "serial sevens" and was "fully oriented," "had no limitations in sustained concentration" and had a "satisfactory ability to interact with supervisors and co-workers and to handle work pressures." (Tr. 159 .) The ALJ also noted that while Lugo had complained of daily pain in his spine due to arthritis, "no evidence was found to support a claim that this pain was disabling" since, for example, he did not require physical therapy or need orthopedic surgery, and he had reported that he could do light household chores. (Tr. 159.)

**\*12** At the August 2000 hearing, the ALJ, consistent with the District Court's remand, stated that he had sought additional evidence, particularly with regard to plaintiff's complaints of severe pain, and had reviewed "the entire body of evidence ... related to all three applications." (*Id.*) The ALJ then summarized the medical evidence in the record, which included the more recent of the numerous consultative examinations as well as reports by Lugo's treating physician.

ALJ Greenberg first summarized the findings of Dr. Finger, based on his January 7 and April 21, 1998 examinations. (Tr. 159-60.) He then recited the findings from the November 11, 1999 consultative examination by Dr. Joseph, the March 2, 2000 consultative examination by Dr. Cacciarelli, the consultative psychiatric examination by Dr. DelaChapelle on January 22, 1998, the consultative psychiatric examination by Dr. Tapia on November 15, 1999, the consultative psychiatric examination by Dr. Richard King on March 2, 2000 and the medical and psychiatric evaluations by Dr. Cadet and Dr. Marcuzzo that Lugo had undergone on November 6, 1998 pursuant to his application for public assistance purposes. (Tr. 160-62.)

In addressing Dr. Marcuzzo's finding of a major depression, the ALJ noted that Lugo's condition, when examined by Dr. Marcuzzo, had differed "markedly" from his condition as described in other consultative psychiatric reports both before and after Marcuzzo's examination. (Tr. 161.) Specifically, neither Drs. DelaChapelle and Tapia in 1999, nor Dr. King in 2000, had found major depression or severe impairments in functioning, but, at most, mild to moderate impairments. (Id.) The ALJ concluded that Lugo's symptoms had "worsened temporarily" at the time of his examination by Dr. Marcuzzo, but that this did not reflect "a psychiatric condition that would last 12 months or more," since his psychiatric status, as determined by a series of examinations between January 1998 and March 2000, was "dysthymic disorder imposing mild to moderate limitations." (Tr. 162.)

ALJ Greenberg then turned to the medical reports provided by Dr. Natta, Lugo's treating physician. (Id.) In the doctor's most recent communication, a brief note in October 1998, he had opined that Lugo could not work "in any capacity," citing his Type II diabetes, his 1994 procedure to remove kidney stones, a latent luetic infection, surgery to remove hydroceles in 1997 and degenerative joint disease, including sclerosis of the sacroiliac joints with persistent low-back pain. (Id.) ALJ Greenberg observed that Dr. Natta had cited no clinical or laboratory findings or any other support for such a degree of impairment, that he had provided no indication of the degree of limitation on Lugo's ranges of motion or ability to ambulate and that he had made "essentially the same unsupported statement on December 18, 1993." (Id.) ALJ Greenberg also cited Dr. Natta's September 1995 evaluation form, indicating that Lugo could not work because of "persistent pain, inability to stand for any length of time, and restriction of activities," and his reports from 1992 to 1998 indicating that Lugo was severely disabled and unable to work. (Id.) The ALJ observed that, despite the severity of the conditions described by Dr. Natta, there was no indication from the doctor that he had provided or recommended intensive treatment or monitoring, that he had referred Lugo for pain management, that Lugo had undergone any physical therapy or orthopedic surgery or that there had been any other attempts to provide the kind of pain relief that would have been warranted if Lugo's pain were so extreme as to prevent him from working for six years. (Id.) As a result,

ALJ Greenberg gave "little weight" to Dr. Natta's opinion that Lugo was unable to work. (Id.)

**\*13** Following this review of physician and psychiatrist reports, ALJ Greenberg summarized the medical evidence as showing that Lugo had a history of kidney stones, arthritis-including back pain requiring no surgery or physical therapy-non-insulin-dependent diabetes without systemic complications and a dysthymic disorder. (Id.) While these impairments were "severe within the meaning of the regulations," ALJ Greenberg opined that they were not severe enough to meet or medically equal one of the impairments in Appendix 1, Subpart P, Regulations No. 4. (Id.)

The ALJ then proceeded to analyze whether Lugo retained the residual functional capacity ("RFC") to perform the requirements of his past relevant work or other work existing in significant numbers in the national economy. He considered all of Lugo's symptoms, including the extent to which they were consistent with objective medical evidence, his testimony about pain and the medical opinions, and found that Lugo's allegations about his limitations were "not credible, based on the medical evidence." (Tr. 162-63.) The ALJ concluded that there was "simply no medical support in the record" for his allegations that he has been unable to work since 1993 because of his pain and psychiatric problems, and that, based on a review of the ample evidence in the record, there was "no information concerning the claimant's physical or mental condition that differs from prior evidence of record." (Tr. 163.)

Focusing on Lugo's complaints of pain, ALJ Greenberg noted that Lugo had not been referred for physical therapy or orthopedic surgery for his condition, and that while the evidence indicated that he had some pain, it was manageable with medication and was not so severe that it prevented him from working. (Id.) He found that Lugo was "employable, but [ ] not motivated: he is a malingerer." (Id.) Based on these facts, the ALJ concluded that Lugo retained a RFC for a "full range of light work," which was "consistent with the medical opinions discussed above" indicating "mild to moderate limitations on physical functioning and no limita[ti]ons on mental functioning." (Tr. 163.)

Proceeding along the five-step disability analysis, ALJ Greenberg found that Lugo could not return to his past

relevant work as a shipping clerk, where he had lifted and carried up to fifty pounds. (*Id.*) With the burden shifting back to the SSA to show there were other jobs that Lugo could perform in the national economy consistent with his RFC, age (forty-seven), education and work experience, ALJ Greenberg reviewed the Medical-Vocational Guidelines, which direct a conclusion of "disabled" or "not disabled" depending on the claimant's RFC and vocational profile. (Tr. 163.) Since Lugo was a "younger individual" with limited education, the ALJ noted, the Guidelines could direct a no-disability decision only if Lugo had the exertional RFC to perform the seven primary strength demands at the given level of exertion and if there were no non-exertional limitations. (*Id.*) He explained that jobs were classified as sedentary, light, medium, heavy and very heavy and described the exertional demands of light work: lifting no more than twenty pounds with frequent lifting or carrying of ten pounds, a "good deal" of walking, and standing or sitting most of the time with some pushing and pulling. (Tr. 164.) He concluded, "Because the evidence supports a finding that the claimant can perform the demands of the full range of light work, a finding of 'not disabled' is directed by Medical-Vocational Rule 202 .16." (*Id.*)

### D. *The Parties' Motions*

 **\*14**  In the Commissioner's moving brief, he seeks an order reversing this decision and remanding the case to the SSA for further proceedings, both to allow further development of the record and to permit the ALJ to provide more detailed findings on several issues. In support of this application, the Commissioner cites two major errors in the ALJ's decision.

The first error concerns how the ALJ arrived at his conclusion that the plaintiff was able to perform light work. That term is defined in 20 C.F.R. § 416.967(b) as the ability (a) to lift up to ten pounds frequently and up to twenty pounds occasionally, and (b) either to stand and walk, off and on, for a substantial amount of time, or to sit for most of the time coupled with the ability to do pushing and pulling of arm or leg controls. *See, e.g., Vargas v. Sullivan,* 898 F.2d 293, 294 (2d Cir.1990); [16] *see also* Titles II and XVI, Determining Capability to do Other Work-the Medical-Vocational Rules of Appendix 2, 1983-1991 Soc. Sec. Rep. Serv. 24 (SSR 83-10), *available at* 1983 WL 31251, at \*5-6 (1983) . [17]  Because the record contained "widely varied assessments" of Lugo's ability to perform

these activities, and because the ALJ did not explain "how he weighed the medical evidence and medical opinions in the record to arrive at his conclusion," the Commissioner seeks remand to correct this error. (*See* Def.'s Mem. 3-4, 6.)

As examples of the "varied assessments," the Commissioner cites not only the reports considered by ALJ Greenberg (including those of Drs. Natta, Finger and Cacciarelli), but also a number of reports not cited by the ALJ that directly addressed the quantifiable physical exertion requirements, including a March 1994 report by Dr. DeLeon (finding no limitation in Lugo's ability to sit, but slight limitation regarding standing, walking, lifting, carrying, pushing and pulling (Tr. 122)); a January 1998 report by Dr. Mason (finding Lugo able to handle twenty-five pounds frequently and fifty pounds occasionally and able to stand or walk for six hours in an eight-hour day (Tr. 337)); a May 1998 report by Dr. Reynolds (finding that Lugo could handle ten pounds frequently and twenty pounds occasionally and that he could stand or walk for six hours in an eight-hour day (Tr. 382)); a November 1999 report by Dr. Joseph (finding that Lugo had no sitting limitation and mild restrictions in prolonged walking, standing and handling heavy objects (Tr. 508)); and a December 1999 report by Dr. Danza (finding that Lugo was able to handle twenty-five pounds frequently and fifty pounds occasionally and that he could stand or walk for six hours (Tr. 523)). (Def.'s Mem. 4-5.) The Commissioner suggests that these reports need to be reconciled with the ALJ's findings. (*Id.* at 3-6.)

The Commissioner also argues that the ALJ erred with respect to Lugo's mental impairments: noting that Dr. Marcuzzo's opinion that Lugo was impaired for all types of mental functioning was inconsistent with that of the other psychiatrists, the Commissioner points out that the ALJ made "inconsistent statements about the severity of the limitations indicated by the other psychiatrists." (*Id.* at 7-8.) The Commissioner observes that at one point the ALJ stated that Lugo had mild to moderate limitations in his mental functioning (Tr. 161-62), but elsewhere in his decision he wrote that Lugo had "no limita[ti]ons on mental functioning" (Tr. 163), and he failed to explain or reconcile these two seemingly inconsistent findings. (Def.'s Mem. 7-8.)

 **\*15**  The Commissioner points out that an accurate assessment of the severity of the limitations on Lugo's

mental functioning was particularly important because of his "long history of substance abuse," as the statute and regulations provide that an individual cannot be found disabled if it is determined that alcoholism or substance abuse was material to the finding of disability. (Def.'s Mem. 8 (citing 42 U.S.C. § 1382c(a)(3)(J)).) In this regard, the Commissioner notes the inconsistent statements made by Lugo throughout the record as to when he stopped abusing cocaine and alcohol-dates that ranged from 1992 to 1997. (Def.'s Mem. 8.) According to the Commissioner, even if Lugo's mental impairments were severe enough to prevent him from working, before he could be found disabled it would still be necessary to evaluate the evidence to determine whether Lugo would still be disabled if he had stopped using drugs or alcohol. Since the ALJ did not address this question, the issue could only be resolved on remand. (Id. at 8-9, Def.'s Reply Mem. in Further Supp. of Her Mot. for a Remand and in Opp'n to Pl.'s Cross-Mot. 5-6.)

Plaintiff in turn filed a cross-motion for judgment on the pleadings, seeking a reversal of the Commissioner's decision and a remand solely for the purpose of awarding benefits. In his brief, Lugo first argues that reversal and payment of benefits is the appropriate remedy because substantial evidence in the record supports a finding that he is disabled pursuant to the statute. (Pl.'s Mem. 17-23.) Specifically, he contends that every physician who treated or examined him concluded that he has "functional limitations" from low-back pain. (Id. at 17.) Lugo maintains that Dr. Natta's findings that he had substantial limitations were not an aberration, given Dr. DeLeon's opinion that he was "slightly limited" in his ability to walk, stand, lift, carry, push and pull; Dr. Finger's opinion that he was mildly to moderately limited; and Dr. Cacciarelli's opinion that he was "limited" in those abilities. (Id. at 18-19.) Against that backdrop, Lugo argues that his treating physician's opinion should have been accorded "controlling weight," as it was "not inconsistent" with other substantial medical evidence of record; according to plaintiff, even though Dr. Natta's conclusion was not "100% consistent" with the other evidence, it did not have to be. (Id. at 19-20.) He also infers that one reason why the consulting physicians might not have regarded Lugo's limitations as so severe is because they failed to look for lumbosacral tenderness. (Id. at 20.) If Dr. Natta's opinions had been given controlling weight, Lugo claims, he would have been found disabled. (Id. at 20.)

Lugo also argues that the ALJ failed to provide specific reasons for discrediting his testimony concerning pain and that his subjective complaints of pain should have been fully credited. If so, this would have resulted in a finding of disability. (Id. at 21-23.)

**\*16** Finally, Lugo argues that reversal, not remand, is appropriate in his case because his claim for benefits is more than ten years old, and that the Commissioner should not be accorded another opportunity to "shore up" his determination that plaintiff is not disabled, particularly since the ALJ, Appeals Council and Commissioner have ignored the District Court's 1998 order directing the SSA to follow the regulations if Lugo's testimony was to be discredited. (Id. at 23-24.)

In his Reply Memorandum, the Commissioner responds that delay alone is never a sufficient basis for reversing a decision and awarding benefits. (Def.'s Reply Mem. 2.) In addition, the Commissioner argues that remand for calculation of benefits is appropriate only where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose" (id.) (quoting Parker v. Harris, 626 F.2d 225, 235 (2d Cir.1980), and that the medical evidence here is not so clear as to warrant such a conclusion, given the "numerous conflicting assessments of the severity of the functional limitations arising from those conditions." (Id. at 4-5.) Finally, the Commissioner reiterates that even if the medical evidence clearly showed that Lugo could not perform any substantial gainful activity, it would still be necessary to determine whether his history of alcohol and drug abuse was material to the finding of disability in light of the conflicting evidence as to when he stopped abusing those substances. (Id. at 5-6.)

## DISCUSSION

I. *Standards for Review and Remand*
For purposes of SSI eligibility, a person is disabled when he is unable to "engage in any substantial gainful activity [18] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c (a)(3)(B); *see also* 20 C.F.R. § 416.905 (footnote not in original). A

person's physical or mental impairment is not considered disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d) (2)(A), 1382c(a)(3)(B). In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir.1988).

The regulations set forth a five-step sequential process to evaluate disability claims. 20 C.F.R. §§ 404.1520, 416.920. The first step requires the ALJ to determine whether the claimant is presently engaged in substantial gainful activity. 20 C.F.R. §§ 404 .1520(b), 416.920(b). If so, he is not considered disabled; if not, Step Two requires the ALJ to determine whether the claimant has a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from a severe impairment, Step Three requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 404.1520(d)-(e), 416.920(d)-(e). If the claimant's impairment meets or equals a listed impairment, the claimant is presumptively disabled; if the claimant is not presumptively disabled, Step Four requires the ALJ to consider whether the claimant's residual functional capacity ("RFC") [19] precludes the performance of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the ALJ so finds, Step Five requires the ALJ to determine whether the claimant can do any other work. 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant retains the burden of proof as to the first four steps, and the Commissioner bears the burden of proving the fifth step. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir.2004).

**\*17** The Social Security Act authorizes the court, when reviewing decisions of the SSA, to order further proceedings, as expressly stated in sentence four of the statute:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgement affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g); Butts, 388 F.3d at 384. Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard." Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir.1999) (internal quotation marks omitted) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir.1996)); cf. Butts, 388 F.3d at 384. Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117 (2d Cir.2000)).

In considering whether a remand is appropriate, the court looks to whether the ALJ complied with his affirmative duty to fully develop the record, which applies even when a claimant is represented at the hearing. See Perez v. Chater, 77 F.3d 41, 47 (2d Cir.1996). To that end, the ALJ must seek additional evidence or clarification when the "report from [the applicant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e) (1); see also Rosa, 168 F.3d at 79 (describing the ALJ's obligation to develop the record). In addition, the ALJ must adequately explain his analysis and reasoning in making the findings on which his ultimate decision rests and must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir.1995); Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir.1984); Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, at \*10 (S.D.N.Y. Aug. 4, 2006).

If the ALJ failed in his duty to fully develop the record or committed other legal error, a reviewing court

> should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence. If, on the other hand, the district court determines

that there is substantial evidence of disability in the administrative record, it may decide to reverse the Commissioner's decision, make a determination of disability and remand solely for the calculation of benefits. Such a remedy is an extraordinary action and is proper only when further development of the record would serve no purpose.

**\*18** *Rivera v. Barnhart,* 379 F.Supp.2d 599, 604 (S.D.N.Y.2005).

In short, a remand solely for an award of benefits may be justified if the court finds that the Commissioner's decision was not based on substantial evidence and that further development of the record would not change that result. *Id.* at 604. Delay alone, however, is not a valid basis for remand solely for calculation of benefits. *See Bush v. Shalala,* 94 F.3d 40, 46 (2d Cir.1996) (citation omitted).

II. *Assessment of Defendant's Motion*

The SSA seeks a remand to correct several identified errors of the ALJ. We address these errors and several others that warrant a remand unless there is a basis in the record to order an outright award of benefits.

A. *The ALJ's Conclusion that Plaintiff Could Perform Light Work*

The Commissioner asserts that the ALJ did not adequately explain how he weighed the medical evidence and medical opinions and arrived at his conclusion that the plaintiff was able to perform light work, particularly given the "widely varied assessments" of Lugo's ability to perform these activities. (Def.'s Mem. 4.) He argues that this error compels remand. We agree.

"It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions." *Pacheco v. Barnhart,* 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004)* (internal quotation marks omitted) (quoting *Rivera v. Sullivan,* 771 F.Supp. 1339, 1354 (S.D.N.Y.1991)). Courts in this Circuit have long held that an ALJ's "failure to acknowledge relevant evidence or explain its implicit rejection is plain error." *Kuleszo F|K|A Dillon v. Barnhart,* 232 F.Supp.2d 44, 57

(W.D.N.Y.2002). Although "every conflict in a record [need not be] reconciled by the ALJ ... the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris,* 728 F.2d at 587.

While the ALJ stated that he had reviewed "the entire body of evidence" in the record, his decision cited the findings of only a small number of the consultative physicians on the question of Lugo's physical limitations. (Tr. 159.) Further, none of those cited had provided an opinion on Lugo's RFC that quantified how long Lugo could sit or walk, and how much he could lift, findings that would form the basis for a determination of whether a claimant can perform sedentary, light, medium, heavy or very heavy work. (Tr. 159-60.) The ALJ cited two assessments by Dr. Finger, who found Lugo "mildly" limited in sitting, "mildly to moderately" limited in standing and walking and "moderately" limited in lifting and carrying; an assessment by Dr. Joseph, who found that Lugo had "mild" restrictions on walking and prolonged standing, no limitation on sitting and "mild" restrictions on carrying and lifting heavy objects; and an assessment by Dr. Cacciarelli, who found that Lugo had a "limited" ability to push, pull or carry heavy objects or stand for long periods of time. (*Id.*) However, it is not clear from the ALJ's decision how these doctors' assessments of "mild" or "moderate" limitations corresponded with the SSA physical-exertion requirements for light work. Moreover, the three cited doctors differed among themselves as to Lugo's limitations, and it was far from clear whether the use of the word "mild" to describe Lugo's limitations by Drs. Finger and Joseph meant the same thing. While the ALJ did explain the basis for according little weight to the opinion of Dr. Natta-who claimed that plaintiff was "unable to work in any capacity" (Tr. 162)-he apparently used the general and unquantified assessments by Drs. Finger, Joseph, and Cacciarelli to conclude that plaintiff could meet the physical requirements of light work. Moreover, he did not mention, assess or reconcile the reports of other doctors in the record-including Drs. DeLeon, Mason, Reynolds and Danza-who did quantify Lugo's exertional capacities. [20]

**\*19** It is true that we might infer that the conclusions reached by the physicians in the record who quantified Lugo's limitations were not significantly different from the reports, for example, of Dr. Finger, who found mild,

Case 7:12-cv-06134-NSR Document 28 Filed 08/02/16 Page 39 of 72

mild to moderate, and moderate limitations in Lugo's exertional requirements. (Tr. 159-60.) Nonetheless, we may not fill in the blanks of the ALJ's reasoning where it is not explicit and on that basis "affirm the ALJ's ruling based upon reasoning attributed to [him] on review but not identified in [his] opinion." (Tr. 216); *Lugo v. Apfel,* 97 Civ. 4942 (S.D.N.Y. Sept. 28, 1998) (JSR) at 3; *see, e.g., Williams,* 859 F.2d at 260-61; *Rivera,* 771 F.Supp. at 1354.

The ALJ similarly did not explain how he weighed the functional-capacity assessments that he noted and those that he did not specifically evaluate, despite the centrality of those assessments to the question of plaintiff's exertional capacity. "[W]here the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate." *Butts,* 388 F.3d at 385. Accordingly, this omission justifies a remand for further proceedings to permit the ALJ to specify how he weighed the medical evidence presented, especially the medical evaluators' quantification of Lugo's RFC, and to explain how he evaluates those varied assessments to arrive at his determination of Lugo's RFC.

2. *Plaintiff's Mental Impairments*
The Commissioner also points out that in assessing the limitations in Lugo's mental functioning, the ALJ arrived at two inconsistent findings in the body of his decision and did not explain or reconcile them. At one point, after reviewing the reports of psychiatrists DelaChapelle, Tapia and King, the ALJ found that Lugo's "overall psychiatric status from January, 1998 to March 2000 was a dysthymic disorder *imposing mild to moderate limitations.*" (Tr. 162 (emphasis added).) The ALJ explained that these psychiatrists had examined Lugo both before and after Dr. Marcuzzo and found, at most, "mild to moderate impairments," in contrast to the "major depression" and other serious mental impairments found by Dr. Marcuzzo. The ALJ explained this variance by characterizing Lugo's condition as having "worsened temporarily" when he saw Marcuzzo. (Tr. 161-62.)

The ALJ went on to evaluate Lugo's assertions concerning his psychiatric problems, and found that there was "simply no medical support in the record for these allegations." (Tr. 163.) In doing so, the ALJ did not explain how he arrived at the conclusion in the next paragraph that Lugo retained a RFC for the full range of light work based on his having mild to moderate

limitations on physical functioning and *"no limita[ti]ons on mental functioning."* (*Id.* (emphasis added).)

This inconsistency is potentially critical in terms of the disability analysis. Mental limitations are considered "nonexertional" for purposes of the fifth step in the disability analysis, *see* 20 C.F.R. § 416.969a(c)(1)(i)-(ii), [21] and, if present, preclude the ALJ's exclusive reliance (as was the case here) on the medical-vocational (or grid) guidelines to dictate whether the applicant is disabled. *See, e.g., Butts,* 388 F.3d at 383-84.

**\*20** Despite the ALJ's reference in his decision to "mild to moderate" limitations in Lugo's mental functioning, he then ignored that finding, stating instead that Lugo had no such limitations. (Tr. 163.) This allowed him to rely exclusively on the grid regulations and to decide that "[b]ased on an exertional capacity for light work, and the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.16." (Tr. 165.)

"In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." *Rosa,* 168 F.3d at 78 (internal quotation marks omitted) (quoting *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986)). However, exclusive reliance on the grids is inappropriate where

> the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform. In these circumstances, the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.

*Id.* (internal quotation marks omitted) (quoting *Bapp,* 802 F.2d at 603).

By seemingly concluding that Lugo's limitations were solely exertional in nature, the ALJ dispensed with the requirement that he consult a vocational expert or look for equivalent evidence. Instead, he made his "not disabled" determination solely by consulting "the Social Security Act's table of medical-vocational guidelines, ...

to conclude that [Lugo] was capable of performing other jobs existing in significant numbers in the national economy and therefore did not meet the requirements for disability status." *Butts,* 388 F.3d at 382; (Tr. 165). By not reconciling his contradictory statements concerning Lugo's limitations on his mental functioning, the ALJ made it impossible for the court to evaluate the role that Lugo's non-exertional limitations (or lack thereof) played or should have played in the ALJ's conclusion that Lugo was not disabled. *See, e.g., Treadwell v. Schweiker,* 698 F.2d 137, 142 (2d Cir.1983) ("[I]t is an elementary rule that the propriety of agency action must be evaluated on the basis of stated reasons.").

Furthermore, even the ALJ's alternative finding of "mild to moderate" mental impairments-which arguably reflect an impairment that is not "significant," *Rosa,* 168 F.3d at 78-cannot stand without further explanation. As noted, Dr. Marcuzzo found that plaintiff was suffering from a "major depression." Although the ALJ opined that the psychiatrist was observing only a transient phenomenon-thus implicitly crediting Dr. Marcuzzo's findings-that determination of transience in a major depression appears to be a medical assessment calling for medical expertise and hence could not be invoked by the ALJ based solely on his lay inference. *See, e.g ., Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998) ("[I]t is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion .... [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who" submitted an opinion to or testified before him.) (internal quotation marks omitted) (quoting *McBrayer v. Sec'y of Health and Human Servs.,* 712 F.2d 795, 799 (2d Cir.1983)); *Filocomo v. Chater,* 944 F.Supp. 165, 170 (E.D.N.Y.1996) (stating that by re-evaluating a doctor's conclusions, the ALJ improperly "engaged in his own evaluations of the medical findings").

**\*21** In sum, because of limitations in the ALJ's analysis and explanations, as well as an apparent gap in the medical record, we are unable to perform a proper review of the ALJ's findings in this respect. It follows that in this case, "further findings would [ ] plainly help to assure the proper disposition of [the] claim," *Rosa,* 168 F.3d at 83, and we believe that remand would be "particularly appropriate" to clarify this matter. *Id.; see also Clark v. Barnhart,* 2003 WL 22139777, at \*2 (E.D.N.Y. Sept. 16, 2003) ("Because

of the inconsistent findings by the ALJ, remand is required for a definitive determination as to whether [claimant] is or is not disabled....").

### 3. *The Role of Alcoholism and Drug Abuse*

The Commissioner also notes that the ALJ never addressed the role that alcoholism and drug abuse played in Lugo's disability determination. As he points out, even if the ALJ found plaintiff to be disabled, he could not award benefits without first addressing the impact of such substance abuse, and for this reason a remand rather than an award of benefits is appropriate. (Def.'s Mem. 8-9, Def.'s Reply Mem. 5-6.)[22]

"[A] person found to be disabled after employment of the five-step sequential evaluation will not be considered disabled within the meaning of the Act 'if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to' a finding of disability." *Orr v. Barnhart,* 375 F.Supp.2d 193, 200 (W.D.N.Y.2005) (quoting 42 U.S.C. § 423(d)(2)(C)). The regulations make clear that the "key factor" in this analysis is whether the Commissioner would still find the claimant disabled if he stopped using alcohol or drugs. *See* 20 C.F.R. §§ 404.1535(b) (1)-(2); 416. 935(b)(1)-(2). "When the record contains medical evidence of substance abuse, the Commissioner should evaluate which of the claimant's 'current physical and mental limitations ... would remain if [he] stopped using drugs or alcohol and then determine whether any or all of [these] remaining limitations would be disabling.' " *Eltayyeb v. Barnhart,* 2003 WL 22888801, at \*4 (S.D.N.Y. Dec. 8, 2003) (alterations in original) (quoting 20 C.F.R. § 404.1535(b)(2) (2003)).

> If the remaining limitations would not be disabling, then drug addiction or alcoholism is a contributing factor material to the determination of disability. 20 C.F.R. § 404.1535(b)(2)(i). When the record reflects drug or alcohol abuse, the claimant bears the burden of proving that substance abuse is not a contributing factor material to the disability determination.

*Id.*

The ALJ found that Lugo's mental impairments were not sufficiently severe to prevent him from working, warranting a finding that Lugo was not disabled. Hence, he never addressed the question of the effect of alcoholism or drug addiction on Lugo's condition. If, however, the

ALJ determined on remand that Lugo became disabled at any relevant time, he would be required to consider the effects of Lugo's alcoholism and drug use on his impairments and limitations. Lugo consistently indicated that his abuse of these substances had been longstanding, which would underscore the need for the ALJ to elicit evidence concerning their effect on Lugo's mental status. (*See* Tr. 118 (heavy drinker since the age of 15); 120 (admitted to snorting cocaine for 10 years); 124 (history of alcohol abuse since his adolescence; used cocaine in the past also); 319 (admitted he was a heavy drinker and cocaine abuser for many years); 334 ("prior history of cocaine abuse for several years"); 480 (admitted to drinking heavily and using cocaine and marijuana for 10 years); 502 (cocaine and marijuana use for 15 years); 531 (alcohol and marijuana dependence since adolescence; cocaine use since age 30).)

**\*22** Moreover, depending on when the disability began, the assessment could be complicated by the fact that the record provides contradictory statements by Lugo as to when he discontinued abusing these substances. The record as it stands leaves the unanswered question whether Lugo may have been abusing these substances during at least some of the period for which he is seeking SSI benefits and what effect that continued use had on his psychiatric evaluations and the conclusions drawn from them. (*See* Tr. 28 (last used cocaine and alcohol in 1992); 118-20 (still drinking in March 1994 and stopped using cocaine in February 1994); 124 (stopped using cocaine and alcohol in 1993 or 1994); 319 (stopped using alcohol in 1995 and cocaine in 1991); 334 (stopped using cocaine in 1995); 480 (stopped using alcohol, cocaine and marijuana in 1997); 502 (stopped using cocaine in 1995); 531 (stopped using alcohol and marijuana in 1997 and cocaine in 1993).) [23] If the timing of the dependency became relevant, the ALJ would have to make the pertinent findings on this point.

4. *The ALJ's Assessment of Pain*

Apart from the issues that defendant flags as justifying a remand, we note an additional problem with the findings of the ALJ. In making a disability determination, the ALJ must take into account the claimant's assertions of disabling pain, even if the claim is premised on subjective symptoms, so long as the evidence establishes that the claimant has a medical impairment that could "reasonably be expected to produce pain." *See, e.g., Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir.1999). The ALJ is of course

free to discount such testimony if he finds it not to be credible, but in assessing that credibility question he must consider a variety of factors specified in the SSA regulations, and consistent with the general requirement for a clear explanation of his analysis, he must sufficiently articulate his reasoning to demonstrate his compliance with the regulation. *See, e.g., Bush,* 94 F.3d at 46 n. 4. In assessing claims of pain, the ALJ must consider the claimant's daily activities; the location, duration, frequency and intensity of the pain; any precipitating and aggravating factors; the claimant's medications (including type, dosage, effectiveness and side effects); treatments other than medication that claimant uses to relieve pain; any other measures used to relieve pain; and any other factors concerning functional limitations and restrictions due to pain. *See* 20 C.F.R. § 404.1529(c)(3).

In this case, the ALJ, when addressing pain, mentioned but did not evaluate Lugo's medication regime, referred to Lugo's attempts to do light housework and cited the lack of physical therapy or surgery. He erred in failing to discuss most of the regulatory factors and in failing concretely to address evidence supportive of plaintiff's claim. Thus, he did not directly assess plaintiff's detailed descriptions of the pain and the limitations it imposed on his activities-although he concluded that Lugo was not credible-and he failed to address the seeming consistency of the symptoms described by Lugo with the conceded diagnoses of both treating and consulting physicians that he suffers from low-back sclerosis. Furthermore, his reference to the absence of alternative treatment measures-specifically, physical therapy and surgery-appears to have usurped the role of doctors in proffering expert opinions, since the record does not demonstrate (as the ALJ assumed) that plaintiff's diagnosed sclerosis condition could be alleviated by either therapy or surgery.

**\*23** While the ALJ is permitted to reject subjective testimony concerning pain for lack of credibility, he must provide an explicit and sufficient explanation so that the decision can be reviewed by the court for legitimacy of reasoning and sufficient evidentiary support. *See, e.g., Williams,* 859 F.2d at 260-61; *Rivera,* 771 F.Supp. at 1356 n. 8; *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987). Particularly since the principal rationale of the plaintiff's disability claim, as reflected in Dr. Natta's reports, is his assertion that he suffers from disabling pain, the failure of the ALJ to lay out a detailed assessment

Lugo v. Barnhart, Not Reported in F.Supp.2d (2008)
Case 7:12-cv-06134-NSR   Document 28   Filed 08/02/16   Page 42 of 72
2008 WL 515927

explaining his rejection of plaintiff's claim requires a remand for correction of this omission.

## B. Remand for Benefits Is Not Appropriate

1. *The Current Record Does not Compel a Benefit Award*
In plaintiff's cross-motion, he argues that reversal and remand for payment of benefits is appropriate because substantial evidence in the record supports a finding that he is disabled. (Pl.'s Mem. 17-23.) He suggests that every doctor who examined him concluded that he had some functional limitations due to low-back pain, and he focuses on the reports from his treating physician, Dr. Natta, who found that his pain placed serious limitations on his activities. (*Id.* at 17-18.) He argues that Dr. Natta's findings "were not an aberration," were "well-supported" by his clinical observations and later X-rays and, though not "100% consistent" with the reports of other consulting physicians, did not have to be. (*Id.* at 18-19.) Finally, he claims that if Dr. Natta's opinions were given the "controlling weight" they deserved, a finding of disability would be mandatory. (*Id.* at 20.)

In a proceeding to review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability. *See, e.g., Curry,* 209 F.3d at 122. Necessarily, then, in seeking a remand solely to calculate benefits, Lugo must demonstrate that the record so clearly supports his claim of disability that a remand for further consideration of that question would serve no purpose. *See, e.g., Butts,* 388 F.3d at 385-86 (quoting *Rosa,* 168 F.3d at 83). Plaintiff fails to make that case.

Lugo bases his argument primarily on the contention that the ALJ erred in not according the reports of his treating physician, Dr. Natta, controlling weight pursuant to the treating physician's rule. The "treating physician rule" is embodied in a series of provisions found in 20 C.F.R. § 404.1527, which details the weight to be accorded a treating physician's opinion and the opinions of non-treating consulting doctors. The treating doctor's opinions are entitled to "controlling weight" in certain specified circumstances:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

**\*24** 20 C.F.R. § 404.1527(d)(2); *see, e.g., Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003). The regulations further specify that if the SSA does not give controlling weight to the opinions of the treating physician, it must consider a series of specified factors in determining the weight to be given those opinions: (1) the length of the treatment relationship and the frequency of examination, with a treating physician's opinion being given more weight; (2) the nature and extent of the treatment relationship, with a treating physician's opinion being given more weight; (3) the evidence that supports the physician's report; (4) how consistent the opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factor that may be significant. 20 C.F.R. §§ 404.1527(d)(2)-(6).

The ALJ found that Dr. Natta's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and were "inconsistent with the other substantial evidence" in the record. We find that the ALJ's conclusions in this respect-although not mandated by the record-are supported by substantial evidence.

The most recent submission of Dr. Natta consisted of a one-page letter dated October 9, 1998 in which he asserted that Lugo was "being treated at this facility" for "degenerative joint disease-sclerosis of the sacroiliac joints" with persistent low-back pain; that Lugo had a latent luetic infection and type II diabetes; and that he had undergone surgery to remove kidney stones in 1994 and surgery to remove hydroceles in 1997. He also reported that Lugo's medications included Tylenol # 3 and Flexeril. He concluded that Lugo "is unable to work in any capacity" (Tr. 500), but provided no "medically acceptable clinical and laboratory diagnostic techniques" to support that statement.

The other records from Dr. Natta date from 1993 and 1995. (Tr. 128-39.) They consist principally of doctor's notes indicating that Lugo had "tenderness" in his lumbar spine (Tr. 129), which was apparently diagnosed as "lumbago. R/O [rule out] osteoarthritis of lumbar

spine." (Tr. 131.) He also provided a medical report in 1995 in which he indicated that he was then treating Lugo every three months (Tr. 133), and he offered a "poor" prognosis due to back pain that had persisted and was not controlled by analgesics. (Tr. 134.) [24] In that report, he estimated that Lugo could sit for up to one-half hour to an hour continuously, and stand for a total of one hour in an eight-hour day and sit for a total of one hour in an eight-hour day; that he could "never" lift or carry any weight, and "never" bend, squat, climb or reach; and that he was "unable to work with persistent pain only partly relieved by analgesics." (Tr. 135-37.)

The ALJ's analysis, at least in general terms, followed the contours mandated by the "treating physician" regulation. He observed that Dr. Natta had "report[ed] no clinical or laboratory findings or any other support for such a degree of impairment" (Tr. 162), and that finding is clearly supported by substantial evidence. Although the ALJ did not make a specific finding that Dr. Natta's conclusions were "inconsistent with the other substantial evidence" in the record, he specifically referred to a series of findings by a number of other doctors who found, contrary to Dr. Natta's reports, only mild or moderate limitations. He apparently concluded, based on this discrepancy, that Lugo was capable of substantially greater exertional activity than Dr. Natta had suggested. (Tr. 159-60.)

**\*25** Given the substantial body of medical opinion rejecting the conclusions of the one treating or examining doctor who has unequivocally opined that plaintiff was physically unable to perform work activities, [25] it cannot be said that the evidence of record so clearly points to a physically disabling condition as to justify a judicially mandated award of benefits. *See, e.g., Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004); *Snell,* 177 F.3d at 133. As for plaintiff's psychiatric condition, as we have noted, there is conflicting evidence in the record as to whether Lugo was suffering from an ongoing severe impairment, and the ALJ failed to offer a consistent and clear set of findings about that condition. This omission mandates a remand, but does not-on the current state of the record, and especially given the confusion about plaintiff's substance abuse-justify an award of benefits at this stage.

As noted, a remand for calculation of benefits is required when the court finds that there is "no apparent basis

to conclude that a more complete record might support the Commissioner's decision." *Butts,* 388 F.3d at 385-86 (quoting *Rosa,* 168 F.3d at 83); *see also Parker,* 626 F.2d at 235 (remand for the calculation of benefits is appropriate where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose"). Because the administrative record and the findings of the ALJ contain significant gaps and further findings will "plainly help to assure the proper disposition of [the] claim," *Rosa,* 168 F.3d at 83, and because it is entirely possible that a complete record would justify the SSA's current conclusion that plaintiff was not disabled at the relevant time, remand for calculation of benefits is not appropriate here. A more complete record, explicit discussion of the weight accorded by the ALJ to the varying assessments of Lugo's functional limitations, clarification of his findings concerning Lugo's mental limitations, more specific findings as to pain and exploration of the relationship between Lugo's substance abuse and his mental limitations are necessary to-once and for all-make a final determination in this case.

3. *Extensive Delay Does Not Justify An Award of Benefits*
Plaintiff also asserts that the "extensive delay in the adjudication of Mr. Lugo's claim is extraordinary and would, if standing alone, seriously test [ ] the Second Circuit's pronouncement in *Bush v. Shalala,* that delay alone is not grounds for reversal and payment [of] benefits." (Pl.'s Mem. 1.) In *Bush,* the Second Circuit held that "absent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." 94 F.3d at 46. It is uncontroverted that Lugo's three applications have been denied at every level of the administrative process. Moreover, the District Court's remand in 1998 and the recommended remand in this instance do not reflect on the merits of Lugo's applications, but rather are directed principally to the failings of the ALJ in not explaining the basis of his findings. We recommend that the court decline Lugo's invitation to extend the holding of *Bush* to rule that even if the ALJ finds a claimant not disabled and there is substantial evidence to support that finding, the delay in resolution is a sufficient basis to remand for benefits.

III. *Time Limit for Remand*
**\*26** There remains the question of whether a remand order may and should impose a time limit for the SSA to

complete all further proceedings in this case. We conclude with an affirmative answer on both counts.

The Second Circuit has noted the authority of the court to require, in appropriate circumstances, that the agency adhere to a timetable on remand. The Court noted that 42 U.S.C. § 405(b) provides that

> after an adverse decision on a disability claim, a claimant is entitled to "reasonable notice and opportunity for a hearing with respect to such decision." 42 U.S.C. § 405(b)(1). We have interpreted footnote 33 of [ Heckler v.] Day, [467 U.S. 104 (1984) ] to mean that injunctive relief would still be an appropriate remedy for individual cases involving unreasonable delays.

Butts v. Barnhart, 416 F.3d 101, 105 (2d Cir.2004) (internal quotation marks omitted) (quoting Barnett v. Bowen, 794 F.2d 17, 22 (2d Cir.1988)).

In Butts, the Second Circuit observed that it was mindful of the "often painfully slow process by which disability determinations are made, and that a remand for further evidentiary proceedings (and the possibility of further appeal) could result in a substantial, additional delay." 388 F.3d at 387 (internal quotation marks and citations omitted) (quoting Carroll v. Sec' y of Health and Human Servs., 705 F.2d 638, 644 (2d Cir.1983)). In remanding Butts's application, the circuit court instructed the district court "to direct that further proceedings before an ALJ be completed within 60 days of the issuance of the district court's order and, if that decision is a denial of benefits, a final decision of the Commissioner be rendered within 60 days of Butts' appeal from the ALJ's decision. The district court's order should provide that, if these deadlines are not observed, a calculation of benefits owed Butts must be made immediately." Butts, 388 F.3d at 387. The Commissioner sought a rehearing, asserting, inter alia, that the 60-day time limit was not sufficient time for the SSA to render a decision while complying with its own rules and regulations, and the Court extended the time limit to 120 days. Butts, 416 F.3d at 102.

In light of the fact that more than ten years elapsed between the plaintiff's filing of his initial application and the full briefing of the current motions, we recommend that the District Court require that the proceedings before an ALJ must be completed within 120 days of the issuance of the District Court's remand order. [26]

## CONCLUSION

Based on the foregoing, we recommend that the Commissioner's motion be granted, that plaintiff's cross-motion be denied, and that the case be remanded for further proceedings consistent with this opinion. In addition, we recommend that the remand order require that proceedings before an ALJ be completed within 120 days of the issuance of the order.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

## All Citations

Not Reported in F.Supp.2d, 2008 WL 515927

Footnotes

1   Arthralgia is defined as "pain in a joint." Dorland's Illustrated Medical Dictionary 140 (28th ed.1994) [hereinafter Dorland's ].

2   This hearing, like the two subsequent ones, was conducted with the assistance of a Spanish interpreter. (Tr. 26, 540, 553.)

3   Lithotripsy is defined as "the crushing of a calculus within the urinary system or gallbladder, followed at once by the washing out of the fragments; it may be done either surgically or by several different noninvasive methods." Dorland's 952.

4    Plaintiff first received muscle relaxants-100 mg of Maclamen three times a day and 10 mg of Flexeril four times a day. (Tr. 131, 132.) In 1994, Dr. Natta replaced the Meclamen with Indocin, 50 mg three times a day. He later added Tylenol # 3 with codeine four times a day. As of November 1995, Lugo was taking Motrin 600, Tylenol # 3 and Flexeril. (Tr. 132.)

5    Nocturia is defined as "excessive urination at night." *Dorland's* 1142.

6    Sclerosis involves a hardening, in this case at the joints. *Dorland's* 1495-96.

7    "Luetic" means "syphilitic." *Dorland's* 961.

8    A hydrocelectomy is the process of draining excess fluid, especially from the testicles or spermatic cord. *Dorland's* 783.

9    This term refers to a "mood disorder characterized by depressed feeling ... and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression." *Dorland's* 519.

10    Crepitus is defined as "the crackling sound produced by the rubbing together of fragments of a fractured bone." *Dorland's* 391.

11    This reference is to the gradual conversion of a bone into an ivory-like mass. *Dorland's* 524. In the case of osteoarthritis-which appears to be plaintiff's condition, as the same exam revealed (Tr. 323)-the bone thins and loses cartilage, "resulting in [the] exposure of the subchondral bone, which becomes denser and the surface of which becomes worn and polished." *Dorland's* 524.

12    The record contains no documentation of the treatment by Dr. Chattah.

13    This term refers to a normal psychological state, not manic or depressed. *See, e.g., Santiago v. Barnhart,* 441 F.Supp.2d 620, 624 n. 3 (S.D.N.Y.2006) (citing *PDR Medical Dictionary* 627 (2d ed.2000)); *accord, e.g., Wren v. Astrue,* 2007 WL 1531804, at *5 n. 4 (D.Kan. May 23, 2007).

14    It is not clear whether Dr. Cadet actually examined plaintiff or simply reviewed his medical records.

15    Another physician, Dr. John Cordice, signed a concurring endorsement on Dr. Danza's assessment, on April 5, 2000. (Tr. 529.)

16    The regulation states:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to substantially all of these activities.

> 20 C.F.R. 416.9267(b).

17    The explanatory statement found in SSR 83-10 is confusing in explaining the standing and walking requirements of the cited regulation. It first states that this portion of the regulation requires "frequent lifting or carrying of objects"-which it notes implies a requirement for extended standing or walking-and it defines "frequent" as "occurring from one-third to two-thirds of the time." It then goes on, however, to state that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." If, however, "frequent" means "one-third to two-thirds of the time," one might expect a standing/walking requirement of about two and one-half to five hours, but SSA does not address this apparent anomaly. In any event, as noted, light work is defined, alternatively, to encompass mostly sitting if accompanied by a sufficient amount of pushing or pulling with the use of arm or leg controls to a greater degree than required for sedentary work.

18    Substantial gainful activity is defined as work that: "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F .R. § 416.910.

19    RFC is defined as the most a claimant can do, despite limitations. In determining a claimant's RFC, all medically determinable impairments will be considered, including those that do not qualify as "severe". 20 C.F.R. § 416.945(a).

20    We do note that Drs. Mason, Reynolds and Danza reviewed plaintiff's medical records but did not examine him. The assessments of such non-examining doctors are entitled to less weight than the findings of treating or examining doctors. 20 C.F.R. § 404.1527(d)(1); *see, e.g., Campagna v. Barnhart,* 2007 WL 1020743, at *5 (D.Conn. Apr. 3, 2007); *Rivera v. Barnhart,* 423 F.Supp.2d 271, 278 (S.D.N.Y.2006); *Steficek v. Barnhart,* 462 F.Supp.2d 415, 419 n. 4 (W.D.N.Y.2006).

21    Pursuant to 20 C.F.R. § 416.969a(c)(1)(i) and (ii), non-exertional limitations include "difficulty functioning because you are nervous, anxious or depressed" or "difficulty maintaining attention or concentration."

22    Plaintiff does not directly address this question in his memorandum of law, suggesting instead that the evidence demonstrates that he is disabled as a result of his physical limitations, thus compelling an award of benefits without reference to his psychological status. (Pl.'s Mem. 23 n. 21.)

2008 WL 515927

23   Note that plaintiff generally frames these estimates in terms of number of years prior to the examination rather than naming a particular year (e.g., "three years ago" rather than "in 1995"); therefore, the dates that we extrapolate are frequently based on a calculation.

24   Natta also referred to plaintiff having undergone a lithotripsy. (Tr. 134.)

25   Although Dr. Cadet also stated that Lugo was disabled, it does not appear that he examined plaintiff. (Tr. 479.)

26   We readily acknowledge that this court's report and recommendation has been a long time (indeed far too long a time) in coming and that our slowness has contributed to the already extended time-line for a final disposition of Lugo's three applications. This part of the delay is of course not attributable to the SSA.

---

End of Document                                                 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 516796
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jose LUGO, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 04 Civ. 1064(JSR).
|
Feb. 27, 2008.

*ORDER*

JED S. RAKOFF, District Judge.

**\*1** On February 8, 2008, the Honorable Michael H. Dolinger, United States Magistrate Judge, issued a Report and Recommendation ("Report") in the above-captioned case recommending that the Commissioner of the Social Security Administration's ("Commissioner") determination be reversed, that his motion for remand for further administrative proceedings be granted, that plaintiff's cross-motion for remand solely for calculation of Supplemental Security Income ("SSI") benefits be denied, and that the case be remanded for further proceedings consistent with the Report. In addition, Judge Dolinger recommended that the Administrative Law Judge be ordered to complete any further proceedings required in this matter within 120 days of the issuance of the remand order.

Neither party has filed any objection to any part of Judge Dolinger's Report and, for that reason alone, the parties have waived any right to review by this Court. *See Thomas v. Arn,* 474 U.S. 140, 147-48 (1985); *Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002). Accordingly, the Court hereby adopts the Report and Recommendation in full, reversing the Commissioner's determination, granting the Commissioner's motion for a remand, denying plaintiff's cross-motion for a remand, and ordering that any further proceedings in this matter be completed within 120 days of the issuance of this order.

Clerk to enter judgment.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 516796

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Oliveras ex rel. Gonzalez v. Astrue, Not Reported in F.Supp.2d (2008)
Case 7:12-cv-06134-NSR Document 28 Filed 08/02/16 Page 48 of 72
2008 WL 2262618, 131 Soc.Sec.Rep.Serv. 361

2008 WL 2262618
United States District Court,
S.D. New York.

Lillian OLIVERAS on-behalf-
of Zanais GONZALEZ, Plaintiff,
v.
Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 07 Civ. 2841(RMB)(JCF).
|
May 30, 2008.

*REPORT AND RECOMMENDATION*

JAMES C. FRANCIS IV, United States Magistrate
Judge.

**\*1**  TO THE HONORABLE RICHARD M. BERMAN,
U.S.D.J.

Lillian Oliveras, on behalf of Zanais Gonzalez,
commenced this action pursuant to 42 U.S.C. § 405(g)
to review a final determination of the Commissioner
of Social Security ("the Commissioner") finding Zanais
not disabled and denying her application for children's
Supplemental Security Income ("SSI") benefits. The
Commissioner has moved for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure. For the reasons that follow, I recommend
that the Commissioner's decision be vacated and the
case remanded for further administrative proceedings
consistent with this report.

*Background*

A. *Prior Proceedings*

On March 28, 2005, Ms. Oliveras filed an application
for SSI on behalf of her daughter, Zanais Gonzalez who
has diabetes. (R. at 36).[1]  On July 28, 2005, the Social
Security Administration (the "SSA") denied the plaintiff's
application. It relied on the fact that Zanais "had variable
blood sugars, but no hospitalization since diagnosis" to
conclude that her condition "does not cause marked and
severe functional limitations." (R. at 40).

Ms. Oliveras requested review of the SSA's initial
eligibility determination by an administrative law judge
("ALJ") (R. at 41), and she and Zanais appeared *pro se* at
a hearing held on October 16, 2006. (R. at 197-212). In an
opinion dated October 27, 2006, the ALJ denied Zanais'
claim. (R. at 9-20). When Ms. Oliveras' subsequent request
for review by the Appeals Council of the SSA was denied
(R. at 3-6), the ALJ's ruling became the Commissioner's
final decision. Ms. Oliveras filed the instant action on
March 13, 2007.

B. *The Record*

Zanais Gonzalez was born on June 11, 1998. (R. at 36).
She was six years old when her mother first filed for SSI
benefits on her behalf. In the application, Ms. Oliveras
reported that Zanais suffers from type 1 diabetes, which
make her irritable and confused when her blood sugar
gets low and aggressive when her blood sugar is high.
(R. at 50, 55, 74). Ms. Oliveras also noted that Zanais'
condition sometimes affects her concentration and vision
and that when her blood sugar gets out of control, her
legs get heavy and wobbly, making it hard for her to walk.
(R. at 47, 75, 209). Ms. Oliveras testified at the hearing
that she walks her daughter to school every morning.
(R. at 206). Zanais was first diagnosed with Type 1
(insulin-dependent, juvenile) diabetes mellitus when she
was taken to Jacobi Medical Center for severe diabetic
ketoacidosis[2] and a blood sugar level of 966 mg/dL[3] on
July 8, 2004. (R. at 55-56, 180). Upon admission, Zanais
was vomiting, "appear[ing] very weak," and complaining
of dizziness and of seeing "blinking stars." (R. at 182).
Zanais was held at the hospital for six nights and released
on July 14, 2004. (R. at 56).

Zanais' only other hospitalization occurred nearly two
years later, on February 16, 2006. A school nurse sent
Zanais to the emergency room after an elevated glucose
reading of 497 mg/dL. (R. at 148, 192, 210). On arrival at
the hospital, Zanais' glucose level measured 30 mg/dL. (R.
at 192, 210). The emergency room doctor diagnosed her
as hyperglycemic and recommended that the school nurse
not read her blood sugar so soon after snack time. (R. at
151, 192-93). Zanais was discharged later that same day.
(R. at 151).

**\*2**  In a Teacher Questionnaire dated May 11, 2005, one
of Zanais' teachers, Meena Patha,[4] stated that she had
known Zanais for two months and observed no unusual

degree of absenteeism, although Zanais left the classroom for about ten minutes once or twice daily to have her blood sugar checked. (R. at 61, 67). Ms. Patha also indicated that she did not observe any problems in each relevant functional category, or "domain," [5] and that Zanais' "functioning appear[ed] age-appropriate." (R. at 62-67). The sole exception she noted was that Zanais had a slight problem "[m]aking and keeping friends," a factor related to the domain of interacting and relating with others. (R. at 64).

In an SSA Function Report completed by Ms. Oliveras on April 25, 2005, she reported that Zanais did not enjoy "being with other children [the same] age." (R. at 51). She explained that her daughter seemed afraid and ashamed of her diabetes and just wanted to be "normal" like the others. (R. at 53, 210-11). At the hearing, Ms. Oliveras informed the ALJ that she was trying to place Zanais in therapy and in a diabetes camp to help her accept her illness. (R. at 210-11).

At the time of the hearing, Zanais was in the second grade. (R. at 201). She testified that she liked her teacher, Kara Monica. (R. at 201). Zanais also testified that she liked to read, write, play video games, and watch television. (R. at 201-03). At the ALJ's request, Zanais was able to name three friends she had at school. (R. at 202). Ms. Oliveras confirmed that Zanais was doing much better in school than the previous year and had a teacher who knew how to work around Zanais' condition. (R. at 206).

Dr. Miriam Silfen,[6] a pediatric endocrinologist who has treated Zanais since her diagnosis, submitted a medical report dated June 17, 2005. (R. at 132-37). In it, Dr. Silfen described Zanais' current hypoglycemia symptoms as, "tired, confused, sweaty, irritability," and her hyperglycemia symptoms as, "polydipsia,[7] polyuria,[8] [and] fatigue." (R. at 132). According to Dr. Silfen, Zanais' last physical exam was normal with *"very variable blood sugars."* (R. at 135, 136). She indicated that Zanais' diabetes is chronic and lifelong. (R. at 133).

On the second page of the report, Dr. Silfen was asked to indicate if the child's function/behavior is age appropriate. If no, then please note at which age level the child functions and describe the basis for your observations." [9] (R. at 133). Rather than comment, Dr. Silfen responded, "N/A. (I am a pediatric endocrinologist)." (R. at 133). Dr.

Silfen reported that Zanais displayed no indication of a psychiatric disorder and that diabetes did not affect other organ systems. (R. at 133, 136). On October 5, 2006, Dr. Silfen reported that Zanais' last Hgb A1c in February 2006 was 9.6%. [10] (R. at 180). Zanais visits Dr. Silfen at Jacobi Hospital every six to eight weeks. (R. at 208).

**\*3** Dr. Radharani Mohanty, an SSA medical consultant, completed a Childhood Disability Evaluation of Zanais on June 27, 2005. (R. at 138-44). He opined that she had a less than marked limitation in the domain of health and physical well-being. (R. at 141). Without elaboration, he determined she had no limitation in the other five domains. (R. at 140-41). Dr. Mohanty appears to have based his review on the record without examining Zanais in person. (Defendant's Memorandum of Law in Support of His Motion for Judgment on the Pleadings ("Answer") at 5).

Other medical information in the file includes records from Hunts Point Multi-Service Center dated May 10, 2002 through June 7, 2005 (R. at 86-120) and records from Jacobi Medical Center dated July 8, 2004 through October 12, 2006. (R. at 121-31, 145-91). Many of the treatment notes are for conditions such as a fever and sore throat (R. at 87) or scalp infection (R. at 84, 89). On June 29, 2006, Zanais was treated for a yeast infection related to her diabetes. (R. at 187, 208).

Zanais' condition is treated with insulin and by closely monitoring her diet. (R. at 69, 133, 180). She testified that she knows how to take her own blood sugar readings and give herself her own shots when necessary. (R. at 203).

### C. Determining Childhood Disability
To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The ALJ engages in a multi-step analysis to decide whether a child is disabled under this standard.

First, the ALJ determines if the child is engaged in "substantial gainful activity," which precludes a finding of disability. 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. §

2008 WL 2262618, 131 Soc.Sec.Rep.Serv. 361

416.924(a). If the child is not involved in such activity, the ALJ next evaluates whether she has a medically determinable impairment or combination of impairments that is considered "severe." 20 C.F.R. § 416.924(a). If the impairment is not "medically determinable" or amounts only to "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," the child will be found not to be disabled. 20 C.F.R. § 416.924(c). Next, if the child has a severe impairment, but that impairment does not "meet, medically equal, or functionally equal" one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the child will be deemed not to be disabled. 20 C.F.R. § 416.924(d); see also 20 C.F.R. § 416.925(a); 20 C.F.R. § 416.926(a). If the child meets the three criteria outlined above, she is eligible for SSI benefits.

To "meet" a listed impairment as described above, the child must both be diagnosed with the impairment and "satisf[y] all of the criteria of the listing." 20 C.F.R. § 416.925(d). To "medically equal" a listed impairment, the claimed impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a), (b). In making this determination, the ALJ must "consider all evidence in [a claimant's] case record about [the claimed] impairment(s) and its effects on [the claimant] that is relevant." 20 C.F.R. § 416.926(c).

*4 To "functionally equal" a listed impairment, the impairment "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The six domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. 20 C.F.R. § 416.926a(b)(1). When assessing limitations in the six domains, the ALJ must compare the child to other children of her age who do not have an impairment. 20 C.F.R. §§ 416.924b, 416.926a(b). The ALJ must "assess the functional limitations caused by [the] impairment(s) ... [and then] the interactive and cumulative effects of all of the impairments for which [there is] evidence, including any impairments ... that are not severe." 20 C.F.R. § 416.926a(a) (internal quotation marks omitted). The ALJ will also consider (1) the child's ability to initiate and sustain activities, how much extra help she needs, and the effects of structured or supportive settings; (2) how well the child functions in school; and (3) the effects of

medications or other treatment. 20 C.F.R. § 416.924a(a) (1)-(3).

### D. The ALJ's Decision

Applying the multi-step analysis described above, the ALJ found that Zanais was not engaged in substantial gainful activity and that she had a severe impairment, but one which did not meet or medically equal one of the impairments listed in Appendix 1. [11] (R. at 15). The ALJ further found that the plaintiff did not have an impairment or combination of impairments that functionally equaled a listed impairment. (R. at 15). First, the ALJ opined that: "the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms [were] not entirely credible." (R. at 15). Next, assessing the six functional domains, the ALJ found the plaintiff had a marked limitation in the domain of physical well-being and a less than marked limitation in moving about and manipulating objects, but found no limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself. (R. at 16-20). Thus, the ALJ concluded that the plaintiff was not disabled according to the Social Security Act, (the "Act"). (R. at 20).

### Discussion

#### A. Standard of Review

The scope of review of a social security disability determination involves two levels of inquiry. First, the court must determine whether the Commissioner evaluated the claim based on the correct legal standard. Pollard v. Halter, 377 F.3d 183, 188-89 (2d Cir.2004) ("Failure to apply the correct standards is grounds for reversal." (quoting Townley v. Heckler, 748 F.2d 109, 112 (2d Cir.1984)). "[W]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles," the ALJ cannot proceed with the review because it "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." Rosado v. Barnhart, 290 F.Supp.2d 431, 436 (S.D.N.Y.2003) (quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir.1987)). An administrative decision cannot be upheld solely on the basis that the records contains a plausible

2008 WL 2262618, 131 Soc.Sec.Rep.Serv. 361

foundation for it. *Thomas v. Barnhart,* No. 01 Civ. 518, 2002 WL 31433606, at *4 (S.D.N.Y. Oct. 30, 2002).

**\*5** Second, the court must ascertain whether the Commissioner's decision "is supported by substantial evidence." *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003) (quoting *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000)). "[T]o determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence." *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999) (internal quotation omitted). The substantial evidence standard also applies to the inferences and conclusions that the Commissioner draws from the facts. *Toribio v. Barnhart,* No. 02 Civ. 4929, 2003 WL 21415329, at *2 (S.D.N.Y. June 18, 2003).

A district court may elect to affirm, reverse, or modify the Commissioner's final decision. 42 U.S.C. § 405(g); *Butts,* 388 F.3d at 385. Remand is warranted where the ALJ has based a final determination on an improper legal standard or if further development of the record is necessary to fill in evidentiary gaps. *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980). Remand is also appropriate if the ALJ's rationale could be rendered more intelligible through further findings or a more complete explanation. *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996). In conducting this review, a court must keep in mind that "[t]he Act must be liberally applied, for it is a remedial statute intended to include not exclude." *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990).

### B. *Duty to Develop the Record*

#### 1. *Applicable Law*
In each case, the ALJ has an affirmative duty to develop a "complete and comprehensive medical record". *Rosado,* 290 F.Supp.2d at 438, 441. While the burden of establishing her disability ultimately lies with the claimant, the Commissioner is obligated to help the claimant develop her case by obtaining relevant records and through questioning to explore the facts. *See* 42 U.S.C. § 423(d)(5)(B) (setting forth duty to obtain medical history

and records); 20 C.F.R. § 404.1512(d)-(f) (describing affirmative obligation of ALJ to obtain records from claimant's medical sources and, if necessary, request a consultative examination); *Dimitriadis v. Barnhart,* No. 02 Civ. 9203, 2004 WL 540493, at *9 (S.D.N.Y. March 17, 2004); *Jones v. Apfel,* 66 F.Supp.2d 518, 538 (S.D.N.Y.1999). This obligation arises from the non-adversarial nature of the proceedings. *Butts,* 388 F.3d at 386. The ALJ's duty is heightened where, as here, the claimant is not represented by counsel. *See Echevarria v. Secretary of Health and Human Services,* 685 F.2d 751, 755 (2d Cir.1982) (describing ALJ's duty to *pro se* claimant "to scrupulously and conscientiously probe into, inquire of, and explore [ ] all the relevant facts" (quoting *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir.1980)); *Valoy v. Barnhart,* No. 02 Civ. 8955, 2004 WL 439424, at *7 (S.D.N.Y. March 9, 2004); *Jones,* 66 F.Supp.2d at 538.

**\*6** The ALJ's responsibility to help a claimant obtain complete medical records dovetails with the treating physician rule, which requires controlling weight be given the opinion of a claimant's treating physician when it is supported by accepted diagnostic techniques and not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Rosado,* 290 F.Supp.2d at 438. The combination of these two principles, "compels the ALJ ... to obtain from the treating source expert opinions as to the nature and severity of the claimed disability .... Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties ... under the treating physician rule." *Pabon v. Barnhart,* 273 F.Supp.2d 506, 514 (S.D.N.Y.2003) (alteration in original) (quoting *Peed v. Sullivan,* 778 F.Supp. 1241, 1246 (E.D.N.Y.1991)). It is not enough for the ALJ to simply obtain the treating physicians records. Rather,

> the ALJ must obtain the treating physician's opinion regarding the claimant's alleged disability; "raw data" or even complete medical records are insufficient by themselves to fulfill the ALJ's duty .... It is the *opinion* of the treating physician that is to be sought; it is his *opinion* as to the existence and severity of a disability that is to be given deference.

*Dimitriadis,* 2004 WL 540493, at *9 (internal citations omitted); *see also Jiminez v. Massanari,* No. 00 Civ.

2008 WL 2262618, 131 Soc.Sec.Rep.Serv. 361

8957, 2001 WL 935521, at *11 (S.D.N.Y. Aug.16, 2001) (remanding for failure to develop the record when none of the treating physicians gave opinions as to claimant's functional limitations). Indeed, a "consultative physician['s] deductions may not replace the true opinions of the treating physicians." *Valoy,* 2004 WL 439424, at *7.

The SSA is required to make "every reasonable effort" to obtain a claimant's treating physician's medical reports. 20 C.F.R. §§ 404.1512(d), 416.912(d); *accord Jones,* 66 F.Supp.2d at 539. This means that the ALJ should make an initial request from the claimant's treating physician for records, plus one follow-up request, 20 C.F.R. §§ 1512(d) (1), 416.912(d)(1), and if the documents received lack any necessary information, the ALJ should recontact the treating physician. 20 C.F.R. §§ 404.1512(e), 416.912(e); *Jiminez,* 2001 WL 935521, at *11; *Jones,* 66 F.Supp.2d at 540-41. The ALJ also has authority to subpoena medical evidence on behalf of the claimant. 42 U.S.C. § 405(d).

At times it may be most reasonable for the ALJ to explain to the claimant that she should obtain a more detailed statement from the treating physician. *Hankerson,* 636 F.2d at 896. It might also be reasonable for the ALJ to reveal that he or she plans to rule against the claimant unless more evidence is presented. *Jones,* 66 F.Supp.2d at 539 (remanding case where "the ALJ did not explain why the records were necessary or that he was planning to rule against [the claimant] and that she needed to produce evidence from her treating physicians to convince him otherwise.").

## 2. *The ALJ's Development of the Record*

 **\*7** In this case, the record lacks a treating physician's opinion regarding her functional capacity in the six domains and the age appropriateness of Zanais' behavior. Consequently, the ALJ was left with only the medical data and the consulting physician's Childhood Disability Evaluation Form to render his assessment of Zanais' functional limitations. Relying on this incomplete record, the ALJ found that Zanais' had no functional limitations in four of the six domains. For the domains of interacting and relating with others and caring for oneself, the ALJ cited to no medical evidence whatsoever,[12] and for the domains of acquiring and using information and attending and completing tasks, he cited exclusively to the report of a consulting physician who never examined Zanais in person.

The opinion of a consulting doctor who simply reviewed the medical data is not an adequate substitute for the opinion of a physician who has been able to observe the claimant over a period of time. There are a number of steps that the ALJ should have taken to attempt to secure an opinion from one of Zanais' treating physicians.

First, the ALJ might have followed up with Dr. Silfen to solicit her opinion. As discussed above, Dr. Silfen initially declined to provide an opinion, stating, "N/A. (I am a pediatric endocrinologist)." (R. at 133) Dr. Silfen's response suggests that she believed herself unqualified to assess Zanais' functional capacity because of her narrow field of expertise. Nevertheless, the ALJ could have attempted to confirm that this was the case. The ALJ might also have explained to Ms. Oliveras that he was going to rule against her and that she should try to get a medical opinion from Dr. Silfen to change that outcome.

Next, the ALJ might have sent an assessment form to Zanais' regular pediatrician, Dr. Janet Hobson, whose name appeared multiple times in the record. (R. at 84-85, 191). Indeed, when asked about her daughter's treatment at the hearing before the ALJ, Ms. Oliveras noted that Zanais, "sees her pediatric endocrinologist about ... every six to eight weeks. And she also has her regular pediatrician, which is Janet Hobson." (R. at 208). Dr. Hobson might have been better situated than a specialist like Dr. Silfen to compare Zanais' functional capacity and behavior to those of other children. However, while clearly aware that he might have obtained a treating source opinion from her, the ALJ never requested an opinion from Dr. Hobson, nor did he direct Ms. Oliveras to request any further information.

It may well be that a treating physician would opine that the functional domains for which the ALJ found there to be little or no limitation are not likely to be affected by the type of diabetes that Zanais has. However, there is currently no medical opinion on the record that states this, and it is not for an ALJ or this Court to render one. Remand is appropriate here, even if there is no guarantee that the outcome will change, so that the ALJ can make all reasonable efforts to obtain a treating physician's opinion on Zanais' behavior and functional capacity.

## D. *The Credibility Ruling* [13]

Oliveras ex rel. Gonzalez v. Astrue, Not Reported in F.Supp.2d (2008)
2008 WL 2262618, 131 Soc.Sec.Rep.Serv. 361

Case 7:12-cv-06134-NSR Document 28 Filed 08/02/16 Page 53 of 72

**\*8** Remand is also warranted so that the ALJ can substantiate his conclusion that the testimony of Ms. Oliveras and Zanais regarding Zanais' symptoms was "not entirely credible." (R. at 15). An ALJ's finding that a witness lacks credibility must be "set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 261 (2d Cir.1988). Accordingly, the ALJ should "mak[e] clear, both to the individual and to any subsequent reviewers, the weight [he] gave to the individual's statements and the reasons for that weight." *Snyder v. Barnhart,* 323 F.Supp.2d 542, 546 (S.D.N.Y.2004).

In this case, the sole sentence addressing credibility in a ten-page opinion is buried in the ALJ's recitation of the pertinent law. The ALJ failed to present any reasoning to justify his disbelief, nor did he identify any discrepancy between the statements and record before him. Furthermore, the ALJ states that the claims are "not entirely" credible, leaving the reader to speculate as to which statements the ALJ accepted and which he rejected. On remand, the ALJ should set forth with greater specificity which aspects of Ms. Oliveras and Zanais' testimony he found not credible and the reasons underlying that finding.

F. *Substantial Evidence*

As discussed above, the ALJ failed to adequately develop the record regarding Zanais' functional capacity. Where the ALJ has failed to develop the record, a reviewing court "need not-indeed, cannot-reach the question of whether the Commissioner's denial of benefits was based on substantial evidence." *Jones,* 66 F.Supp.2d at 542; *see Valoy,* 2004 WL 439424, at *9. Thus, any review of whether the decision was based on substantial evidence must be deferred until the record is complete.

*Conclusion*

For the reasons set forth above, I recommend that the Commissioner's decision denying Ms. Oliveras' application on behalf of her daughter for SSI benefits be vacated and remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, U.S.D.J., Room 650, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2262618, 131 Soc.Sec.Rep.Serv. 361

Footnotes

1   "R." refers to the administrative record filed by the Commissioner.

2   Ketoacidosis is "the accumulation of acid and hydrogen ions or depletion of alkaline reserve[s] in the body tissues and fluid, accompanied by a build up of ketone bodies. "[U]ntreated, diabetic ketoacidosis progresses to nausea, vomiting, stupor, and [to a] potentially fatal hyperosmolar coma." *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 17, 489, 942 (29th ed.2000).

3   Glucose (or blood sugar) is measured in milligrams per deciliter. The normal range is between 60 and 100 mg/dL. (R. at 168, 170).

4   The signature on the questionnaire is partially illegible; thus, the spelling of Ms. Patha's last name here is an approximation.

5   To determine if a child's disability is functionally equivalent to a listed impairment, the Commissioner must assess the child's capacity in six domains, which are discussed in more detail below.

6   Dr. Silfen is misidentified as "Dr. Silfer" in the hearing transcript. (R. at 208).

7   Polydipsia is "chronic excessive thirst and intake of fluid." *Dorland's* 1430.

8   Polyuria is "the passage of a large volume of liquid in a given period." *Dorland's* 1436.

9   The following skill areas were listed, and left blank, on the form: fine/gross motor skills, sensory abilities, communication skills, cognitive skills, and social/emotional skills. (R. at 133-34). These areas overlap with three of the six domains

Oliveras ex rel. Gonzalez v. Astrue, Not Reported in F.Supp.2d (2008)

Case 7:12-cv-06134-NSR Document 28 Filed 08/02/16 Page 54 of 72

2008 WL 2262618, 131 Soc.Sec.Rep.Serv. 361

relevant to determining childhood disability: acquiring and using information, interacting and relating with others, and moving about and manipulating objects.

10    Hgb is shorthand for hemoglobin. An Hgb A1c test estimates a person's average blood sugar level. *See* Diabetes Exams and Tests, http:// diabetes.webmd.com/tc/type-1-diabetes-recently-diagnosed-exams-and-tests (last visited May 14, 2008). The normal range is 3.9-6.9%. (R. at 169, 173-75, 178).

11    In particular, the ALJ looked at listing 109.08, which requires the claimant have juvenile diabetes mellitus plus one of the following: "A. Recent, recurrent hospitalizations with acidosis; or B. Recent, recurrent episodes of hypoglycemia; or C. Growth retardation ...; or D. Impaired renal function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 109.08. The ALJ found that the plaintiff did not have recurrent hospitalizations or any of the conditions required under § 109.08(B)-(D). (R. at 15).

12    For the domain of interacting and relating with others, the ALJ inaccurately stated that "[n]o problems were alleged." (R. at 18). In the Function Report dated April 25, 2005, Ms. Oliveras indicated that Zanais' condition affected her behavior with other people and that she did not enjoy being around her peers. (R. at 51). Also, in the Teacher Questionnaire dated May 11, 2005, Ms. Patha reported that Zanais had some difficulty "[m]aking and keeping friends." (R. at 64).

13    Zanais' mother raised several other issues in a letter responding to the Answer, including a fear that the ALJ assigned too much weight to the teacher questionnaire and assumed too much from Zanais' happy disposition on the day of the hearing. Specifically, Ms. Oliveras complains that the ALJ relied upon the opinion of a teacher who only observed Zanais for one month. (Plaintiff's Resp. to the Commissioner's Motion For Judgment dated March 2, 2008 ("Pl.Response") at 2). The regulations instruct ALJs to consider all relevant evidence in determining a child's functioning, including information from the child's teachers; 20 C.F.R. § 416.924a(a) though the weight to be assigned to that information should depend upon the extent of the teacher's contact with the child. *Carballo ex rel. Cortes v. Apfel,* 34 F.Supp.2d 208, 218 (S.D.N.Y.1999). In this case, the ALJ did not cite to the Teacher's Questionnaire in his opinion. Presumably, he did not afford it much weight. Ms. Oliveras also suggests that the ALJ was mistaken in his assessment Zanais' emotionally well-being. (Pl. Response at 2). The ALJ has an affirmative duty to develop the record, but the burden is ultimately on the plaintiff to prove she has a disability. 20 C.F.R. § 404.1512(a); *see also Yancey v. Apfel,* 145 F.3d 106, 114 (2d Cir.1998). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's own] statement of symptoms." 20 C.F.R. § 404.1508 (emphasis added). Ms. Oliveras did not present any medical evidence that Zanais had an emotional or psychological impairment, the ALJ did not err by declining to investigate further.

---

**End of Document**                 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3819304
United States District Court,
S.D. New York.

George SANTIAGO, Plaintiff,
v.
COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 13CV3951–LTS–SN.
|
Signed Aug. 4, 2014.

*ORDER ADOPTING REPORT
AND RECOMMENDATION*

LAURA TAYLOR SWAIN, District Judge.

**\*1** *Pro se* George Santiago ("Plaintiff"), brings this action, pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. section 405(g), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Insurance ("SSI") benefits. The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the of the Federal Rules of Civil Procedure. Before the Court is the Report and Recommendation (the "Report") of Magistrate Judge Sarah Netburn, recommending that the Commissioner's motion be denied. No objections to the Report have been filed.

When reviewing a report and recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C.S. § 636(b)(1) (C) (LexisNexis 2012). "To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Wilds v. United Parcel Service, Inc.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003) (internal citations and quotation marks omitted)).

Having reviewed Magistrate Judge Netburn's thorough and well-reasoned Report, to which no objection was made, the Court finds no clear error. Therefore, the Court adopts the Report in its entirety. Accordingly, the Court

denies the Commissioner's motion. This case is remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with the Report and this Order. The Clerk of Court is respectfully requested to enter judgment and close this case. This Order resolves docket entry no. 19.

SO ORDERED.

*REPORT AND RECOMMENDATION*

SARAH NETBURN, United States Magistrate Judge.

**TO THE HONORABLE LAURA TAYLOR SWAIN:**
Plaintiff George Santiago, appearing *pro se,* brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI") benefits. The Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. I conclude that the Commissioner failed to resolve ambiguities in the record as to the source of medical opinion statements, as demonstrated by the Administrative Law Judge's ("ALJ") failure to address several doctors' findings. This leaves the Court unable to determine if the ALJ properly complied with the Social Security Administration's ("SSA") regulations for evaluating medical opinions. In addition, Santiago has submitted new evidence to the Court that warrants a remand for its consideration. Accordingly, I recommend that the Commissioner's motion be DENIED and the case be remanded to the Commissioner for further proceedings.

**PROCEDURAL BACKGROUND**

**\*2** On January 11, 2011, Santiago submitted an application for SSI benefits. On March 24, 2011, the SSA denied this application. On May 9, 2011, an attorney advisor reached a fully favorable decision on Santiago's behalf, concluding that while Santiago's impairments did not meet or medically equal any of the listings impairments in 20 C.F.R. Part 404, Subpt. P, App'x 1, there were no jobs in the national economy that Santiago could perform given the attorney advisor's

residual functional capacity ("RFC") determination: light work [1] with (1) an inability to lift or carry more than 10 pounds; (2) occasional pushing and pulling; (3) simple unskilled, nonpublic work; (4) only occasional interaction with coworkers or supervisors; (5) an inability to travel unaccompanied more than occasionally; (6) limited ability to deal with normal changes in a work environment; (7) an inability to deal with money; (8) and an inability to perform jobs with significant quality, quantity, or time related standards.

On July 11, 2011, the Appeals Council, on its own motion, reviewed the attorney advisor's decision. Additional evidence was submitted to the Appeals Council, including "a prescription for physical therapy, a referral to a neurologist, prescription records, and an authorization for a TENS unit...." (R. 74; 441–47.) The Appeals Council concluded that substantial evidence did not support the attorney advisor's RFC assessment or the determination that Santiago was disabled due to his physical or mental impairments. It found that the medical records indicated only moderate restrictions in lifting and supported the conclusion that Santiago could perform a full-range of light work. It further found that the medical evidence of record supported at most moderate limitations due to Santiago's mental impairments. The Appeals Council remanded the case to an ALJ for further proceedings, including consideration of Santiago's RFC during the entire period and, if warranted, use of a vocational expert.

Santiago subsequently appeared with his representative before ALJ Patrick Kilgannon on April 10, 2012. The ALJ issued a decision on April 27, 2012, denying Santiago benefits. The Appeals Council denied Santiago's request for review of the ALJ's decision on April 19, 2013, thereby rendering the decision of the Commissioner final.

On June 6, 2013, Santiago filed this *pro se* action, and on June 28, 2013, the Honorable Laura Taylor Swain referred Santiago's case to my docket for a report and recommendation. Santiago subsequently submitted additional medical records to the Court, which were also provided to defendant. On February 13, 2014, the Commissioner filed a motion for judgment on the pleadings with supporting memorandum of law. On March 19, 2014, the Court issued an Order directing Santiago to file a response by April 2, 2014, otherwise the motion would be considered fully briefed. On March 31, 2014, the Court received an additional document from

Santiago, indicating that he was currently unable to work, and accepted the document as Santiago's response. The motion is considered fully briefed.

## FACTUAL BACKGROUND

**\*3** The following facts are taken from the administrative record.

### I. Non–Medical Evidence

Santiago was born in 1958 and was 52 years old on the date of his application for benefits. Santiago completed either the eighth or ninth grade, and at the time of his hearing, lived in an apartment with his sister. He last worked in 2005 or 2006.

In a disability report, dated December 17, 2010, and completed with the assistance of Bibiana Blanco, Santiago's case manager at FEGS, Santiago identified depression, posttraumatic stress disorder, uncontrolled hypertension, dislocated right shoulder, back pain, and hepatitis C as the conditions that limited his ability to work. Santiago noted that he had been depressed since childhood and experienced sudden mood swings every day. He avoided being in crowded places because he was easily agitated. Santiago had not received mental health treatment since 2009 because he lost his Medicaid insurance, but was in the process of receiving treatment at All Med Medical and Rehab at the time of the report.

On February 2, 2011, Blanco completed a third-party function report. Santiago reported that he could not sleep through the night due to severe right shoulder and back pain. He did not cook for himself but relied on his sister for food preparation. Santiago also did not perform other chores because of his shoulder and back pain. Santiago reported that he could go outside alone and relied on walking or public transportation. Santiago described himself as "very antisocial" but had no difficulties getting along with his family. (R. 176.) Blanco noted that Santiago was extremely moody during the interview.

Blanco indicated that Santiago's ability to lift, bend, stand, walk, and concentrate was affected by his impairments. According to Santiago, he could not lift anything over 10 pounds and found it difficult to bend over, stand for more than 25 minutes, and walk long distances.

## II. Medical Evidence

### A. Before January 11, 2011 [2]

### 1. Lincoln Medical and Mental Health Center ("Lincoln Medical")

Santiago was treated at Lincoln Medical between June 2006 and September 2010 on numerous occasions for a variety of ailments including right shoulder pain, back pain, hypertension, cellulitis, swelling and an abscess of the leg, itchy red eyes, wrist pain, an insect bite, and a human bite. Most of the medical records are from visits to the facility in 2008. While some of the records note that Santiago could move all of his extremities, his range of motion was limited in his right shoulder as a result of pain. In September 2008, Santiago described his back pain as three out of ten, his leg pain as between one to five out of ten, and his shoulder pain as three out of ten. Santiago's gait, however, was observed to be normal. He was prescribed various medication for his right shoulder pain, hypertension, and leg cellulitis and was also referred to physical therapy for his leg and shoulder. The Lincoln Medical records generally indicate that Santiago was independent in his activities of daily living and was oriented to person, place and time.

 **\*4**  While back pain and depression are noted in the medical records from Lincoln Medical, the evidence primarily addresses Santiago's shoulder pain. In 2006, Dr. Carella, upon examination of Santiago and review of an x-ray of his shoulder, determined that there was no fracture and no dislocation, but there was a 2–3 grade separation of the AC joint. Dr. Carella noted "minimal clinical objective findings." (R. 295.) In July 2007, although Santiago had a limited range of motion in his right shoulder due to pain, Dr. Stoimen Evtimov at Lincoln Medical reported that Santiago's right shoulder pain was not disabling and did not qualify as a disability. In October 2007, Dr. Mistry Rakeshkumar noted a limited range of motion in Santiago's right shoulder, and Santiago reported that the pain was not controlled by medication. Santiago also reported that his shoulder pain was a 6 out of 10 and that the pain interfered with his physical activity. In November 2007, Dr. Joji Sakuma, diagnosed Santiago with tendonitis.

In July 2008, Dr. Richard Frenkel completed a psychiatric summary. Santiago had a history of anxiety, depression, and difficulty sleeping. Dr. Frenkel noted that Santiago stopped using heroin in 1995 and was on methadone at the time of the summary. Dr. Frenkel diagnosed Santiago with major depressive disorder and indicated a Global Assessment of Functioning ("GAF") of 50. [3] At the time of the psychiatric summary, Santiago was living in a shelter. Dr. Frenkel noted that Santiago needed to have stable housing to minimize his stress level, engage in weekly individual psychotherapy, and take his medications as prescribed.

### 2. Federation of Employment and Guidance Service ("FEGS")

On December 17, 2010, Abraham Burstein, a social worker with FEGS, completed a biopsychosocial summary for Santiago. At the time, Santiago was renting a room from his sister. Santiago denied any paid work history. He reported that he began using heroin at 22 but entered treatment at West Midtown Medical in 1995, and had not used heroin since. He was prescribed 120 milligrams of methadone daily.

Santiago informed the social worker that he had a history of depression, suicidal ideation, and suicide attempts, though he denied any current plans or intent to commit suicide. His last suicide attempt was at the age of 30. Santiago reported that he began hearing voices calling his name and mumbling around the age of 20 and last heard these voices in 2007. Santiago, however, was not taking any medication at the time of the evaluation. Santiago indicated that he felt depressed and hopeless nearly every day and had difficulty falling or staying asleep. He also had difficulty concentrating. Santiago stated that his problems made working, domestic chores, and interacting with people extremely difficult. Santiago reported that he was able to complete all of his activities of daily living, albeit slowly and over a long period of time due to his leg and back pain, but was unable to work. The social worker indicated that Santiago had severe depression. He also noted that Santiago had used public transportation to arrive at the appointment and had no travel limitations.

 **\*5**  Dr. Sandhya Pattem, a physician at Bronx Lebanon Hospital, performed an examination on December 17, 2010, and indicated that Santiago reported back pain and depression as the current medical conditions related to his employment difficulties. Dr. Pattem noted abnormalities in Santiago's spine, right upper extremity, and right lower

extremity, and observed right paraspinal muscle tightness and mild limited abduction.

With regard to his mental state, Dr. Pattem observed that Santiago was not alert but was oriented. His mood was abnormal and he had a mildly flat affect. Dr. Pattem noted that he had not been taking his medications.

On January 4, 2011, Dr. Hayden performed a psychiatric consultation. [4] Dr. Hayden indicated that Santiago was unkempt but calm and cooperative. His affect was constricted and his mood was depressed. He reported auditory hallucinations and suicidal ideations. Dr. Hayden described Santiago's ability to follow work rules, deal with the public, and adapt to change and stressful situations as severely impaired. His ability to maintain attention and relate to coworkers was moderately impaired. Dr. Hayden diagnosed Santiago with major depressive disorder and post-traumatic stress disorder, and also noted that he had arthritis and back, leg, and foot pain. Dr. Hayden indicated that Santiago's GAF was 45. Although Santiago had no travel restrictions, he had "substantial functional limitations to employment due to medical conditions that will last for at least 12 months and make the individual unable to work" based on his depression and post-traumatic stress disorder. (R. 336.)

On January 4, 2011, Dr. Pattem diagnosed Santiago with hypertension, depression, right shoulder pain, back pain, and a history of hepatitis C. She indicated that he had no travel limitations. Dr. Pattem wrote "not applicable" for Santiago's work limitations criteria. (R. 314.) On that same date, Dr. Pattem indicated that Santiago had "substantial functional limitations to employment due to medical conditions that will last for at least 12 months and make the individual unable to work." [5] (R. 316–17.) Dr. Pattem referred Santiago for a psychiatric evaluation.

On January 6, 2011, Johanna Arias, an SSI Entitlement Specialist at FEGS, indicated that Santiago was referred to the SSI track due to his uncontrolled hypertension, depression, and posttraumatic stress disorder. Arias also noted that Santiago had "medical and/or mental health conditions that significantly affect[ed] functioning. The client has other conditions that consist of: Shoulder, Back, and Leg Pain." (R. 327.)

The ALJ did not address any of these FEGS records in his decision.

**B. After January 11, 2011**

**1. All Med and Rehabilitation of New York ("All Med")**
Santiago was seen for medical treatment at All Med beginning January 2011. Dr. Monica Martin examined Santiago on four occasions for his physical ailments. Most of her notes are illegible. On January 26, 2011, Dr. Martin noted that Santiago had been referred to All Med by FEGS. His blood pressure was 130/84, and she noted a dislocated right shoulder. On February 24, 2011, Santiago's blood pressure was 160/100. Dr. Martin noted Santiago's hypertension and referred him to a cardiologist. On March 12, 2011, Santiago's blood pressure was 130/70. Dr. Martin made a notation of a dislocated [right] shoulder and hypertension. She appears to have referred him to orthopedics. On April 29, 2011, Dr. Martin saw Santiago for medication refills, and his blood pressure was 120/70.

**\*6** In July and August 2011, Dr. Kenneth McCulloch referred Santiago for physical therapy for "chronic LS sprain/strain" and "LS disk herniation." (R. 441.) The goal of the therapy was to increase Santiago's range of motion, decrease pain or swelling, and improve function. The physical therapy prescription indicated that Santiago was to attend three times per week for four weeks. The treatment was to include moist heat, cold pack, ultrasound, massage, and therapeutic exercises for range of motion and muscle strengthening. In July 2011, Santiago was informed that his health care provider had authorized the purchase of a support for his back.

From March 2011 to May 2011, Dr. Fruitman, a psychiatrist at All Med, examined Santiago on three occasions. Most of his notes are illegible. On March 2, 2011, Santiago reported insomnia and anxiety. On April 1, 2011, Santiago again reported anxiety, and Dr. Fruitman continued to prescribe medication for his depression, anxiety, and insomnia. On May 2, 2011,

Dr. Fruitman examined Santiago for medication management. Santiago claimed that his medications were not working for him. Dr. Fruitman noted that Santiago's hygiene was good and his mood was calm. He was coherent, made good eye contact, denied any suicidal or homicidal ideation. Santiago demonstrated no acute

psychotic symptoms and was coherent. Dr. Fruitman recommended that he remain on his prescription medication.

## 2. Commissioner's Examinations

### a. Dr. Herb Meadow

On March 10, 2011, Dr. Herb Meadow, a psychiatrist, evaluated Santiago at the Commissioner's request. Santiago arrived at his appointment by public transportation. Santiago informed Dr. Meadow that he socialized primarily with his immediate family and spent his time watching television and listening to music. He took care of his own hygiene but did not perform any household chores.

Santiago reported that he had no history of psychiatric hospitalizations but had been receiving psychiatric treatment at All Med for the past two months. Santiago had difficulty falling asleep and was depressed with dysphoric moods, irritability, low energy, diminished selfesteem, and difficulty concentrating. He had suicidal thoughts in the past but told Dr. Meadow that he was not currently having them, though he did have flashbacks and nightmares of being sexually abused as a child. While Santiago stated that he had panic attacks, Dr. Meadow noted that he was actually describing psychomotor agitation, which was his only manic symptom. Santiago reported that he was taking prescription medications for his depression, insomnia, and hypertension.

Dr. Meadow observed that Santiago's demeanor was cooperative, and he related adequately. He was appropriately and neatly dressed. His gait, posture, and motor behavior were all normal. His eye contact was appropriate and his speech was fluent and clear. He was coherent and goal-directed, with no indications of hallucinations, delusions, or paranoia. His affect was appropriate, and he was oriented to time, place, and person. His recent and remote memory skills were intact.

*7 Santiago's mood, however, was depressed, and his attention and concentration were impaired due to his limited intellect. Santiago could count but he could not add or subtract single-digit numbers. Dr. Meadow described Santiago's cognitive functioning as below average. Santiago's insight and judgment were fair.

Dr. Meadow diagnosed Santiago with depressive disorder, post-traumatic stress disorder, cognitive disorder, heroin abuse/dependence in remission, and opioid dependence. He also diagnosed right shoulder pain, back pain, and hypertension. Dr. Meadow indicated that Santiago's prognosis was fair and recommended continued psychiatric treatment. Dr. Meadow reported that Santiago would be able to perform all the tasks necessary for vocational functioning. Though the results of the exam were consistent with psychiatric and cognitive problems, these problems did not appear to be significant enough to interfere with Santiago's ability to perform the daily tasks of living. Santiago, however, would need assistance in managing his funds because he had difficulty with math.

### b. Dr. William Lathan

On March 10, 2011, Dr. William Lathan performed a medical examination at the request of the Commissioner. Upon physical examination, Santiago appeared to be in no acute distress. His gait was normal, and he could walk on his heels and toes without any difficulty. Santiago could perform a full squat and his stance was normal. He used no assistive devices during the examination and needed no help changing for the exam or getting on and off the exam table. Santiago was able to rise from his chair without difficulty.

Santiago's cervical spine and lumbar spine showed full flexion, extension, lateral flexion, and full rotary movements bilaterally. There was no evidence of scoliosis or abnormality in the thoracic spine. There was a full range of motion of the shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. Santiago's joints were stable and not tender, with no redness, heat, swelling, or effusion. He also had full strength in his upper and lower extremities. His hand and finger dexterity were intact, and he possessed full grip strength bilaterally.

Dr. Lathan noted a history of right shoulder arthralgia, back syndrome, hypertension, and depression. Santiago's prognosis was reported to be stable. Dr. Lathan indicated a moderate restriction for lifting, pushing, pulling, and reaching with the upper right extremity and for bending and strenuous exertion. Dr. Lathan also recommended a psychiatric consultation.

On March 10, 2011, Dr. Lawrence S. Liebman, a radiologist, reviewed x-rays of Santiago's back and

Santiago v. Commissioner of Social Sec... Not Reported in F.Supp.3d (2014)
Case 7:12-cv-06134-NSR Document 28 Filed 08/02/16 Page 60 of 72
2014 WL 3819304, 205 Soc.Sec.Rep.Serv. 527

shoulder taken in conjunction with his consultative examination. Dr. Liebman noted that there was degenerative spondylosis at L1–L2 in Santiago's spine. There was no evidence of a compression fracture, but there was a transitional L5 vertebral body. Dr. Liebman noted that these were degenerative changes. Upon examination of the right-shoulder xray, Dr. Liebman found no evidence of acute fracture, dislocation, or destructive bony lesion. The joint spaces were relatively well maintained, and there were post-surgical changes of the lateral end of the clavicle.

### c. Dr. A. Burford

 **\*8** On March 21, 2011, Dr. A. Burford evaluated the evidence of record and completed a Physical Residual Functional Capacity Assessment for Santiago. Dr. Burford described Santiago's primary diagnosis as shoulder disorder and high blood pressure, with a secondary diagnosis of degenerative disease of the spine. Dr. Burford indicated that Santiago could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds. Santiago could stand, walk, or sit with normal breaks for about 6 hours in an 8–hour workday. Santiago had no restrictions for pushing or pulling, other than those for lifting and carrying. Dr. Burford indicated that Santiago had no postural, manipulative, visual, or environmental limitations.

Dr. Burford noted that Santiago claimed chronic back and shoulder pain and that he used over-the-counter pain medication. Dr. Burford reported that Santiago had a full range of motion in his shoulder and back with normal strength. The x-ray of Santiago's back showed some degenerative changes, but the x-ray of his right shoulder was within normal limits except for post-surgical changes to the clavical. Based on the objective medical evidence, Dr. Burford found Santiago's allegations only partially credible. Dr. Burford concluded that the "severity of his impairments does not preclude his ability to perform light work." (R. 403.)

### d. Dr. T. Harding

On March 22, 2011, Dr. T. Harding, a state agency psychologist, evaluated the evidence of record. Dr. Harding noted a diagnosis of a cognitive disorder, depression, post-traumatic stress disorder, and opioid dependence. Dr. Harding indicated that Santiago demonstrated moderate limitations in his daily

living activities, social functioning, and concentration, persistence, or pace, and had no episodes of deterioration for an extended period. Dr. Harding further indicated that the evidence did not establish the presence of a paragraph C criteria.

After assessing Santiago's mental residual functional capacity, Dr. Harding concluded that Santiago had, at most, moderate limitations. The following abilities were moderately limited: (1) to understand, remember, and carry out detailed instructions; (2) to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) to accept instructions and respond appropriately to criticism from supervisors; and (4) to respond appropriately to changes in the work setting. Dr. Harding indicated that all other abilities were not significantly limited. Dr. Harding concluded that Santiago may have some difficulty completing complex tasks and responding appropriately to stress, but the evidence of record did not support a finding of marked limitations. Santiago retained the ability to perform unskilled work.

### C. Medical Evidence Submitted to the Court

#### 1. Documents Attached to the Complaint

 **\*9** Santiago attached several medical records to his complaint, filed on June 6, 2013, which are not found in the administrative record. These documents include underlying treatment notes from a nurse practitioner at All Med, dated January 7, 2013, March 4, 2013, and April 3, 2013. The notes from January 2013 indicate that Santiago continued to complain of insomnia. He was diagnosed with bipolar disorder and instructed to continue with his medication. His mood was euthymic. The notes further indicate that he was "unemployed" and "disabled." (Compl. at 8.) The March 2013 report notes that Santiago visited the office for his anxiety and depression. His employment status was listed again as "unemployed" and "disabled." (Compl. at 12.) No further notations regarding Santiago's mental impairments were provided.

Santiago also attached treatment notes from various physician's assistants and nurse practitioners, all supervised by Henry Sardar, DO, dated January 30, 2013, March 13, 2013, April 9, 2013, and May 22, 2013.

Hoda Abdelaziz, a family nurse practitioner, treated Santiago for back and shoulder pain. On January 30, 2013, Santiago complained of bilateral shoulder pain and chronic low back pain, both of which had been ongoing for years. Santiago reported that the pain was a 9 out of 10. Santiago was taking several prescription medications, using a gel, and receiving physical therapy to address the pain. Abdelaziz indicated that Santiago's mood was normal, his affect was bright, with no signs of depression or anxiety. She described his gait as slow, with difficulties in standing and walking without an assistive device. Santiago's standing balance was fair and his sitting balance was good.

Abdelaziz observed a decreased range of motion in forward flexion and abduction in Santiago's shoulders, and signs of impingement. There was tenderness in both shoulders as well as diminished sensation over the C6–C7 dermatome. The examination revealed that Santiago's lumbar spine had a positive decrease range of motion in all planes, with pain at the end of the range. Abdelaziz observed significant spasm, taut muscle bands, and tenderness to palpation over the lumbar paraspinal region. Abdelaziz noted muscle pain and spasm, lumbar and cervical radiculopathy, shoulder and low back pain, gait dysfunction with difficulty ambulating, and bilateral shoulder impingement syndrome. She also noted diminished sensation on the L4–L5 and L5–S1 dermatomal distribution bi-laterally. Abdelaziz recommended that Santiago continue with his current prescriptions and physical therapy. She also performed a right sacroiliac joint injection. In March 2013, Santiago was again examined by Abdelaziz, and the treatment record is nearly identical to the January 2013 report.

In April 2013, Tae Soo Kim, a physician's assistant supervised by Dr. Sardar, treated Santiago. Santiago complained of bilateral shoulder pain and chronic low back pain, which he reported to be a 7 out of 10 on average. Santiago also reported that the pain had significantly worsened over the last few days. The medications and cream used by Santiago had provided satisfactory pain control as well as improvement in functional activity, and the right sacroiliac joint injection had "markedly" helped with the pain and functionality for a prolonged period of time. (Compl. at 16.) The rest of the report is nearly identical to prior reports, except for the fact that Santiago refused another injection.

*10  In May 2013, Dr. Sardar examined Santiago. Much of the information in the treatment records is identical to that in the April 2013 report. Santiago reported that his pain was an 8 out of 10 on average. Dr. Sardar described Santiago's impairments as "severe." (Compl. at 18.) Dr. Sardar prescribed medication and performed a trigger point injection in the lumbar region of Santiago's back.

**2. Documents Submitted on July 31, 2013**
On July 31, 2013, Santiago submitted additional documents to the Court. Some of these documents are duplicative of evidence in the medical record, and some of the documents are medical records which predate or postdate the period at issue here. These records include prescription lists, psychiatric assessments, a list of physical therapy treatments provided, and physician treating plan reports.

**a. Documents Predating Relevant Period**
Dr. Richard Fenkel completed a psychiatric assessment of Santiago on October 22, 2007. Santiago was oriented and his concentration and memory were fair. Santiago was cooperative, though he was anxious, depressed, and not sleeping well. Dr. Fenkel diagnosed Santiago with major depression and prescribed medications.

**b. Documents Postdating the Relevant Period**
In October 2012, Daniel Paniagua, a physician's assistant at West Midtown Medical Group, examined Santiago. He noted a history of chronic bilateral shoulder pain that increased with activity and walking. Paniagua observed Santiago's gait to be normal and he was oriented to person, place, and time. He had a decreased range of motion in his shoulders and tender biceptal tendons. Paniagua also noted a decreased range of motion in Santiago's back due to pain. Santiago also reported that his hypertension was controlled by diet and denied taking medications for the hypertension. Paniagua noted that Santiago had a history of post-traumatic stress disorder and depression.

In September 2013, Juliana F. Bizerril–Williams, a licensed physician's assistant supervised by Dr. Sardar, completed a Treating Physician's Wellness Plan Report at the prompting of FEGS. Bizerril–Williams indicated that Santiago was unable to work for at least 12 months due to joint pain. On September 10, 2013, Santiago

Case 7:12-cv-06134-NSR Document 28 Filed 08/02/16 Page 62 of 72

presented with neck pain, shoulder pain, and low back pain. Santiago requested that his treatment be focused on his lower back pain, which he described as a 9 out of 10. The pain interfered with his activities of daily living and standing or sitting for a prolonged time. At the time of the exam, Santiago was taking various prescription medications for the pain and using a cream, which provided moderate control of his pain as well as improvement in his functional activity. Bizerril–Williams indicated that Santiago's mood was normal, his affect was bright, with no signs of depression or anxiety. She described his gait as slow, with difficulties in standing and walking without an assistive device. Santiago's standing balance was fair and his sitting balance was good. The examination revealed that Santiago's lumbar spine had a positive decrease range of motion in all planes, with pain at the end of the range. Bizerril–Williams observed significant spasm, taut muscle bands, and tenderness to palpation over the lumbar paraspinal region. Bizerril noted muscle pain and spasm, lumbar and cervical radiculopathy, shoulder and low back pain, gait dysfunction, with difficulty walking, and bilateral shoulder impingement syndrome. Bizerril–Williams recommended that Santiago continue with his current prescriptions, and he received a right sacroiliac joint injection.

 *11 In July 2013, a nurse practitioner at All Med noted that Santiago had arrived at the facility using a rolling walker.

### 3. Document Submitted As Opposition

On March 31, 2014, the Court received an additional document from Santiago and interpreted it to be Santiago's response to the Commissioner's motion. The document was a notification of temporary assistance work requirements determination for the City of New York, indicating that as of February 15, 2014, Santiago had been determined to be exempt from participating in the temporary assistance work activities because he was unable to work due to a medical issue. No further details on the nature of the medical issue were provided.

### III. The Administrative Hearing

### A. Santiago's Testimony

Santiago appeared at the hearing on April 10, 2012, with a representative. Santiago testified that he was 53

years old at the time of the hearing. He testified that he completed the eighth grade in New York, and had no other job training or education. Santiago relied primarily on the subway for transportation and lived with his sister. Santiago last worked for a temporary job placement agency, Top Job Personnel, in approximately 2005. He worked on a day-to-day basis as a "truck helper" making deliveries to companies. (R. 36–37.)

Santiago testified that his back and right shoulder were the main problems affecting his ability to work. He testified he had not had surgery, physical therapy, or injections for his shoulder but he did take medication. Santiago relied on medication and shock therapy for his back, but the therapy was not very helpful in reducing the pain. Santiago informed the ALJ that he had an MRI on his back, which apparently showed a strain of the spine. Santiago indicated that he also had a pulled leg muscle that began about the same time as his back problems.

Santiago testified that he was also receiving mental health treatment from Dr. Fruitman at All Med for depression. He attended monthly appointments to receive his medication. Santiago stated that his medication helped a little with the depression and that he had never been hospitalized for any mental health condition.

The ALJ asked Santiago to describe a typical day. Santiago informed the ALJ that early in the morning he would go to his methadone program. At the appointments, he would talk with his counselor and receive his medication. Then he would go home and watch television. Santiago testified that he was able to bathe and dress himself, but his sister would do the cooking. He went to church once in a while, but he did not have many friends. He did, however, enjoy spending time with his family.

### B. Vocational Expert Testimony

Christina Boardman, a vocational expert, testified at the hearing by telephone. She reviewed the evidence in the record and testified that Santiago had prior work experience as a truck helper. The ALJ asked the vocational expert to assume an individual of Santiago's age, educational background, and work experience who could perform only light exertional work with the following limitations: (1) lift up to 20 pounds occasionally; (2) lift or carry up to 10 pounds frequently; (3) stand, walk, or sit for approximately six hours per eight-hour workday,

with normal breaks; (4) pushing or pulling, including the operation of hand or foot controls frequently with the upper right extremity; (5) climb ramps and stairs frequently; (6) no climbing of ladders, ropes, or scaffolds; (7) balance, stoop, kneel, crouch, or crawl occasionally; (8) reaching, including overhead reaching, only frequently in right dominant upper extremity; (9) simple, routine, and repetitive tasks; and (10) a low stress job with only occasional decisionmaking and occasional changes in work setting. The vocational expert testified that Santiago would not be able to perform his prior work as a truck helper with such restrictions. He would, however, be able to perform other jobs such as mail clerk, marker, and usher. Each of these jobs were available in significant numbers: (1) mail clerk, 7,580 regionally and 119,960 nationally; (2) marker, 63,730 regionally and 1,795,970 nationally; and (3) usher, 6,670 regionally and 107,200 nationally.

**\*12** The ALJ noted that if it was found that Santiago could perform only sedentary work, a Grid rule [6] would apply and Santiago would be entitled to benefits. The ALJ asked the vocational expert about the impact of absences on Santiago's ability to work. The expert confirmed that if Santiago were absent in excess of one time per month, he would not be able to maintain his employment at any of these jobs.

On April 27, 2012, the ALJ issued his decision denying Santiago's claim for SSI, and on April 19, 2013, the Appeals Council denied Santiago's request for review, thereby rendering the decision of the Commissioner final.

### DISCUSSION

#### I. Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed.R.Civ.P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Dargahi v. Honda Lease Trust,* 370 F. App'x 172, 174 (2d Cir.2010) (citation omitted). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala,* 59 F.3d 307, 312 (2d Cir.1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. *See Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir.2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise* " (citation and internal quotation marks omitted; emphasis in original)).

*Pro se* litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (citation and internal quotation marks omitted); see *Alvarez v. Barnhart,* 03 Civ. 8471(RWS), 2005 WL 78591, at \*1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal pro se standard in reviewing denial of disability benefits).

### II. Definition of Disability

**\*13** A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d) (3). A claimant will be determined to be disabled only if the impairment(s) are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration has established a fivestep sequential evaluation process when making disability determinations. *See* 20 C.F.R. § 416.920. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart,* 341 F.3d 182, 183–84 (2d Cir.2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. *Melville v. Apfel,* 198 F.3d 45, 51 (2d Cir.1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education and past relevant work experience. 20 C.F.R. § 416.960(c) (2); *Melville,* 198 F.3d at 51.

Title 20 C.F.R. § 416.920a provides additional information to guide evaluations of mental impairments. Calling it a "complex and highly individualized process," the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 416.920a(c) (1),(2). The main areas that are assessed are activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation; each is rated on a five-point scale. 20 C.F.R. § 416.920a(c)(3)-(4). If an impairment is given the rating of "severe," then the ALJ is instructed to determine whether the impairment qualifies as a listed mental disorder. 20 C.F.R. § 416.920a(d)(2).

**\*14** An affective disorder, such as depression, will qualify as a "listed impairment" if there is medically documented persistence, either continuous or intermittent, of depressive syndrome resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[7] 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 §§ 12.04(A), 12.04(B) (so called "paragraph B criteria"). If the mental disorder does not qualify as a listed impairment under these standards, it will still qualify as a disability if there is:

> a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: [r]epeated episodes of decompensation, each of extended duration; or a[r]esidual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(C) (so called "paragraph C criteria").

### III. The ALJ's Determination

On direction from the Appeals Council, the ALJ considered Santiago's maximum RFC based on additional

evidence, including medical source statements and the testimony of a vocational expert. On April 27, 2012, after evaluating Santiago's claims pursuant to the sequential evaluation process, the ALJ issued a decision finding that Santiago was not disabled within the meaning of the Social Security Act from the date his application was filed, January 11, 2011. At step one, the ALJ determined that Santiago had not been engaged in "substantial gainful activity" ("SGA"). At step two, the ALJ found that Santiago had the following severe impairments: lumbar disc disease, right shoulder impairment, and depression. The ALJ concluded that Santiago also had the following non-severe impairments, which had only a *de minimus* effect on his ability to work: hypertension, high cholesterol, and Hepatitis C. At step three, the ALJ found that Santiago's severe impairments, however, did not meet or medically equal any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ relied on Santiago's testimony and Dr. Meadow's opinion when articulating the reasons for his determination at Step Three.

The ALJ determined that Santiago had the residual functional capacity to perform light work except that he could not climb ladders, ropes, or scaffolds, though he could frequently climb ramps or stairs. Santiago could occasionally balance, stoop, crouch, or crawl. He could frequently reach in all directions and push or pull with his dominant right upper extremity. Santiago's non-exertional limitations [8] resulting from his depression restricted him to routine, repetitive, and simple tasks in a low-stress environment that required only occasional decisionmaking and occasional changes in the work setting. The ALJ based his determination on "the opinion[s] of Dr[s]. Lathan, Meadow, and Harding," and Santiago's "subjective allegations and the effects of his obesity on his ability to carry out physical and work activities."

**\*15** At step four, the ALJ found that Santiago was unable to perform any of his past relevant work. Finally, at step five, the ALJ determined that Santiago had the capacity to perform other types of jobs that existed in significant numbers in the national economy. [9] Therefore, Santiago was not disabled.

# IV. Legal Errors

## A. Legal Standard

### 1. Duty to Develop the Record

When the ALJ assesses a claimant's alleged disability, the ALJ must develop the claimant's medical history for at least a twelve-month period. 42 U.S.C. § 423(d)(5)(B), 20 C.F.R. § 416.912(d). Further, the Act authorizes the Commissioner to "issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation...." 42 U.S.C. § 405(d).

The Court of Appeals considers this statutory authorization to impose an affirmative duty on the ALJ to develop the record. Indeed, before a district court can evaluate the ALJ's conclusions, the court must ensure that the claimant received a full hearing. *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982) (holding that an ALJ must ensure that the claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act" (citing *Gold v. Sec'y of HEW,* 463 F.2d 38, 43 (2d Cir.1972))). Due to the "non-adversarial nature" of social security proceedings, a full hearing requires the ALJ to "affirmatively develop the record." *Echevarria,* 685 F.2d at 755. Whether or not the claimant is represented by counsel, *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999), the ALJ must contact medical sources and gather any additional information if the ALJ believes that the record is inadequate to make a determination. When the ALJ has failed to develop the record adequately, the district court must remand to the Commissioner for further development. *See, e.g., Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996).

The ALJ's duty to develop the record is further enhanced when the disability in question is a psychiatric impairment. The Regulations articulate that claims concerning mental disorders require a robust examination that is sensitive to the dynamism of mental illnesses and the coping mechanisms that claimants develop to manage them:

> Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For

Santiago v. Commissioner of Social Sec..., Not Reported in F.Supp.3d (2014)
Case 7:12-cv-06134-NSR Document 28 Filed 08/02/16 Page 66 of 72
2014 WL 3819304, 205 Soc.Sec.Rep.Serv. 527

instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress.

**\*16** 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E). Similarly, Social Security Ruling 85–15 directs the Commissioner to consider that "[d]etermining whether these individuals will be able to adapt to the demands or 'stress' of the workplace is often extremely difficult." SSR 85–15 at \*5. The Ruling explains that this difficulty arises because individuals with mental illnesses "adopt a highly restricted and/or inflexible lifestyle within which they appear to function well." *Id.* at 6. The Rulings point out that, when claimants are in structured settings, they are able to function adequately "by lowering psychological pressures, by medication, and by support from services...." *Id.*

Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination. In this circuit, the rule is robust. See, e.g., *Schaal v. Apfel,* 134 F.3d 496, 503–05 (2d Cir.1998) (remanding a case to the SSA for further development "because we are unsure exactly what legal standard the ALJ applied in weighing [the treating physician's] opinion, because application of the correct standard does not lead inexorably to a single conclusion, and because the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion as required by SSA regulations").

## 2. Treating Physician Rule

The "treating physician rule" is inextricably linked to the duty to develop the record. Under the treating physician

rule, the ALJ is required to give the medical opinion of a treating physician "controlling weight" on whether or not claimant's impairments prevented her from being able to engage in substantial gainful activity if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir.2008) (citation omitted) (alteration in original). "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999). *See also Rivera v. Comm'r of Soc. Sec.,* 728 F.Supp.2d 297, 327 (S.D.N.Y.2010) (finding the ALJ validly rejected the treating physicians' opinions because they conflicted with plaintiff's admitted daily activities and other evidence in the record; thus, remand for reapplication of the treating physician rule was not appropriate). A report by a consultative physician may constitute substantial evidence when the treating physician's opinion is inconsistent with other substantial evidence in the record. *Guzman v. Astrue,* 09 Civ. 3928(PKC), 2011 WL 666194, at \*9 (S.D.N.Y. Feb. 4, 2011).

**\*17** If the ALJ decides to discredit the opinion of a treating physician, the ALJ must follow a structured evaluative procedure, considering the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 416.927(c)(2)-(6). This process must also be transparent: the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 416.927(c) (2). Indeed, where an ALJ does not credit the findings of a treating physician, the claimant is entitled to an explanation of that decision. *Snell,* 177 F.3d at 134.

## 3. Medical Source Opinions

Consideration of the duty to develop the record, together with the treating physician rule, produces an obligation that encompasses the duty to obtain information from

physicians who can provide opinions about the claimant. The ALJ must make reasonable efforts to obtain a report prepared by a claimant's treating physician even when the treating physician's underlying records have been produced. This is, in part, because the ALJ is required to "probe into, inquire of, and explore for *all* the relevant facts," *Cruz,* 912 F.2d at 11 (emphasis supplied), and "review *all* pertinent information relative to [the claimant's] condition." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E) (emphasis supplied). *See also* 12 C.F.R. § 416.913(b)(6) (explaining that "the Commissioner "will request a medical source statement about what [the claimant] can still do despite [his] impairment(s) ..."). *See* *Jones v. Apfel,* 66 F.Supp.2d 518, 524 (S.D.N.Y.1999) (noting the regulations require the Commissioner to make "every reasonable effort" to get the necessary medical reports and remanding for failure to do so); *Cruz,* 912 F.2d at 11.

While 12 C.F.R. § 416.913(b)(6) seems "to impose on the ALJ a duty to solicit such medical opinions," the regulations also indicate that "the lack of the medical statement will not make the report incomplete." *Tankisi v. Comm'r of Soc. Sec.,* 521 F. App'x 29, 33 (2d Cir. Apr. 2, 2013). Accordingly, the Court of Appeals has held that "it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity," in cases where there is a "voluminous medical record" that permits the ALJ to make a determination as to disability. *Tankisi,* 521 F. App'x at 34.

**4. Additional Evidence**

Under 42 U.S.C. § 405(g), the Court may remand a case to the Commissioner for the consideration of new evidence if the new evidence is "material" to the disability determination and where "good cause for the failure to incorporate such evidence into the record in a prior proceeding" is shown. 42 U.S.C. § 405(g). The Court of Appeals has held that three requirements must be satisfied to remand on this ground: (1) the evidence must be new and not merely cumulative of evidence already in the record; (2) the evidence must be material, meaning relevant to the time period of denial, probative, and reasonably likely to have influenced the Commissioner to reach a different conclusion; and (3) there must be good cause for the failure to present the evidence earlier. *Mulrain v. Comm'r of Soc. Sec.,* 431 F. App'x 38, 38 (2d Cir.2011) (citing *Tirado v. Bowen,* 842 F.2d 595,

597 (2d Cir.1988)). "[M]edical evidence generated after an ALJ's decision [cannot] be deemed irrelevant solely because of timing...." *Williams v. Comm'r,* 236 F. App'x 641, 644 (2d Cir.2007) (citing *Pollard v. Halter,* 377 F.3d 183, 193 (2d Cir.2004)). Such evidence may be relevant if it "disclose[s] the severity and continuity of impairments existing [during the relevant period] or may identify additional impairments which could reasonably be presumed to have been present...." *Pollard,* 377 F.3d at 194 (quoting *Lisa v. Sec'y of Dep't of Health and Human Servs.,* 940 F.2d 40, 44 (2d Cir.1991) (quotation marks omitted)).

**B. Application**

**1. The FEGS Records and Medical Opinion Evidence**
**\*18** In his written decision, the ALJ makes no reference to any of the medical records from FEGS, to Dr. Pattem, or to Dr. Hayden. The ALJ erred by, without explanation, failing to mention these treatment records and opinions, which included an assessment that Santiago was unable to work for at least 12 months and provided a diagnosis of hypertension, depression, posttraumatic stress disorder, right shoulder pain, back pain, and hepatitis C. Without any evaluation of this evidence, the ALJ concluded that Santiago's hypertension and hepatitis C were not severe impairments. This is particularly troubling given that the FEGS records indicate that Santiago's hypertension was one of his disabling impairments.

As noted previously, there is an ambiguity in the record as to who conducted the FEGS Phase II psychiatric assessment, an ambiguity that the ALJ was obligated to resolve in order to determine the weight to afford the assessment. It appears to the Court that two physicians, Dr. Pattem and Dr. Hayden, not social workers, opined that Santiago's impairments rendered him unable to work. In her notes dated January 4, 2011, Dr. Pattem reported that Dr. Hayden had recommended SSI for chronic depression and PTSD. In addition, she indicated on the same date that Santiago was diagnosed with hypertension, depression, right shoulder pain, back pain, and a history of hepatitis C. She further noted that "substantial functional limitations to employment due to medical conditions that will last for at least 12 months and make the individual unable to work." (R. 316.)

If, as it appears, the ALJ mistakenly believed that the FEGS records were all reports by social workers, and

not physicians, such a factual error "ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered." *Zabala v. Astrue, 595 F .3d 402, 409 (2d Cir.2010).* Because the FEGS reports are significantly more favorable to Santiago, remand is appropriate.

Upon remand, the ALJ must consider how to weigh the opinions of Dr. Hayden and Dr. Pattem under the regulations for evaluating opinion medical evidence. See *20 C.F.R. § 416.927.* If necessary, the ALJ should contact these physicians to clarify the basis for their opinions, and if the ALJ concludes that the opinions are not supported by the objective medical evidence in the record, he must clearly explain this in his written decision.

> Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation, under *Schaal* and *§ [416.927(d)(2) ],* to explain why a treating physician's opinions are not being credited. The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even- and perhaps especially-when those dispositions are unfavorable.

**\*19** *Snell, 177 F.3d at 134.*

The requirement to explain the evaluation of a physician's medical opinion applies to non-treating physicians [10] as well. *See 20 C.F.R. § 416.927(c)* ("we will evaluate *every* medical opinion we receive ... [and] consider all of the following factors in deciding the weight we give to *any* medical opinion" emphasis added); *20 C.F.R. 416.927(e)(2)(ii)* ("Unless a treating source's opinion is given controlling weight, *the administrative law judge must explain in the decision the weight given* to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, *as the administrative law judge must do for any opinions from* treating sources, *nontreating sources,* and

other nonexamining sources *who do not work for us.*) (emphasis added).

Therefore, even if the ALJ determines that under the guidelines set forth in *20 C.F.R. § 416.927(c)* these opinions should be given little weight, the ALJ must provide an explanation for his reasoning. *See e.g., Colon v. Astrue,* 10 Civ. 3779(KAM), at \*11 (E.D.N.Y. Aug. 10, 2011) ("[T]he ALJ failed to give good reasons for according the non-treating physicians substantial weight."); *Featherly v. Astrue, 793 F.Supp.2d 627, 631 (W.D.N.Y. June 23, 2011)* ("[T]he ALJ must articulate her reasons for assigning the weight that she does accord to both the treating and nontreating physician's opinions.").

The Court cannot infer a reason for the ALJ's failure to address these records. *See Barbera v. Barnhart, 151 F. App'x 31, 33 (2d Cir. Oct. 4, 2005)* ("A reviewing court may not supply reasons to justify an agency determination." (citing *SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)*)).

The Court is particularly concerned about the ALJ's silence on these favorable records given that the ALJ relied significantly on the less-favorable opinions of the state physicians, who, like the FEGS physicians, examined Santiago on only a single occasion. As such, the ALJ's decision to disregard the opinions of the FEGS physicians, without *any* explanation, is troubling. Given the ALJ's failure to provide an explanation for his reasoning, the Court cannot determine whether Santiago was afforded a full and fair hearing. *20 C.F.R. § 416.927(c)(2–6).* The Court, therefore, recommends, that the case be remanded to identify the sources of the FEGS opinions and to provide a good reason for the weight given to these favorable opinions and records.

## 2. Opinions from Treating Physicians During Relevant Period

It is also unclear from the record whether the ALJ affirmatively sought a mental or physical RFC assessment or other medical opinion from either Dr. Martin or Dr. Fruitman, both of whom were treating physicians during the relevant period. While the regulations impose a duty on the ALJ to request medical opinions from treating physicians in determining a claimant's RFC, see *20 C.F.R. § 416.913(b)(6),* remand *solely* on this ground is unwarranted if there is substantial evidence in the record to support the ALJ's RFC determination. *See Tankisi, 521*

F. App'x at 34 ("[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where ... the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC].").

**\*20** Here, however, the Court is recommending remand for the proper consideration of Santiago's medical records under the treating physician rule. Therefore, the Court recommends that on remand the ALJ also seek medical opinions from Dr. Martin and Dr. Fruitman, the only physicians to have examined Santiago on multiple occasions during the relevant period. *See Peed v. Sullivan, 778 F.Supp. 1241, 1246 (E.D.N.Y.1991)* ("Because the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician. What is valuable about the perspective of the treating physician ... is his opportunity to develop an informed *opinion* as to the physical status of a patient." (citation and quotation marks omitted)). These opinions are of particular importance given the presence of mental impairments, the differing opinions regarding disability by the state physicians and the FEGS physicians, and, as will be addressed below, new evidence suggesting that Santiago's condition either was worse than thought at the time of the ALJ's decision or worsened after the relevant period.

**3. Additional Evidence**

Santiago attached several medical records to his complaint, filed on June 6, 2013, which are not found in the administrative record, and on August 1, 2013, Santiago submitted additional documents to the Court, some of which also constitute new evidence. On March 31, 2014, the Court received a final document from Santiago and interpreted this to be Santiago's response to the Commissioner's motion. Though some of the key documents submitted to the Court postdate the relevant period, the date of the documents alone is not grounds for concluding that the evidence is not relevant because a medical report that postdates the period at issue may be "pertinent evidence in that it may disclose the severity and continuity of impairment existing before [the date in question]," *Parker v. Harris, 626 F.2d 225, 232 (2d Cir.1980)*.

Some of the newly submitted medical records support Santiago's assertions of physical and mental impairments, particularly with regard to his back pain, or at a minimum suggest that his physical impairments may have worsened following the ALJ's decision. For example, in October 2012, Daniel Paniagua, a physician's assistant at West Midtown Medical Group, noted that Santiago had chronic shoulder pain that increased with activity and resulted in a decreased range of motion. He also noted back pain with a decreased range of motion.

In January 2013, an All Med physical therapist indicated that Santiago's current health status was good, but that he was unable to bend over, lift, or walk more than a block and a half. His seated balance was good and his standing balance was fair, but Santiago's endurance and ambulation were poor. Furthermore, Santiago appeared for an appointment with a nurse practitioner at All Med in July 2013, using a rolling walker. By September 2013, Santiago reported that the pain in his lower back was a 9 out of 10 on average, and significantly interfered with his activities of daily living. Santiago was taking various medications and using a cream to help control the pain. These medications provided only moderate relief and improvement in functionality.

**\*21** In 2013, Dr. Sardar described Santiago's gait as slow, and noted that he had difficulty standing and walking without an assistive device. Dr. Sardar indicated that Santiago had a decreased range of motion in his lumbar spine, with significant spasm and tenderness to palpation. He described Santiago's impairments as severe.

On February 4, 2014, a New York City notification of a work requirements determination indicated that, as of that date, Santiago had been determined to be exempt from participating in temporary assistance work because of a medical issue. No basis for the determination was provided.

The Court concludes that upon remand, the Commissioner need not consider any of the duplicative documents or those that date predate the ALJ's decision. The duplicative documents are not "new" and have already been considered by the Commissioner. Furthermore, the records that predate April 27, 2012, could have been provided to the Commissioner prior to the ALJ's decision. Santiago has offered no explanation for his failure to do so. Accordingly, there is no "good cause" for the consideration of these documents.

As for the records that postdate the decision of the ALJ, remand for consideration is appropriate, particularly given the Court's recommendation for remand on other grounds. These documents are "new" because they have not been presented to the Commissioner, and there is good cause for Santiago's failure to present the evidence to the ALJ because they were created after the date of the ALJ's decision. *See Pollard,* 377 F.3d at 193 ("Because the new evidence submitted by [the claimant] did not exist at the time of the ALJ's hearing, there is no question that the evidence is "new" and that "good cause" existed for her failure to submit this evidence to the ALJ."). Furthermore, because these records address many of the same impairments raised by Santiago, they may be "material" to Santiago's claims. These new records disclose a continuity of impairments and may shed light on the severity of the impairments prior to the ALJ's determination. *See Melvin v. Barnhart,* 02 Civ. 4527(GBD)(JCF), 2004 WL 2591948, at *6–7 (S.D.N .Y. Nov. 8, 2004) (recommending remand where the new evidence of degenerative disc disease of the cervical spine "depart[ed] significantly from the previous evaluations" ... and could be the "result of a worsening spinal condition."); *Baran v. Bowen,* 710 F.Supp. 53, 56 (S.D.N.Y.1989) (remanding for consideration of new evidence where the evidence documented the severity of the claimant's impairments, was "closely linked" to the impairments during the period, and demonstrated that the impairments had worsened contrary to the ALJ's determination of improvement). *Compare Mulrain,* 431 F. App'x at 39–40 (refusing to remand where the new evidence did not indicate that the condition was more serious than originally thought or that the condition had worsened). The documents reveal that Santiago's physical impairments, particularly his back pain, have resulted in limited mobility that requires the use of an assistive device. His pain continues to be significant and his range of motion is limited. Dr. Sardar, an examining physician, described his impairments as severe. The Court cannot say that there is no "reasonable possibility" that this newly supplied evidence would not influence the Commissioner "to decide the claimant's application differently." *Pollard,* 377 F.3d at 193, 194.

**\*22** Therefore, the Court recommends that on remand the Commissioner consider the new evidence that postdates the ALJ's decision to assess its effect on Santiago's disability determination during the relevant period.

**CONCLUSION**

The Commissioner failed to address all of the medical opinion evidence and failed to resolve ambiguities in the record as to the source of medical opinion statements, thereby leaving the Court unable to determine if the ALJ properly complied with the SSA regulations for evaluating medical opinions. Therefore, I recommend that the Commissioner's motion for judgment on the pleadings be DENIED and the case be remanded to the Commissioner for further proceedings, including the consideration of the newly submitted evidence.

\* \* \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a), (d) (adding three additional days when service is made under Fed.R.Civ.P. 5(b)(2) (C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed.R.Civ.P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Swain. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(b), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

**SO ORDERED.**

Filed July 14, 2014.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3819304, 205 Soc.Sec.Rep.Serv. 527

Footnotes

1    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967(b).

2    This is the date of Santiago's application for benefits. The earliest month for which the SSA can pay benefits is the month after the month the claimant filed his application. 20 C.F.R. § 416.335.

3    "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue,* 595 F.3d 402, 405 n. 1 (2d Cir.2010) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV"), at 34 (4th ed. rev.2000)). A GAF score from 51–60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers). A GAF score of 41–50 represents serious symptoms or any serious impairment in social or occupational functioning. The Court notes that the Fifth Edition of the DSM has discarded the use of GAF Scores. *See Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed.2013). The DSM IV, however, was in effect at the time of Santiago's treatment.

4    There is some confusion in the record as to the source of the notes for the FEGS BPS Phase II Psychiatric Consultation. The Commissioner identifies the source as Bertha Alvarez, a social worker with FEGS. Notations made by Dr. Pattem, however, suggest that Dr. Hayden completed, or at least affirmed, the determination that Santiago could not work due to depression and post-traumatic stress disorder. (*See* R. 316) ("[P]hase II psych consult by Dr. Hayden reviewed and appreciated. [R]ecommends SSI for chronic Depression and PTSD."). Furthermore, there is a note in the FEGS record that "FHayden" completed a "BPS II Exam" on January 4, 2011. (R. 338.)

5    Dr. Pattem's finding that Santiago was unable to work may prove to be a reiteration of Dr. Hayden's finding as to functional work limitations in the Phase II Psychiatric Consultation report.

6    "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable [M]edical [V]ocational guidelines." *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999) (citation and internal quotation marks omitted). Those guidelines, colloquially known as "the Grids," take into account "the claimant's residual functional capacity in conjunction with the claimant's age, education, and skill level." *Id.* (citation and internal quotation marks omitted).

7    "The term repeated episodes of decompensation, each of extended duration in the[ ] listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." If the claimant has experienced "more frequent episodes of shorter duration or less frequent episodes of longer duration, [the Commissioner] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 at § 12.00(C)(4).

8    A non-exertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments that affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, handle, and use of the fingers for fine activities." *Archambault v. Astrue,* 09 Civ. 06363(RJS)(MHD), 2010 WL 5829378, at *35 (S.D.N.Y. Dec. 13, 2010) (citation omitted), *rep. and rec. adopted by* 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011) (citation and quotation marks omitted; alteration in original).

9    The ALJ considered Santiago's age when determining the availability of jobs. (R. 23.) In his written decision, the ALJ identified Santiago as a "younger individual age 18–49," though he recognized Santiago's age to be 52. According to the Social Security Act, an individual age 52 is considered to be an individual "closely approaching advanced age." 20 C.F.R. § 416.963 ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45–49 are more limited in their ability to adjust to other work than persons who have not attained age 45.... If you are closely approaching advanced age (age 50–54), we will consider that your age along with a severe impairment(s) and limited work experience

Santiago v. Commissioner of Social Sec., Not Reported in F.Supp.3d (2014)
Case 7:12-cv-06134-NSR Document 28 Filed 08/02/16 Page 72 of 72
2014 WL 3819304, 205 Soc.Sec.Rep.Serv. 527

may seriously affect your ability to adjust to other work.") While the ALJ did not rely solely on the Grids for his determination of available work, the correct age category should be applied on remand.

10   "Nontreating source means a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." 20 C.F.R. § 416.902.

---

**End of Document**                                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.